Goutam U. Jois (N.J. Bar No. 037412007)
SIEGEL TEITELBAUM & EVANS, LLP
260 Madison Avenue, 17th Floor
New York, NY 10016
(212) 455-0300
gjois@stellp.com

Shireen A. Barday (*pro hac vice forthcoming*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2621
sbarday@gibsondunn.com

*Attorneys for Plaintiff*
*Gustavo Martínez*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GUSTAVO MARTÍNEZ<br><br>Plaintiff,<br>v.<br><br>CITY OF ASBURY PARK,<br>MONMOUTH COUNTY, BOROUGH<br>OF BELMAR, AMIR BERCOVICZ,<br>and JOHN DOE OFFICERS 1–14,<br><br>Defendants. | Civil Action No. _____<br><br>**COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>*Electronically Filed* |

Plaintiff Gustavo Martínez, through counsel located at 260 Madison Avenue, New York, New York, hereby submits this Complaint against Defendants City of Asbury Park, located at 1 Municipal Plaza, Asbury Park, New Jersey; Monmouth County, located at 2500 Kozloski Road, Freehold, New Jersey; Borough of Belmar, located at 601 Main Street, Belmar, New Jersey (collectively, the "Municipal Defendants"); Amir Bercovicz, residing in New Jersey and employed at 1 Municipal Plaza, Asbury Park, New Jersey; and John Doe Officers 1–14 (the "John Doe Defendants"), and alleges as follows:

## STATEMENT OF THE CASE

1.   A press badge should not be a bullseye.  Reporters should not be in danger of violence or arrest at the hands of the police seeking to silence their reports on public protests—especially where those reports cover police violence against civilians protesting peacefully against police misconduct.  Yet in recent weeks, reporters around the country have been targeted, attacked, arrested and locked up for doing their jobs because law enforcement does not want the world to see what these journalists are witnessing.  On June 1, 2020, Gustavo Martínez, a seasoned reporter with more than fifteen years of experience reporting on political protests, became the newest reporter to find himself in the crosshairs of police censorship.

2.   That night, at a Black Lives Matter protest in Asbury Park, New Jersey, Mr. Martínez was unlawfully tackled, arrested, detained and jailed by law enforcement while reporting on the police use of force against two teenage protesters whose screams can be heard on the footage Mr. Martínez recorded that night.  Ostensibly, Mr. Martínez was tackled and arrested by the police for being out after the town curfew went into effect, but the Proclamation of State of Emergency, which established the curfew, expressly exempted reporters, including those covering the protest. Mr. Martínez's paper, the Asbury Park Press, had confirmed with police earlier that day that they understood reporters were exempt.  Mr. Martínez wore his brightly colored press badges on a lanyard around his neck all night, so there would be no question that he was one such reporter.

3.   The video Mr. Martínez was recording and broadcasting when he was tackled by law enforcement provides chilling context to his unlawful arrest and detention.  As the arrival of police in riot gear ushered in a wave of police violence against the otherwise peaceful protesters in Asbury Park, Mr. Martínez saw the police spraying protesters with what appeared to be a chemical irritant.  As police aggression left protesters scrambling, Mr. Martínez kept hearing screams from different directions.  And he kept pivoting—trying to document what was

2

happening around him.  In the seconds before he was tackled, Mr. Martínez's camera, which had

been broadcasting through his Twitter handle (@newsguz), showed a teenage girl explaining to

police that she and her twin brother were trying to leave when her brother was suddenly tackled

to the ground by the police and handcuffed, without any apparent provocation.  The girl can then

be heard pleading "that's my brother," before a police officer grabs her and slams her to the

ground.  Mr. Martínez's footage then shows a number of law enforcement officers advancing

toward him as he continued filming.  He begins retreating, walking backwards, while still

filming the altercation between police and the teenagers.

4.     Then suddenly, Mr. Martínez heard a police officer scream, apparently in his

direction, "Fuck him!  He's the problem!"  An instant later, a large officer tackled him.  As soon

as he hit the ground, he heard: "You're under arrest!  Put your fucking hands behind your back!"

No sooner had Mr. Martínez fallen to the ground than he heard an officer yell: "Take down his

fucking phone!"  The phone was then slapped out of Mr. Martínez's hand.  On the ground, Mr.

Martínez says, "I'm a reporter, bro."  One officer responds: "Shut your mouth."  Yet another

adds: "Fuckers!"

5.     By the time New Jersey woke up on June 2, the State's chief law enforcement officer,

Attorney General Gurbir Grewal, had publicly apologized for Mr. Martínez's arrest, tweeting:

"We will also figure out why this happened and make sure it doesn't happen again.  Because in

America, we don't lock up reporters for doing their job."  Attorney General Grewal followed up

his tweet with a personal call to Mr. Martínez, during which he once again apologized to the

reporter for his treatment at the hands of law enforcement the prior night.  The charges brought

against Mr. Martínez that morning were quickly dropped.  Soon after, United States Senator

Cory Booker also issued a statement, calling Mr. Martínez's arrest "unacceptable," and saying,

"While charges have been dropped against Mr. [Martínez], incidents like this send a chilling message that runs counter to our values as Americans."

6.   Indeed, they do.  Unfortunately, we will never know what else Mr. Martínez might have recorded on the night of June 1 at the Black Lives Matter Protest in Asbury Park because his ability to report on the protest was cut short by law enforcement who did not want Mr. Martínez recording the events around him.  As Mr. Martínez would later learn, law enforcement was so serious about leaving no trace of what transpired that night that two of the officers involved in silencing him happened to have their body-worn cameras turned off during the entire incident.  Not surprisingly, law enforcement continues to stand behind a shield of silence: the Monmouth County Prosecutor's Office (the "Monmouth Prosecutor") has refused to release the names of those—or any of the other— officers involved in silencing Mr. Martínez.  The Monmouth Prosecutor has also refused to release its investigative file of "evidence" it reviewed in connection with its so-called "investigation" into the misconduct that occurred during that Black Lives Matter protest.

7.   But the Monmouth Prosecutor's whitewash does not trump the requirements of the United States Constitution and the Constitution of the State of New Jersey, which prohibit the actions taken by law enforcement the night of June 1.  Mr. Martínez now brings this action to prevent law enforcement from continuing to infringe upon the constitutional rights of reporters and others seeking to record and document political protests.  He also seeks to redress the harm unlawfully inflicted on him when law enforcement tackled, arrested, detained and jailed him, preventing him from exercising his First Amendment rights that night.

**JURISDICTION AND VENUE**

8.   The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, as the claims stated in this Complaint raise federal questions under 42 U.S.C. § 1983.

9.   The Court also has jurisdiction pursuant to 28 U.S.C. § 1367 over the claims in this Complaint arising under state law because those claims form part of the same case or controversy as the claims brought under 42 U.S.C. § 1983.

10.  Venue is proper in the District of New Jersey pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because a substantial part of the events giving rise to this claim occurred in this District and all Defendants reside in this District.

**PARTIES**

11. Plaintiff Gustavo Martínez is a multimedia journalist for the Asbury Park Press, who at all relevant times was a resident of Brick Township, in Ocean County, New Jersey.  Mr. Martínez was born in El Paso, Texas, and got his first journalism experience at age fourteen when he began covering basketball for a local magazine and radio show in Mexico City.  He was later hired by *El Diario de El Paso* when he was still a student, and he was employed there until June 2005.  Since then, he has done freelance work or been on the staff at publications such as the *El Paso Times*, *Al Dia* by the *Dallas Morning News*, *Mundo Hispanico*, *El Diario de Nueva York*, and the *Associated Press*.  Mr. Martínez has been a reporter for the Asbury Park Press since August 2019.  Mr. Martínez holds a bachelor's degree in bilingual print media from the University of Texas at El Paso and a master's degree in multimedia journalism from the Craig Newmark Graduate School of Journalism at the City University of New York, where he was elected Student Commencement Speaker of his graduating class.  Mr. Martínez has been a

recipient of the National Association of Hispanic Publications José Martí Award in 2009, 2012, and 2013 for his work on immigration and sports journalism.

12. Defendant City of Asbury Park is a municipal corporation and/or public entity organized and existing under the laws of the State of New Jersey.  The City of Asbury Park's principal offices are located at 1 Municipal Plaza, Asbury Park, New Jersey 07712.

13. Defendant Monmouth County is a municipal corporation and/or public entity organized and existing under the laws of the State of New Jersey.  Monmouth County Sheriff's Office's principal offices are located at 2500 Kozloski Road, Freehold, New Jersey 07728.

14. Defendant Borough of Belmar is a municipal corporation and/or public entity organized and existing under the laws of the State of New Jersey.  The Borough of Belmar's principal offices are located at 601 Main Street, Belmar, New Jersey 07719.  The Borough of Belmar, together with the City of Asbury Park and Monmouth County, are collectively referred to as the "Municipal Defendants."

15. Defendant Amir Bercovicz, at all relevant times, is or was the Acting Lieutenant of Patrol Squad C for the Asbury Park Police Department and a resident of New Jersey.

16. Mr. Martínez is unaware of the true names of those defendants sued as John Doe Officers 1–14 (the "John Doe Defendants"), and has therefore sued the John Doe Defendants using their fictitious names.  Upon information and belief, the John Doe Defendants are individual law enforcement officers employed by one or more of the Municipal Defendants or other law enforcement agencies who were involved in Mr. Martínez's arrest and detention, and whose identities can only be ascertained through further discovery.  The John Doe Defendants are sued in their individual and official capacities.

## FACTUAL ALLEGATIONS

### *The Morning of June 1:*
### Gustavo Martínez Is Assigned to Cover the Black Lives Matter Protest

17. On May 25, 2020, police officers in Minneapolis killed George Floyd—an unarmed Black man whose death sparked nationwide protests against police brutality and misconduct. The nation's outrage stemmed in no small part from the fact that George Floyd told the police that he could not breathe more than twenty times in the moments leading up to his death.[1]  One week later, on June 1, Mr. Martínez received a call from his editor at the Asbury Park Press.  Mr. Martínez answered that call.

18.  Mr. Martínez was tasked by his editor with documenting the Asbury Park Black Lives Matter protest that day starting around 8:00 p.m. when the City's curfew took effect.  A Proclamation of State of Emergency promulgated the same day by Asbury Park Emergency Management Coordinator, Garrett Giberson, Jr., and the Mayor of Asbury Park, John Moor, specifically exempted "credentialed members of the media" from the City's curfew so they could report on events at the protest.  (*See* Ex. A, "Emergency Proclamation" at 2.)  This press exemption cleared the way for Mr. Martínez's assignment that evening but, out of an abundance of caution, individuals at the Asbury Park Press also contacted local law enforcement to confirm that they understood the curfew exempted reporters.  Upon information and belief, the Asbury Park Press was repeatedly assured that law enforcement understood reporters were exempt from the curfew.

19.  Around 6:00 p.m., Mr. Martínez packed his gear, including his yellow bandana and reflective armbands, and headed toward the protest to relieve his colleagues who had been

---

[1]      *See, e.g.*, M. Singh, "George Floyd Told Officers 'I Can't Breathe' More Than 20 Times, Transcripts Show," The Guardian (July 9, 2020), https://www.theguardian.com/us-news/2020/jul/08/george-floyd-police-killing-transcript-i-cant-breathe.

covering the protest during the day.  Halfway through his drive, Mr. Martínez realized he had forgotten his press badges.  Mr. Martínez had two press badges: one issued by the State Police through the New Jersey Police Press Credential program and a second from the Asbury Park Press.  Mr. Martínez knew that he needed to carry his press credentials to identify himself as a reporter during the protest and remain safely in the area, so he returned home to retrieve the badges.

*Around 7:00 p.m.:*
**Gustavo Martínez First Arrives at the Black Lives Matter Protest in Asbury Park**

20. Around 7:00 p.m., Mr. Martínez arrived at the protest.  He was wearing his press badges prominently around his neck.  Mr. Martínez first met with the colleagues he was assigned to relieve at the protest before heading toward the Asbury Park Police headquarters, where a gathering of protesters had remained after the curfew.  Even as he approached the gathering of protesters, Mr. Martínez remained close to other nearby journalists as he began reporting on the events of the protest and livestreaming them from his phone.  For some time after he arrived at the protest, Mr. Martínez spoke to several law enforcement officers at the protest without incident.  At one point, he was even introduced to a police spokesperson.

*Between Approx. 9:00 p.m. and 10:00 p.m.:*
**Law Enforcement's Response to Protesters Takes a Turn for the Worse**

21. Around 9:50 p.m., a tall officer stopped Mr. Martínez on the sidewalk and asked what he was "still doing here."  Mr. Martínez told this officer that he was a journalist with the Asbury Park Press and was in the area to report on the protest.  At this time, Mr. Martínez—who was already wearing his protective gear, including a helmet, goggles, a yellow bandana, and reflective bracelets—showed this officer his press badges.  After this interaction, Mr. Martínez continued reporting the news, including recording and streaming from his iPhone a scene of police officers "taking a knee" in solidarity with protesters.  (*See* Ex. B, Martínez Video.)  For

the first time since curfew began, the police began yelling over bullhorns for protesters to leave

the area.  Officers also began to yell at individual protesters to leave, and Mr. Martínez saw more

officers enter with riot gear.

### At Approx. 10:00 p.m.:
### Law Enforcement Begins Attacking Protesters

22. At around 10:00 p.m., officers started pushing and shoving protesters and reporters

out of the area they were occupying.  Though there had been an earlier shift in the atmosphere

when the police officers began ordering people to leave, it was not until around 10:00 p.m. when

the violence really began.  Mr. Martínez continued to record the scene before him as the police

started attacking protesters.

23. Mr. Martínez turned a corner and regrouped with a few other journalists.  They

collectively continued to report, capturing video and still images of the scene unfolding before

them:  police and protesters racing across the street, people screaming, a helicopter loudly flying

above, and officers spraying the crowd with what appeared to be a chemical irritant.  Mr.

Martínez heard screams in the distance, and he and other journalists headed in that direction.

Mr. Martínez saw police officers spraying an irritant and chasing people, cursing and yelling at

them to leave the area.  Mr. Martínez saw an orange haze explode out of its canister and into the

air.  Mr. Martínez continued recording without interfering with the police officers.  And as the

police officers continued to yell that people should leave, Mr. Martínez immediately turned with

the group of retreating protesters.

24. Mr. Martínez suddenly heard a loud scream.  Still recording, he turned to see police

officers acting violently toward two teenagers.  Mr. Martínez heard a young woman say that she

and a young man were leaving when suddenly the young man was tackled to the ground and

handcuffed by several police officers.  The young woman, who Mr. Martínez later learned was

the young man's sister, tried to intervene on her brother's behalf but a police officer grabbed her and slammed her onto the ground.  Mr. Martínez livestreamed as much of the siblings' encounter with the police as he could.  Mr. Martínez's footage then shows a number of law enforcement officers advancing toward him to move him away from the incident with the teenagers.  He begins retreating, walking backwards, while still trying to film the altercation between police and the teenagers.

### *Around 10:25 p.m.:*
### Police Name Gustavo Martínez the "Problem" and then Tackle, Arrest and Detain Him, Silencing the @Newsguz Broadcast of Police Violence Against Two Teenagers

25.     While Mr. Martínez was backing away but still visibly recording the two teenagers' interactions with the police, Mr. Martínez heard, "Fuck him!  He's the problem."  A large officer tackled him.  As soon as he hit the ground, he heard: "You're under arrest!  Put your fucking hands behind your back!"  No sooner had Mr. Martínez fallen to the ground than he heard an officer yell: "Take down his fucking phone!"  The phone was then slapped out of Mr. Martínez's hand.  On the ground, Mr. Martínez can be heard in body-worn camera footage from one of the officers saying, "I'm a reporter, bro."  An officer responds: "Shut your mouth." Another exclaims: "Fuckers!"  Two of the officers, who the Monmouth Prosecutor has refused to identify, happened to have their body-worn cameras off the whole time despite regulations requiring them to activate their body-worn cameras.

26. The arresting officers handed Mr. Martínez to another officer, who took him to a van that read "Monmouth County Sheriff."  The van was surrounded by a group of officers wearing jackets emblazoned with the word "Sheriff."  One of those officers noticed Mr. Martínez's press badges and inquired about them.  Mr. Martínez identified himself as a reporter, now for the second time following his arrest.  Mr. Martínez was nevertheless stripped of his protective gear

and loaded into the van.  As the officer sat him down in the van and slammed the door shut, Mr. Martínez's press badges still dangled around his neck.

27. Mr. Martínez was driven to the nearby town of Belmar, along with other individuals arrested at the protest.  He was unloaded at the Belmar police station along with the other arrestees.  Mr. Martínez was handcuffed to a bench as the other people under arrest were being processed.  When Mr. Martínez was finally called to be processed at Belmar, the local officer taking his belongings noticed the press badges dangling from his neck.  The officer asked Mr. Martínez whether he was a reporter.  Mr. Martínez responded, now for the third time following his arrest, "Yes, I'm a reporter."  That same officer took his press badges and put them with the rest of Mr. Martínez's belongings before escorting him to his cell for the night.

28. While sitting in that cell, yet another law enforcement officer asked Mr. Martínez whether he was a reporter.  Again, Mr. Martínez responded, "yes."  This was the fourth time since his arrest that Mr. Martínez had identified himself as a reporter.  After this officer asked Mr. Martínez if he had his press badges with him, Mr. Martínez responded affirmatively and said that they had been placed with the rest of his belongings.  From the cell, Mr. Martínez asked the local officers why he had been arrested, but they said only that he was being held for the Asbury Park Police.  He asked when he would be let out, but the officers did not know or did not want to tell him.  They also did not have (or at least, were not willing to share) any information about the charges pending against him.

29. Around 12:30 a.m., an Asbury Park Police Officer arrived and took Mr. Martínez into a separate room.  In keeping with the frustrating pattern of the night, the officer asked Mr. Martínez if he was a reporter.  Mr. Martínez confirmed yet again, for the fifth time following his arrest, that he was a reporter covering the protests that night.  The officer notified Mr. Martínez

that the police were going to process him and release him soon and stated that he would receive a misdemeanor ticket.  At this point, the officer collected personal identifying information from Mr. Martínez, including his social security number, home address, and full name, before reiterating that Mr. Martínez would be ticketed for disorderly conduct.

*Around 3:30 a.m. on June 2:*
**Gustavo Martínez Receives Summons, Police Concede No Judicial Probable Cause**

30. Around 3:30 a.m., Mr. Martínez was finally released from the Belmar police station, where he was handed a summons and complaint on his way out the door.  Under oath, Officer Amir Bercovicz, the certifying officer, stated that Mr. Martínez "knowingly, purposely fail[ed] to obey an order to disperse."  (*See* Ex. C, Criminal Summons.)  Importantly, the complaint and summons notes that "a judicial probable cause determination is not required prior to the issuance of this Complaint-Summons."  Further, while the complaint states that the alleged failure to obey occurred on June 1, 2020 (and body-worn camera footage makes clear the arrest happened around 10:20 p.m. that night), the certification was not signed by Officer Bercovicz until June 2, 2020, which means that by the time Officer Bercovicz signed the complaint, Mr. Martínez had identified himself as a reporter at least five times to various members of law enforcement over at least two hours.  Mr. Martínez was picked up by his editor about twenty minutes after being released.  Upon returning home, Mr. Martínez found himself unable to sleep.  It was not until roughly 9:00 a.m. that Mr. Martínez fell asleep—over twenty-four physically and emotionally painful hours after heading out to work the day prior.

*Around Lunchtime on June 2:*
**Attorney General of New Jersey Apologizes to Gustavo Martínez on Call, Twitter**

31. Around 12:30 p.m., Mr. Martínez learned from an Asbury Park Press employee that the charges against him had been dropped.  He also discovered that he had a voicemail from New Jersey Attorney General Gurbir Grewal.  In that voicemail, the Attorney General apologized for

what happened to Mr. Martínez and asked him to return the call.  When Mr. Martínez called back around 2:00 p.m., Attorney General Grewal reiterated his apology to Mr. Martínez for the unlawful actions of law enforcement the prior night.  The Attorney General also assured Mr. Martínez that there was nothing to worry about and that the charges had been dropped.  Mr. Martínez learned from his colleagues that afternoon that Attorney General Grewal had tweeted about his arrest earlier that morning, writing: "We will also figure out why this happened and make sure it doesn't happen again.  Because in America, we don't lock up reporters for doing their job."  Later, while reading reports on the protests of the prior night, Mr. Martínez learned that United States Senator Cory Booker had also publicly condemned his arrest.  By June 3, Mr. Martínez's arrest had been chronicled in at least four media outlets.  To date, his Twitter video recording from the night of the arrest has over 57,900 viewers.

***The Morning of June 29:***
**Gustavo Martínez Participates in Congressional Briefing on First Amendment Violations**

32. Despite the outpouring of support, Mr. Martínez's sleeplessness persisted.  And so too did the physical and psychological pain.  Mr. Martínez's ordeal and unlawful arrest and detention have garnered national attention as a symbol of police abuses and disregard for the First Amendment.  On June 29, 2020, at the invitation of the Subcommittee on Civil Rights and Civil Liberties of the United States House of Representatives Committee on Oversight and Reform, Mr. Martínez participated in a briefing entitled First Amendment Violations at Black Lives Matter Protests.  During the roughly two-hour briefing, Mr. Martínez spoke to Members of Congress about his experience covering the Asbury Park protest on June 1, 2020.[2]

---

[2]        The Subcommittee has provided a recording of the Briefing online.  *See Subcommittee on Civil Rights and Civil Liberties Briefing on "First Amendment Violations at Black Lives Matter Protests"* (June 29, 2020), *available at* https://oversight.house.gov/legislation/briefings/select-subcommittee-briefing-on-first-amendment-violations-at-black-lives; *see also Activists, Journalists, and Clergy Brief Subcommittee on First Amendment Violations by Police at Recent Protests* (June 30, 2020), *available at*

33. On June 29, 2020, twenty-eight days after his arrest, Mr. Martínez, through counsel, sent letters to the Asbury Park and Belmar Police Departments and the Monmouth County Sheriff's Office notifying them that he intended to assert claims against them relating to their actions the night of June 1 in tackling, arresting, detaining and jailing him.  In the letter, Mr. Martínez, through counsel, demanded that the law enforcement offices retain all relevant documents, including copies of all body-worn camera footage.

### *The Morning of July 8:*
### **The Monmouth Prosecutor Issues "Investigative Findings" Replete with Inconsistencies and Contradictions, Cannot Identify Why Two Body-Worn Cameras Never Activated, Refuses to Provide Documents Reviewed in Investigation**

34. Roughly a week later, in an attempt to circle the wagons ahead of this lawsuit, the Monmouth Prosecutor issued a press release and a letter to Mr. Martínez purporting to release the results of an "investigation" into Mr. Martínez's unlawful arrest and detention.  (*See* Ex. D, "Investigative Findings.")  The Investigative Findings, which concede that Mr. Martínez's constitutional rights were violated and conclude only that the violation was not "intentional," also reveal that the "investigation" was a sham as evidenced by a multitude of errors and inconsistencies in the document.  For example, the Monmouth Prosecutor says that the "officers who arrested Martínez reasonably believed he was one of the protestors who failed to disperse, ***despite repeated orders to do so***, more than two hours after the expiration of a city-side curfew," but the Monmouth Prosecutor also states that the officers' "belief was reasonable ***given the brevity*** of their interaction with [Mr. Martínez] (***approximately 1 minute***)," about half of which the Monmouth Prosecutor attributes in its Investigative Findings to the arrest itself.  The Monmouth Prosecutor says further confusion arose because Mr. Martínez was "wearing a dark

---

https://oversight.house.gov/news/press-releases/activists-journalists-and-clergy-brief-subcommittee-on-first-amendment.

hooded sweatshirt and dark jeans," but then they attach a picture of Mr. Martínez to the Investigative Findings, which depicts Mr. Martínez in a gray sweatshirt with a yellow bandana and a light blue facemask.

35. Most important and most troubling, the Monmouth Prosecutor states, "there is no indication that Martínez informed the officers that he was a member of the press," but Mr. Martínez can be heard on the body-worn camera footage that was publicly posted by the Monmouth Prosecutor on YouTube *identifying himself as a reporter* to the officer who tackled him.  Law enforcement's code of silence seems to have prevented the Monmouth Prosecutor from addressing law enforcement's response, which appears nowhere in the Investigative Findings but is also audible in the same clip.  After Mr. Martínez identifies himself as a reporter, one officer snaps: "Shut your mouth," and another says "Fuckers."

36. The Monmouth Prosecutor also acknowledges that two officers (who have been referred to the Internal Affairs Unit) happened to have their body-worn cameras turned off during the whole incident.  And the limited body-worn camera footage recorded and released from that night actually shows Mr. Martínez's "press credential lanyard" prominently displayed.  While the Monmouth Prosecutor quibbles with the size of Mr. Martínez's press credentials, law enforcement in the State of New Jersey authorized and issued those credentials to Mr. Martínez; Mr. Martínez did not design or have any say so in the size or appearance of the credentials the State authorized.

37. Further, the Monmouth Prosecutor's statement that those credentials were "backwards throughout the night" cannot be squared with the confessed "brevity" of law enforcement's interactions with Mr. Martínez (roughly half of which involved tackling him), or the images from that night which were attached to the Investigative Findings and show Mr.

Martínez's credentials clearly displayed.  (Of course, the Monmouth Prosecutor does not address whether anyone other than a reporter would typically wear such a lanyard.  Nor does the Monmouth Prosecutor contend that it would be common for a protester to wear a lanyard, presumably because they cannot; body-worn camera footage from that night shows exactly the opposite.)

38. Mr. Martínez through counsel requested a copy of the "evidence" reviewed by the Monmouth Prosecutor in connection with its Investigative Findings but the Monmouth Prosecutor has refused to produce any documents in response to that request and further refuses to identify any of the officers involved.

### *The Afternoon of July 8:*
### New Jersey Attorney General Forms Working Group to Address Freedom of Press, Free Speech and Safety—Invites Gustavo Martínez to Join

39. Recognizing the numerous deficiencies in the Municipal Defendants' policies and their training and supervision of law enforcement officers, the New Jersey Attorney General announced on July 8, 2020, that he is forming a working group to "develop clear guidelines" for, among other things, "implementing additional training for police officers to handle demonstrations and protesters, including training on identifying and interacting with members of the news media at such events."  The Press Release, which acknowledges that Mr. Martínez's "mistaken arrest" had "prompted" the formation of the working group followed guidance issued from the Attorney General roughly a month earlier (on June 5), when the Attorney General announced that New Jersey would be revising its "statewide Use of Force Policy, which has not been updated in two decades."

40. During the June 5 announcement, the Attorney General also instructed all county prosecutors' offices to "remind police departments within your jurisdiction to comply with these rules," including the rule regarding "Media Covering Public Demonstrations," which requires

law enforcement officers to "allow credentialed journalists to film, broadcast, and otherwise report on these demonstrations without undue interference, and requires law enforcement "to ensure that they take all reasonable steps to safeguard the First Amendment rights of journalists." Pointedly, the June 5 guidance also explicitly stated that "***police cannot arrest journalists in retaliation for negative coverage*** or ***to prevent reporting on a public demonstration***."

41. The need for reform of police training and supervision and the policies governing police interactions with journalists is unmistakable.  If the Municipal Defendants' policies regarding training and supervision had prepared officers to deal with journalists during the predictable challenges posed by reporting on protests and similar events, this working group would be unnecessary—and Mr. Martínez would not have been forced to endure the violent arrest and violation of his constitutional rights in early June.

42. Mr. Martínez was attacked by the police while filming police brutality at a protest ***about*** police brutality.  No fewer than five law enforcement officials across three different jurisdictions ignored Mr. Martínez's repeated statements that he was a journalist—and they ignored Mr. Martínez's constitutional rights to record and report the news.

43. The past several years have seen a national swell in the frequency and scale of protests and other forms of civic action against police misconduct and other social wrongs.  This phenomenon has increased even more dramatically following the highly publicized deaths of unarmed individuals at the hands of police, including Breonna Taylor and George Floyd.  This national phenomenon has been felt in Asbury Park and other towns in Monmouth County, including at the Black Lives Matter protest that ended with Mr. Martínez's violent and unlawful arrest.  And in light of current trends in national politics and society, there is a high likelihood that protests will continue to occur for the foreseeable future.  As a working journalist who has

and will continue to cover newsworthy events in Monmouth County and its towns, Mr. Martínez faces the real and immediate, ongoing threat that he will face similar police misconduct in violation of his constitutional rights while covering protests and other events in Monmouth County, given the Municipal Defendants' custom or policy of deliberate indifference to the need to train or improve the training of their officers on the First Amendment rights of journalists and reporters, a policy that the New Jersey Attorney General acknowledges needs to be fixed. Injunctive and declaratory relief from this Court must issue to ensure that the Municipal Defendants make lasting policy changes to adequately train and supervise their officers to avoid violating Mr. Martínez's rights and the rights of other journalists.  Without such relief, the Municipal Defendants' officers will continue to act as they did on June 1, especially considering that the Monmouth Prosecutor turned a blind eye to law enforcement's infringement of reporters' constitutional rights when it "exonerated" those officers whose names the Monmouth Prosecutor will not even release publicly.

44. The United States Constitution and the Constitution of the State of New Jersey demand that journalists be able to do their jobs without fear of reprisal or violence from law enforcement.  Reporters' rights must be as ingrained in policing as Miranda rights.  On the night of June 1, they were not.  The actions taken by law enforcement that night were unconstitutional, and the individuals and departments involved should be held responsible for those trespasses.

## FIRST CAUSE OF ACTION

Against the John Doe Defendants and Amir Bercovicz

Violation of the First and Fourteenth Amendments to the U.S. Constitution
Violation of Art. I, §§ 6 and 18 of the New Jersey Constitution
Free Speech, Free Press, Free Assembly, Right to Record
(Pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2)

45. Mr. Martínez hereby repeats, re-alleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

46. In addition to protecting free speech, free press, and free assembly, the First Amendment and Article I protect the right to record as part of the public's right of access to information.  Recording police activity in public areas is a protected activity that extends beyond the press protection and expressive conduct.

47. On June 1, 2020, Mr. Martínez was lawfully exercising his First Amendment and Article I rights to free speech, free press, and free assembly, and to record police actions in furtherance of the public's right of access to information.  He was reporting on a matter of public concern in a time and at a place where he was authorized to be, including under the express terms of the Emergency Proclamation.  He was wearing his press badges issued by the Asbury Park Press and the New Jersey Press Association on Behalf of the New Jersey State Police and the New Jersey Association of Police Chiefs as he documented what he saw in real time.

48. The John Doe Defendants and Amir Bercovicz violated Mr. Martínez's First Amendment and Article I rights when they arrested him for engaging in conduct protected by the United States Constitution and the New Jersey Constitution—recording and reporting on a matter of public concern in a time and at a place where he was authorized to be.  Mr. Martínez was complying with law enforcement officers' instructions when he was arrested.

19

49. The John Doe Defendants and Amir Bercovicz's statements and actions demonstrated that they were aware Mr. Martínez was recording or broadcasting the protest.  The John Doe Defendants and Amir Bercovicz who initially arrested Mr. Martínez, as well as those who loaded him into a van for transportation, were on notice that Mr. Martínez had been exercising his federal and state constitutional rights because his press badges were visibly displayed around his neck on a lanyard and because he identified himself multiple times as a reporter, including in the presence of one officer who responded "Shut your mouth" and another who stated simply, "Fuckers."

50. The John Doe Defendants and Amir Bercovicz consciously or recklessly disregarded Mr. Martínez's rights when they willfully, deliberately, and maliciously arrested him without probable cause.  Moreover, the John Doe Defendants and Amir Bercovicz' actions in using excessive force to arrest lawfully present members of the media would chill a person of ordinary firmness from continuing to exercise his First Amendment and Article I rights.  Their actions did chill Mr. Martínez from exercising his constitutional rights.

51. The John Doe Defendants and Amir Bercovicz acted under color of state law when they prevented Mr. Martínez from exercising his First Amendment and Article I rights.

52. Accordingly, Mr. Martínez is entitled to a judgment declaring that the John Doe Defendants and Amir Bercovicz violated Mr. Martínez's rights under the United States Constitution and the Constitution of the State of New Jersey and an injunction preventing the John Doe Defendants and Amir Bercovicz from further violating his constitutional rights, applicable to all reporters, including the right to record and report the news.  The John Doe Defendants and Amir Bercovicz further damaged Mr. Martínez by causing him to suffer physical injuries, emotional distress, and mental anguish.

## SECOND CAUSE OF ACTION

Against the John Doe Defendants and Amir Bercovicz

Violation of the First and Fourteenth Amendments to the U.S. Constitution
Violation of Art. I, §§ 6 and 18 of the New Jersey Constitution
Retaliation
(Pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2)

53. Mr. Martínez hereby repeats, re-alleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

54. Mr. Martínez was lawfully exercising his First Amendment and Article I rights as he was documenting matters of public concern in his work as a journalist.

55. The John Doe Defendants and Amir Bercovicz violated Mr. Martínez's First Amendment and Article I rights when they arrested Mr. Martínez in retaliation for recording and reporting their activity—including their violent and seemingly unjustified arrest of two teenage protesters.  The John Doe Defendants and Amir Bercovicz identified Mr. Martínez as a "problem" while he was recording the police.  The John Doe Defendants and Amir Bercovicz knew or should have easily recognized that they were arresting a reporter because Mr. Martínez was wearing a lanyard with his press badges, was recording police activity, and verbally identified himself as a reporter to law enforcement who responded: "Shut your mouth" and said, "Fuckers."

56. The John Doe Defendants and Amir Bercovicz consciously or recklessly disregarded Mr. Martínez's rights when they willfully, deliberately, and maliciously arrested him without probable cause in retaliation for his recording an incident of police violence against teenagers. The John Doe Defendants and Amir Bercovicz' actions in using excessive force to arrest lawfully present members of the media would chill a person of ordinary firmness from

continuing to exercise his First Amendment and Article I rights.  Their retaliatory actions did chill Mr. Martínez from exercising his constitutional rights.

57. The John Doe Defendants and Amir Bercovicz acted under color of state law when they retaliated against Mr. Martínez for exercising his First Amendment and Article I rights as a member of the press.

58. Accordingly, Mr. Martínez is entitled to a judgment declaring that the John Doe Defendants and Amir Bercovicz violated Mr. Martínez's rights under the United States Constitution and the Constitution of the State of New Jersey and an injunction preventing the John Doe Defendants and Amir Bercovicz from further violating his constitutional rights, applicable to all reporters, including the right to record and report the news free from retaliation. The John Doe Defendants and Amir Bercovicz further damaged Mr. Martínez by causing him to suffer physical injuries, emotional distress, and mental anguish.

## **THIRD CAUSE OF ACTION**

Against the John Doe Defendants and Amir Bercovicz

Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution
Violation of Article I, § 7 of the New Jersey Constitution
Unlawful Arrest and False Imprisonment
(Pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2)

59. Mr. Martínez hereby repeats, re-alleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

60. The Fourth Amendment and Article I prohibit "unreasonable searches and seizures," which at a minimum, requires arresting officers to have probable cause that the arrestee has committed a crime.  Mr. Martínez's arrest was objectively unreasonable as it was effectuated without a warrant and without probable cause.  Nor could the arresting officers have reasonably

believed they had probable cause.  Because Mr. Martínez's initial arrest was unlawful, Mr.

Martínez's subsequent imprisonment was likewise unlawful.

61. The John Doe Defendants and Amir Bercovicz unlawfully seized Mr. Martínez when

they tackled, handcuffed, and arrested Mr. Martínez without probable cause.  Mr. Martínez had

not committed a crime and did not pose a threat to anyone.  Furthermore, Mr. Martínez was

authorized to be at the protest past curfew under the plain terms of the Emergency Proclamation

and was wearing his press badges on a lanyard around his neck at all relevant times.  The John

Doe Defendants and Amir Bercovicz consciously or recklessly disregarded Mr. Martínez's rights

when they willfully, deliberately, and maliciously arrested and imprisoned him without probable

cause.

62. The John Doe Defendants and Amir Bercovicz acted under color of state law when

they unlawfully arrested and imprisoned Mr. Martínez without probable cause.

63. Accordingly, Mr. Martínez is entitled to a judgment declaring that the John Doe

Defendants and Amir Bercovicz violated Mr. Martínez's rights under the United States

Constitution and the Constitution of the State of New Jersey and an injunction preventing the

John Doe Defendants and Amir Bercovicz from further violating his constitutional rights,

applicable to all reporters, including the right to be free from arrest and imprisonment without

probable cause.  The John Doe Defendants and Amir Bercovicz further damaged Mr. Martínez

by causing him to suffer physical injuries, emotional distress, and mental anguish.

## FOURTH CAUSE OF ACTION

Against the John Doe Defendants and Amir Bercovicz

Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution
Violation of Article I, § 7 of the New Jersey Constitution
Excessive Force
(Pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2)

64. Mr. Martínez hereby repeats, re-alleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

65. The Fourth Amendment and Article I prohibit "unreasonable searches and seizures." Mr. Martínez's arrest constituted an unreasonable seizure because the police deliberately used excessive force under the circumstances when they tackled Mr. Martínez to the ground as Mr. Martínez was complying with orders, if any, and not resisting.

66. One John Doe Defendant approached Mr. Martínez from out of his line of direct sight and tackled him to the pavement.  Several John Doe Defendants and Amir Bercovicz held Mr. Martínez down on the ground and subsequently handcuffed him, despite Mr. Martínez's conduct not inviting any sort of physical force.  The John Doe Defendants and Amir Bercovicz consciously or recklessly disregarded Mr. Martínez's rights when they willfully, deliberately, and maliciously tackled him to the ground to arrest him without justification.

67. The John Doe Defendants and Amir Bercovicz acted under color of state law when they used excessive force against Mr. Martínez.

68. Accordingly, Mr. Martínez is entitled to a judgment declaring that the John Doe Defendants and Amir Bercovicz violated Mr. Martínez's rights under the United States Constitution and the Constitution of the State of New Jersey and an injunction preventing the John Doe Defendants and Amir Bercovicz from further violating his constitutional rights, applicable to all reporters, including the right to not be subjected to arrest and injury through the

intentional use of unreasonable levels of force while complying with police orders, not resisting, and posing no danger to the police.  The John Doe Defendants and Amir Bercovicz further damaged Mr. Martínez by causing him to suffer physical injuries, emotional distress, and mental anguish.

## FIFTH CAUSE OF ACTION

Against the John Doe Defendants and Amir Bercovicz

Failure to Intervene
(Pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2)

69. Mr. Martínez hereby repeats, re-alleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

70. The John Doe Defendants who arrested and detained Mr. Martínez violated his rights under the United States and New Jersey Constitutions.  Amir Bercovicz and other John Doe Defendants, as police officers, had a duty to intervene to prevent those violations of those rights by the officers who unlawfully arrested and detained Mr. Martínez.  Despite having both a duty to intervene and more than sufficient opportunity to do so, neither Amir Bercovicz nor a single John Doe Defendant attempted to prevent or curtail the deprivation of Mr. Martínez's rights. Amir Bercovicz and the John Doe Defendants consciously or recklessly disregarded Mr. Martínez's rights when they willfully, deliberately, and maliciously failed to intervene to stop other John Doe Defendants from violating his constitutional rights.

71. Amir Bercovicz and the John Doe Defendants were acting under color of state law when they failed to intervene to prevent Mr. Martínez's unlawful treatment.

72. Accordingly, Mr. Martínez is entitled to a judgment declaring that Amir Bercovicz and the John Doe Defendants were responsible for the violation of Mr. Martínez's rights under the United States Constitution and the Constitution of the State of New Jersey and an injunction

preventing Amir Bercovicz and the John Doe Defendants from further violating their duties to intervene to prevent other officers from violating his constitutional rights, applicable to all reporters.  Officer Bercovicz and the John Doe Defendants further damaged Mr. Martínez by causing him to suffer physical injuries, emotional distress, and mental anguish.

## SIXTH CAUSE OF ACTION

Against the Municipal Defendants (City of Asbury Park,
Borough of Belmar, and Monmouth County)

Municipal Liability – Failure to Train and Failure to Supervise
(Pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2)

73. Mr. Martínez hereby repeats, re-alleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

74. As set forth above, Mr. Martínez was deprived of his federal and state constitutional rights by virtue of the John Doe Defendants' actions.

75. The John Doe Defendants are each police officers or other employees of the Municipal Defendants.

76. The Municipal Defendants' training policies were inadequate to train their officers and employees to carry out their duties at protests where credentialed journalists were expected to be in attendance or at the police stations where arrestees would be held.

77. The Municipal Defendants failed to supervise their officers and employees in carrying out their duties at protests where credentialed journalists were expected to be in attendance or at the police stations where arrestees would be held.

78. The Municipal Defendants knew or should have known that their officers and employees would confront journalists at these protests, especially considering, among other things, that Asbury Park issued the Emergency Proclamation that specifically exempted

credentialed journalists from the restrictions of the curfew, and which was specifically imposed in connection with the July 1 protest.

79. There can be little question that reporters will cover events of consequence, including protests.  The existence of the New Jersey Police Press Credential program ensures that law enforcement in New Jersey can identify journalists and tailor their interactions with them.  As such, the Municipal Defendants knew that their officers would come into contact with reporters doing their jobs at protests.  Here, law enforcement required journalists like Mr. Martínez to apply to them for a press badge, which is designed to help police identify reporters, but then ignored that press badge precisely when it mattered most.

80. It was readily foreseeable, indeed patently obvious, that the Municipal Defendants' officers or employees would violate the above-referenced constitutional rights of journalists like Mr. Martínez if they arrested them at protests, including one like the June 1 Black Lives Matter protest, where journalists were specifically privileged to be present past curfew under the Emergency Proclamation.  It was also readily foreseeable that their officers or employees would face difficult choices about how to interact with journalists at protests.

81. Further, there is no doubt that the arrest of a reporter who was not violating any law at a protest will frequently deprive that reporter of his or her rights under the United States Constitution and the Constitution of the State of New Jersey.  It is obvious that officers would need to know how to address journalists covering major events like protests.  The failure to train and supervise officers and employees on how to treat reporters in light of the obvious need to do so is reflective of Municipal Defendants' unconstitutional custom and policy of deliberate indifference to Mr. Martínez's and journalists' safety, well-being, and constitutional rights.  It is

highly likely that Defendants will continue to violate journalists' constitutional rights without adequate training and supervision.

82. Accordingly, Mr. Martínez is entitled to a judgment declaring that the Municipal Defendants proximately caused the violation of Mr. Martínez's rights under the United States Constitution and Constitution of the State of New Jersey based on their failure to adequately train and/or supervise their law enforcement officers and an injunction preventing the Municipal Defendants from further violating his rights, applicable to all reporters. The Municipal Defendants further damaged Mr. Martínez by proximately causing him to suffer physical injuries, emotional distress, and mental anguish.

## PRAYER FOR RELIEF

WHEREFORE, Mr. Martínez respectfully requests that this Court enter judgment in his favor and, in addition:

A. Declare that the prohibition on Mr. Martínez's protected free speech and free press rights in a public forum on June 1, 2020, while Mr. Martínez was acting as a journalist for the news media, violated the First and Fourteenth Amendments to the United States Constitution and Article I, Sections 6 and 18 of the New Jersey Constitution;

B. Declare that Mr. Martínez's arrest and detention were unreasonable and unlawful and violated Mr. Martínez's rights under the Fourth and Fourteenth Amendments to the United States Constitution and Article I, Section 7 of the New Jersey Constitution;

C. Declare that the arrest and detention that violated Mr. Martínez's rights under the United States and New Jersey Constitutions were proximately caused by the failure of the City of Asbury Park, Monmouth County, and the Borough of Belmar to adequately train or supervise their officers;

D.    Declare that there must be a reform in policing policy to prevent further unwarranted arrest, harassment, or violence against journalists reporting on police activity;

E.    Enjoin Defendants and their employees, agents, and assigns, from restricting or prohibiting Mr. Martínez or any other persons from engaging in protected free speech or free press activity, including but not limited to recording police activity in public spaces in Asbury Park, except when such activities are prohibited by valid law or local ordinance;

F.    Award Mr. Martínez appropriate compensatory damages, punitive damages, and prejudgment interest in an amount to be proven at trial;

G.    Award Mr. Martínez reasonable attorney's fees and costs under 42 U.S.C. § 1988 and N.J.S.A. 10:6-2; and

H.    Grant any other relief the Court deems just and proper.

Mr. Martínez demands a trial by jury.

Dated: July 13, 2020
       New York, New York

By:  _s/ Goutam U. Jois_              

| | |
|---|---|
| Shireen A. Barday* | Goutam U. Jois (N.J. Bar No. 037412007) |
| GIBSON, DUNN & CRUTCHER LLP | SIEGEL TEITELBAUM & EVANS, LLP |
| 200 Park Avenue | 260 Madison Avenue, 17th Floor |
| New York, NY 10166 | New York, NY 10016 |
| (212) 351-2621 | (212) 455-0300 |
| sbarday@gibsondunn.com | gjois@stellp.com |
| | |
| *_pro hac vice_ application forthcoming | _Attorneys for Plaintiff_ |

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

Pursuant to Local Civil Rule 11.2, undersigned counsel for Plaintiff hereby certifies under penalty of perjury under the laws of the United States of America that the matter in controversy here is not the subject of any action pending in any other court, arbitration, or administrative proceeding.

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1</u>

Pursuant to Local Civil Rule 201.1, undersigned counsel for Plaintiff hereby certifies that this action is excluded from compulsory arbitration because it is based on an alleged violation of a right secured by the Constitution of the United States.

*s/ Goutam U. Jois*

Goutam U. Jois (N.J. Bar No. 037412007)
SIEGEL TEITELBAUM & EVANS, LLP
260 Madison Avenue, 17th Floor
New York, NY 10016
(212) 455-0300
gjois@stellp.com