# EXHIBIT D



**OFFICE OF THE COUNTY PROSECUTOR**
**COUNTY OF MONMOUTH**

132 JERSEYVILLE AVENUE
FREEHOLD, NJ 07728-2374

**(732) 431-7160**

CHRISTOPHER J. GRAMICCIONI
MONMOUTH COUNTY PROSECUTOR

LORI LINSKEY
FIRST ASSISTANT PROSECUTOR

MICHAEL J. WOJCIECHOWSKI
DEPUTY FIRST ASSISTANT PROSECUTOR

JOHN G. McCABE JR.
CHIEF OF DETECTIVES

**July 8, 2020**

Via Email (gmartinez@gannettnj.com) & Regular Mail
Gustavo Martinez



Re:     **Investigative Findings**
        **MCP2000254**

Dear Mr. Martinez:

Thank you for meeting with us on June 8, 2020.  As you are aware, after your arrest on June 1, 2020, following the protest in Asbury Park, our office conducted an investigation into the circumstances surrounding your arrest.  Specifically, it was alleged by members of the public that you were arrested due to your status as a reporter or to prevent you from performing your job as a member of the press in the aftermath of the protest. The New Jersey Attorney General's Office also requested that we commence a review as they were also contacted after your arrest. We have concluded our review and wish to make you aware of our findings that will be released publicly due to the intense community interest surrounding this incident.

On June 1, 2020, you were arrested by members of the Asbury Park Police Department and charged on a summons with violating N.J.S.A. 2C:33-1b, for knowingly or purposely failing to obey an order to disperse.  Your arrest occurred at the end of a scheduled protest in the City of Asbury Park when police were attempting to disburse a large crowd and enforce a city-mandated curfew.  Subsequent to your arrest, we exercised our prosecutorial discretion and had the charge against you was dismissed due to the fact that at the time of your arrest, you were working as a reporter for the Asbury Park Press.

Our investigation was comprehensive, and included the interviews of 21 people, including 14 law enforcement officers from various agencies in Monmouth County, as well as a review of body worn camera (BWC) footage and social media footage (your Twitter footage) captured during the protest.

Based on our review, we have determined that there is no evidence to suggest that the Asbury Park Police Officers who arrested you did so because you were a reporter or to prevent you from performing your duties as a member of the press. To the contrary, the officers who arrested you believed that you were a protester who had disobeyed numerous orders to disperse for more than two hours after the expiration of the City-wide curfew, and during a time when the scene had become dangerous for all present. While the officers' belief that you were a protester turned out to be incorrect, their belief was reasonable given the brevity of their interaction with you (approximately 1 minute), your dark clothing, the poor lighting in the area, your positioning alongside other protesters, and the absence of clearly identifiable press credentials, which the video footage reveals to have been backwards throughout the night.[1] In contrast, other journalists were visible on BWC footage from that night, often standing off to the side apart from the protesters, wearing bright neon vests and/or carrying large camera equipment, making them easily identifiable as reporters.

Our conclusion in no way seeks to diminish what must have been an unpleasant experience for you. We fully support and embrace the First Amendment Protections that journalists have to report the news and would condemn any attempt to violate these important constitutional safeguards. However, a thorough and detailed analysis of all of the facts of this matter reveals that what occurred here was not an intentional infringement upon the First Amendment, but a reasonable and justifiable arrest when viewed under the totality of the circumstances. Accordingly, the officers involved in your arrest are *exonerated* of the allegation that they unlawfully arrested you due to your status as a reporter or to prevent you from performing your duties as a member of the press.

Please be advised that while our review is complete and we are closing our file, our investigation revealed that two officers did not properly activate their BWCs which may violate agency protocol. Accordingly, that issue will be referred to the Asbury Park Police Department's Internal Affairs Unit for its review and any administrative action that agency deems appropriate.

CHRISTOPHER J. GRAMICCIONI
MONMOUTH COUNTY PROSECUTOR

By:     Melanie Falco
        Director, Professional Responsibility and Bias
        Crime Bureau

cc: Jose D. Roman, Esq. (via email at jroman@lawppl.com)

---

[1] See *Reporters Committee for Freedom of the Press; Police, Protesters and the Press* (2020), at p. 1[1] as well as the *Reporters Committee Tip Sheet*[1] (stating that to avoid being mistaken for a protester, reporters should avoid wearing all black, promptly comply with dispersal orders, and prominently display their press credentials, as well as suggesting they team up with another reporter).



**_Monmouth County Prosecutor's Office_**
_Prosecutor Christopher J. Gramiccioni_

**FOR IMMEDIATE RELEASE:**                                   **CONTACT:** Public Information Office
July 8, 2020                                                         Charles Webster/Chris Swendeman
www.mcponj.org                                            Desk: (732) 431-7160 ext. 7535/6468
pio@mcponj.org                                    Mobile: (732) 637-3382/ (732) 567-9768

### INVESTIGATIVE FINDINGS: ASBURY PARK OFFICERS REASONABLY BELIEVED REPORTER WAS A PROTESTER FAILING TO DISPERSE

     FREEHOLD – A comprehensive internal affairs investigation into the June 1, 2020 arrest of Asbury Park Press (APP) reporter Gustavo Martinez has determined that arresting officers had no knowledge they were apprehending a reporter, announced Monmouth County Prosecutor Christopher J. Gramiccioni. The investigation consisted of the interviews of 21 people, including 14 law enforcement officers and Martinez, and review of body worn camera (BWC) footage and social media footage captured during the protest. The investigation revealed that the officers who arrested Martinez reasonably believed he was one of the protestors who failed to disperse, despite repeated orders to do so, more than two hours after the expiration of a city-wide curfew. "We fully support and embrace the First Amendment protections that journalists' have to report the news. Our investigative findings are in no way inconsistent with those important constitutional safeguards," said Gramiccioni. A summary of the investigations findings are outlined below.[1]

### June 1, 2020 Peaceful Protest – Asbury Park

     On June 1, 2020, at 5:00 p.m., a peaceful protest occurred in the City of Asbury Park ("the City"). Like many nationwide, the protest occurred in the wake of the death of George Floyd, who died while being arrested by members of the Minneapolis Police Department. One hour before the protest was scheduled to take place, the City issued a curfew commencing at 8 p.m. The Emergency Proclamation establishing the protest stated the curfew was being issued because many of the nationwide protests had turned violent. The Emergency Proclamation further indicated that credentialed members of the media were exempt from the city-wide curfew. See Exhibit 1.

     The protest was peaceful for the majority of the night. While exact numbers are unknown, it is estimated that several thousand people were present at the height of the protest. Law enforcement officers from throughout Monmouth County and the New Jersey State Police (NJSP) were on hand to ensure the safety of the protest. From the time that the protest ended at 8:00 p.m., until approximately

---

[1] This investigation was undertaken not because of any direct complaint filed against any individual officer, but due to a number of broader citizen inquiries into the arrest of a journalist the night of the protest. To date, Martinez has not filed a formal complaint against any of the officers involved with either our Office or the Asbury Park Police Department. Because the officers involved are exonerated, their identities are not disclosed. Moreover, since the conduct of the officers was reasonable and warrants no discipline, it would not fall under the purview of AG Directive 2020-5 dictating the public disclosure of the identities of officer who commit serious disciplinary violations.

10 p.m., police officers repeatedly issued verbal orders to protestors via loudspeaker to disburse and leave the area due to the curfew.  Most people still lingering in Asbury Park after the protest ended heeded requests to disperse the area in compliance with the curfew.

### Violations of Curfew Order

Approximately 200 people refused to comply with officers' requests to disburse and leave the area as mandated by the 8 p.m. curfew.  Officers continued to use public address systems in patrol cars and were giving verbal orders imploring observance of the curfew.  In contrast to the peaceful protesters who filled the streets earlier in the evening, multiple accounts paint a far different landscape of those who remained past curfew.  Many of the remaining protestors were taunting and threatening officers, were unruly, and some threw water in officers' faces.  At approximately 10:00 p.m., the Monmouth County Rapid Deployment Force (RDF) and the NJSP Mobile Field Force were jointly deployed to disperse the crowd.  Officers are heard in BWC footage pleading with protesters to leave the area and go home.  Many citizens who had not yet retreated from the streets were filming the chaotic scene on their cell phones.

By approximately 10:16 p.m., the scene had shifted drastically from the earlier peaceful protest to what officers described as a "riot."  Protesters began throwing large rocks, some the size of baseballs, and other objects at officers and at their police vehicles.  See Exhibit 2.  Police in riot gear were using their shields to protect themselves and fellow officers who were in basic uniforms without enhanced protection.  All of the officers who were interviewed described the scene in the same manner as "nerve-wracking," "dangerous," "chaotic," "violent," and "very scary."  During his interview with our office, Martinez similarly described the scene as "chaotic" and full of "commotion."  At least two officers required medical attention for injuries sustained from the projectiles being thrown by the crowd, one received stitches in his chin due to a laceration and the most seriously injured officer sustained a skull fracture after being hit in the face with a rock.

### Press Presence at the Protest & After Curfew

Given the large number of people participating in the Asbury Park protest, as well as the international attention on protests following the death of George Floyd, it is not surprising that the event was heavily covered by members of the press from numerous media outlets.  Notably, not all journalists present were readily identifiable as members of the press.  While some journalists are seen on BWC and cell phone footage that evening wearing fluorescent vests emboldened with the word "PRESS" visible to all and/or were also carrying large cameras consistent with what news outlets use, not all journalists were easily recognizable as members of the press.  Martinez, unfortunately, was one such journalist whose affiliation with a news organization was extremely difficult to discern.

In light of the specific allegations made that necessitated this review – that Martinez was arrested because he was a journalist – it is relevant and necessary to examine whether his profession as a reporter covering this event was directly linked in any manner to his arrest.  Martinez told detectives conducting this review that his employer, the APP, assigned him to cover the post-curfew protest from 8:00 p.m. onward.  Martinez is observed in BWC footage that night wearing a dark hooded sweatshirt and dark jeans.  He was also wearing goggles, a mask, a black helmet and a gray backpack.  See Exhibits 3-5.  Martinez wore a lanyard around his neck with his press credentials - about the size of a deck of playing cards - that had his picture and the words 'PRESS' on one side, and the other side blank with no writing on the back.  Martinez was filming the event on his cell phone.  When asked by detectives whether his employer provided him with any specific clothing or equipment, Martinez said they did not, but said that his editor did advise him to bring protective gear.

2

One such encounter, prior to Martinez's arrest, shows him engaged in dialogue with one officer who is asking protesters to leave the area. The officer calmly engages Martinez in dialogue, believing him to be a protester. During this encounter, Martinez's lanyard containing his press credentials is seen hanging backwards with the blank side facing outward. See Exhibit 6.[2] Even if the officer deduced from their conversation that Martinez was a member of the press at that earlier point in time, Martinez had contact with multiple police officers later in the evening who were unaware he was a reporter.

### The Events Leading Up to the Arrest of Martinez

At 10:22:09 p.m., Martinez is observed on BWC footage near the train tracks on Memorial Drive immersed within the crowd of protesters being walked back by the line of police officers from the Monmouth County RDF and the NJSP Mobile Field Force. Martinez is depicted walking backwards while filming the police officers with his cellular phone. Again, his press credential lanyard is seen on the footage hanging backwards, with the blank side facing outward. See Exhibit 6.

At 10:24:20 p.m., an officer arrests a female on Memorial Drive. A second officer who was nearby the arrest of the female simultaneously is shown arresting a male subject. A third police officer, accompanied by a fourth officer, observed Martinez walking towards the first two officers who were effectuating the arrests, while recording on his cell phone. See Exhibit 6. The third officer, who believed Martinez was a protester, had just ordered Martinez to move from the area. A group of 3-4 protesters, including Martinez, gathered near the arrests. Other officers in the area became concerned for the officer arresting the female because the officer's back was to the crowd of protesters that was forming, and this was occurring in the general area where rocks had been thrown at police. These events are also confirmed on Martinez's own cell phone recording that night he posted on Twitter. Moreover, there is no indication that Martinez informed the officers that he was a member of the press when the officers told him to leave. Rather, he continued backing away from the officers making the arrests, while continuing to face them to record. It is at this point that Martinez is arrested, and the interactions of the two officers with Martinez at the time of his arrest lasted approximately one minute.

### Review of BWC Footage of the Arrest

The arrest of Martinez was captured on the body worn camera of one of the officers who arrested him. See Exhibit 7.[3] During that encounter, once again, Martinez's press credentials are backwards, the blank side facing forward. The area is dark, poorly lit, and loud with yelling going on during the melee. Martinez is heard saying something during his arrest, but what he is saying is indiscernible and difficult to hear. Detectives reviewing the footage could only make out that Martinez said "*I'm a [inaudible]*." Martinez is wearing a mask, is positioned face down, and there is a lot of commotion making hearing his exact words difficult for both the arresting officers and detectives who reviewed the clip multiple times. After Martinez is handcuffed, the officer advises him that he is going to roll him on his side and to get up on his right knee so the officer can help him up. Notably, after being helped to his feet, Martinez never indicates to either officer he is a member of the press.

---

[2] The BWC initially captured video of the encounter due to a recording latency common to the Panasonic Arbitrator BWC. The BWC, however, has pre-event recording function capabilities that captured 30 seconds of video footage prior to the officer's activation of the recording function on the device. As a result, the BWC footage did not initially capture via audio the interaction between Martinez and the officer.

[3] The arrest of Martinez begins on the BWC footage at approximately 10:23:15 and the interaction lasts less than 30 seconds.

In his reporting, Martinez alleged that his cell phone was purposely knocked out of his hands during the arrest, but the two officers involved contend it fell during the arrest.  The BWC footage does not clarify this point, but one officer is seen retrieving the phone and placing it in Martinez's pocket after Martinez was helped to his feet.  See Exhibit 7.  Both officers assert they did not know Martinez was a reporter, nor did they ever hear him say that he was with the press.  The officers interviewed as a part of this investigation indicated that had they realized that Martinez was a reporter, they likely would have asked him to stand to the side.

After his arrest, Martinez was turned over to other officers, was walked to the transport van and later processed at the Belmar Police Headquarters.  Martinez had contact with three officers in the course of being transported to Belmar, but did not indicate to any of them he was a reporter.  While being processed in Belmar, Martinez indicated he was a reporter only after an officer took possession of is property, saw his lanyard, and specifically asked Martinez if he worked for the APP.  These officers, however, were unaware of the specific circumstances that led to his arrest.  Martinez was issued a summons for failing to obey an order to disburse.  See Exhibit 8.  These charges were dismissed later that same morning.  See Exhibit 9.

### Investigation of the Arrest of Martinez

This office immediately initiated an internal affairs investigation into this incident after receiving numerous complaints from citizens regarding the arrest of a journalist the morning after the protest.  The New Jersey Attorney General's Office also contacted our office to request that we conduct an internal affairs review of the matter and dismiss the summons filed against Martinez.  However, our office had already taken steps to do both before receiving that request.  See Exhibit 9.

In addition to interviewing Martinez, the Professional Responsibility Unit interviewed 14 police officers who were involved in or were in the vicinity of the arrest. They also interviewed another APP reporter who had spent part of the evening working with Martinez.  Detectives also reviewed Martinez's Twitter video from the protest, the BWC footage of arresting officers, the June 1, 2020 Emergency Proclamation creating the curfew, the summons issued to Martinez, police reports of the arresting officers and Martinez's June 3, 2020 article recounting his arrest.  The investigative team also reviewed the *Reporters Committee for Freedom of the Press; Police, Protesters and the Press* (2020), at p. 1[4] as well as the *Reporters Committee Tip Sheet* for reporters covering protests.[5]

### Investigative Conclusions

Martinez was not arrested because he was a reporter or in an effort to prevent him from performing his job as a member of the press.  Rather, Martinez was arrested because police officers believed him to be a protester who had disobeyed numerous orders to disperse more than two hours after the expiration of the curfew.  The officers' beliefs, under the circumstances, were reasonable.

Although we agree that in the interest of justice and in an exercise of our prosecutorial discretion that the dismissal of the summons was appropriate under the circumstances, our investigation also revealed that the officers who arrested acted reasonably in effectuating the arrest.  While the city-issued Emergency Proclamation exempted credentialed press from the curfew, it did

---

[4] https://www.rcfp.org/wp-content/uploads/2020/06/Police-Protesters-Press-2020.pdf

[5] https://www.rcfp.org/wp-content/uploads/imported/20180614_100229_rcfp_protest_tip_sheet_0618.pdf

not create a similar exemption for other laws such as the failure to disburse.  See N.J.S.A. §2C:33-1B.  Nor is there a blanket prohibition on the arrest of a reporter.[6]

The Reporters Committee noted in its article that, "[j]ournalists recording protest activities can increase their chances of First Amendment protection and reduce their risk of arrest by identifying themselves as press, not interfering with law enforcement, and recording from a safe distance, if possible."[7]  Additionally, the Tip Sheet prepared for journalists by the Reporters Committee notes, "to avoid being mistaken for a protester, use your best judgment and try not to wear clothing that matches what protesters are wearing (e.g. all black). Also, engage with police before the protest so they know who you are and may be less likely to arrest you."  Importantly, the Tip Sheet also notes, "If police issue a dispersal order or give any other directives, promptly comply and prominently display your press credentials."

In this case, Martinez was not recognizable to officers at the protest as a reporter due, in large part to his attire and the absence of clearly identifiable press credentials.  This is especially apparent when compared to the other journalists seen on BWC footage that night wearing bright neon vests clearly identifying them as reporters.  This conclusion in no way seeks to diminish what must have been an unpleasant experience for Martinez.  However, in light of what is seemingly standard protocols for journalists covering public protests, and what was exhibited by the majority of journalists from other news outlets covering the event, Martinez was not outfitted with the gear or resources to clearly make his identity known to law enforcement officers that night.  Although his credentials may have been appropriate and identifiable when seeking entry to a public building during daylight hours, in combination with this attire, at night in poorly lit areas, they were not sufficient.

We have concluded that the officers who arrested Martinez are exonerated of the allegations that the arrest was made because he was a journalist in an effort to prevent him from reporting.  During the course of our investigation, we determined that in two instances BWCs were not activated pursuant to standard operating procedure.  These findings in no way limited the ability of the investigative team to reach these conclusions.  That aspect of this investigation will be referred back to the Asbury Park Police Department for their review in accordance with their policies and procedures.

The Attorney General's Office of Public Integrity and Accountability (OPIA) reviewed this IA investigation and agreed with its findings and conclusions.

---

[6] See State v. Lashinsky, 81 N.J. 1, 14-15 (1979) upholding a reporter's conviction for disorderly persons offense for failure to obey an officer's order to move away from a serious motor vehicle accident.

[7] In Higginbotham v. Sylvester, 741 F. App'x 28 (2d Cir. 2018), a video journalist challenged his arrest, claiming it was in retaliation for recording a protest. The Second Circuit found that no reasonable jury could find that the police had arrested him due to his recording activity as opposed to his reckless endangerment of others.

<u>List of Exhibits</u>

<u>Exhibit 1</u> – City of Asbury Park Emergency Proclamation
<u>Exhibit 2</u> – photograph of rocks thrown at police officers
<u>Exhibits 3-5</u> – screenshot depictions of Martinez and his attire during the protest
<u>Exhibit 6</u> – **<u>BWC footage of APPD officer</u>**
<u>Exhibit 7</u> – **<u>BWC footage of APPD officer</u>**
<u>Exhibit 8</u> – Martinez Criminal Summons
<u>Exhibit 9</u> – Martinez Request to Dismiss Summons
<u>Exhibits 10-12</u> – screenshot depictions of visibly identified members of the press

# # #



## PROCLAMATION OF STATE OF EMERGENCY
## TO ALL CITIZENS AND PERSONS WITHIN THE CITY OF ASBURY
## PARK AND TO ALL DEPARTMENTS, DIVISIONS AND BUREAUS OF THE
## MUNICIPAL GOVERNMENT OF THE CITY OF ASBURY PARK:

**WHEREAS,** peaceful assemblies are the lifeblood of our democracy based on the Constitutional rights guaranteed to all citizens of the United States of America; and

**WHEREAS,** in the past week, individuals have engaged in legal and peaceful protests throughout the nation; and

**WHEREAS,** during the same timeframe, certain individuals have engaged in behavior that has endangered the health and safety of residents of their respective cities; and

**WHEREAS,** the civil disturbances have continued and grown nationally and in the State of New Jersey, endangering lives and property; and

**WHEREAS,** on June 1, 2020 a peaceful protest is scheduled at 801 Bangs Avenue in Asbury Park in support of social justice and police accountability; and

**WHEREAS,** the City of Asbury Park, its Mayor and Council, and the Asbury Park Police Department stand in full solidarity with the Asbury Park community in promotion of a peaceful demonstration; and

**WHEREAS,** the City of Asbury Park, its Mayor and Council and the Asbury Park Police Department denounce the actions of the officers involved in the murder of George Floyd and any acts of police misconduct; and

**WHEREAS,** in order to protect the safety of the organizers and attendees of the peaceful demonstration on June 1, 2020, certain precautionary safety measures must be taken; and

**WHEREAS,** pursuant to the powers vested in me by **N.J.S.A. App. A:9-40.5** and by ordinances adopted by the City of Asbury Park, and other relevant authority, I have the authority to declare a **STATE OF LOCAL DISASTER EMERGENCY** within the City of Asbury Park; and

**WHEREAS,** the aforesaid laws authorize the promulgation of such orders, rules, regulations, and emergency management operations as are necessary to meet the various problems which have or may be presented by such an emergency.

Ex. 1

**NOW, THEREFORE, IN ACCORDANCE WITH** the aforesaid laws, given current exigent circumstances, I do hereby declare, in order to continue to protect the residents of the City of Asbury Park, the following:

1. That a **STATE OF LOCAL DISASTER EMERGENCY** exists within the City of Asbury Park

2. As part of the **STATE OF LOCAL DISASTER EMERGENCY**, a limited curfew is imposed for the City of Asbury Park beginning at 8:00 p.m. on Monday, June 1, 2020 and shall expire on Tuesday, June 2, 2020 at 5:00 a.m. unless further extended.

   a. During the hours of curfew, all persons are prohibited from using, standing, sitting, travelling or being present on any public street or in any public place, including for the purpose of travel, with the following exemptions:

      i. All law enforcement, firefighters, paramedics or other medical personnel, as well as any other emergency response personnel authorized by the State of New Jersey, and credentialed members of the media.

      ii. Individuals traveling directly to and from work; attending religious services; commercial trucking and delivery services; obtaining food; caring for a family member, friend, or animal; patronizing or operating private businesses; seeking medical care or fleeing dangerous circumstances; and travel for any of the above services.

   b. For purposes of this order, "travel" includes, without limitation, travel on foot, bicycle, skateboard, scooter, motorcycle, automobile, or public transit, or any other mode of transporting a person from one location to another.

   c. For purposes of this order, "public place" means any place, whether on privately or publicly owned property, accessible to the general public, including but not limited to public streets and roads, alleys, highways, driveways, sidewalks, parks, vacant lots, and unsupervised property.

   d. For purposes of this order, "exempt care" means necessary medical services for an individual's self or family member.

Emergency Management Coordinator
City of Asbury Park

Date 6-1-2020

Mayor
City of Asbury Park

Date 6-1 2020

2



Ex. 2



Ex. 3

31

Ex. 4

Ex. 5

# COMPLAINT - SUMMONS

| COMPLAINT NUMBER | | | | THE STATE OF NEW JERSEY |
|---|---|---|---|---|
| **1303** | **S** | **2020** | **000783** | *VS.* |
| COURT CODE | PREFIX | YEAR | SEQUENCE NO. | **GUSTAVO  MARTINEZ** |

**ASBURY PARK MUNICIPAL COURT**
**ONE MUNICIPAL PLAZA**
**ASBURY PARK          NJ   07712-0000**
**732-775-1765**  COUNTY OF:  **MONMOUTH**

ADDRESS

| # of CHARGES | CO-DEFTS | POLICE CASE #: |
|---|---|---|
| 1 | | **20AP11948** |

COMPLAINANT NAME: **AMIR       BERCOVICZ**
**ONE MUNICIPAL PLAZA**
**ATTN RECORD BUREAU**
**ASBURY PARK            NJ   07712**

DEFENDANT INFORMATION
SEX: **M**  EYE COLOR: **BROWN**          DOB:
DRIVER'S LIC. #:                                          DL STATE:  **NJ**
SOCIAL SECURITY #: **xxx-xx-**          SBI #:
TELEPHONE #:                ( )
LIVESCAN PCN #:

By certification or on oath, the complainant says that to the best of his/her knowledge, information and belief the named defendant on or about **06/01/2020** in      **ASBURY PARK CITY**          ,     **MONMOUTH**  County, NJ did:
WITHIN THE JURISDICTION OF THIS COURT, KNOWINGLY, PURPOSELY FAIL TO OBEY AN ORDER TO DISPERSE.

in violation of:

| Original Charge | 1) **2C:33-1B** | 2) | 3) |
|---|---|---|---|
| Amended Charge | | | |

**CERTIFICATION:**
I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Signed: _____ **AMIR    BERCOVICZ** _____          Date: __ **06/02/2020** __

The complaining witness is a law enforcement officer and a judicial probable cause determination is not required prior to the issuance of this Complaint-Summons.

**SUMMONS**
YOU ARE HEREBY SUMMONED to appear before the   **Municipal Court**      in the county of:   **MONMOUTH**
at the following address:  ASBURY PARK MUNICIPAL COURT
**ONE MUNICIPAL PLAZA**                                        **ASBURY PARK**          **NJ** 07712-0000
If you fail to appear on the date and at the time stated below, a warrant may be issued for your arrest.

Date of Arrest:   **06/01/2020**   Appearance Date:   **06/12/2020**   Time: **10:00AM**   Phone: **732-775-1765**

Signature of Person Issuing Summons: _____ **AMIR       BERCOVICZ** _____          Date:   **06/02/2020**

| ❑ **Domestic Violence – Confidential** | ❑ **Related Traffic Tickets or Other Complaints** | ❑ **Serious Personal Injury/ Death Involved** |
|---|---|---|

Special conditions of release:
❑ **No phone, mail or other personal contact w/victim**
❑ **No possession firearms/weapons**
❑ **Other (specify):**

**ORIGINAL**

Page **1** of **7**

Ex. 8

## REQUEST TO DISMISS OR VOID COMPLAINT

ALL DISMISSALS AND VOIDS TO BE PLACED ON THE
RECORD IN OPEN COURT, PER DIRECTIVE #02-08

### ASBURY PARK MUNICIPAL COURT

#### FORM TO BE DISMISSED OR VOIDED:

☐ Uniform Traffic Ticket # _____

☐ Special Form of Complaint # _____

☒ CDR # _S – 2020 – 783_____

**CHECK ONE BOX ONLY:**

☒ DISMISSAL REQUEST: The undersigned has issued the
above referenced ticket or complaint and requests that the ticket
or complaint be DISMISSED because:
_Accused Failed To identify As A Reporter_

_After identified Request Dismissal_

☐ VOID REQUEST: The undersigned states that the above
ticket or complaint was spoiled, not completed or lost and
requests that it be VOIDED because:

_____

_____

Replacement ticket/complaint number(s), if any:

**CERTIFICATION:**
I certify that the foregoing statements made by me are true. I am
aware that if any of the foregoing statements made by me are wilfully
false, I am subject to punishment.

6 / 2 / 20
Date of Request          Signature & Badge # of Officer/Requestor

**OFFICER SUPERVISOR REVIEW:**
I have reviewed and approved the above request to
**dismiss** or void the above complaint.

6/2/2020
Date of Review          Signature of Police Chief (or Supervisor)

**REVIEW REQUEST TO DISMISS BY MUNICIPAL PROSECUTOR:**

☐ **DISMISSAL RECOMMENDED**

_____
Date          Municipal Court Prosecutor

(1) All copies of the Uniform Traffic Ticket/Special Form of Complaint/CDR to
be VOIDED MUST be attached to this request.
(2) All copies (EXCEPT defendant copy) of the Uniform Traffic Ticket/Special
Form of Complaint/CDR MUST be attached to the DISMISSAL request.
(3) Officer may retain photocopy of request for police records.
(4) Municipal Prosecutor may retain copy for prosecutor records.

Ex. 9



Ex. 10



Ex. 11



Ex. 12