Shireen A. Barday (admitted *pro hac vice*)
Stephanie L. Silvano (N.J. Bar No. 168182016)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2621
sbarday@gibsondunn.com
ssilvano@gibsondunn.com

Goutam U. Jois (N.J. Bar No. 037412007)
SIEGEL TEITELBAUM & EVANS, LLP
260 Madison Avenue, 17th Floor
New York, NY 10016
(212) 455-0300
gjois@stellp.com

*Attorneys for Plaintiff*
*Gustavo Martínez*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GUSTAVO MARTÍNEZ<br><br>Plaintiff,<br>v.<br><br>CITY OF ASBURY PARK, MONMOUTH COUNTY, BOROUGH OF BELMAR, AMIR BERCOVICZ, DEWITT BACON, DANIEL SAVASTANO, WILLIAM WHITLEY, and JOHN DOE OFFICERS 1–14,<br><br>Defendants. | Civil Action No. 3:20-cv-08710-AET-DEA<br><br>**FIRST AMENDED COMPLAINT**<br><br>JURY TRIAL DEMANDED<br><br>*Electronically Filed* |

Plaintiff Gustavo Martínez, through counsel located at 200 Park Avenue, New York,

N.Y., hereby submits this First Amended Complaint against Defendants City of Asbury Park,

located at 1 Municipal Plaza, Asbury Park, N.J.; Monmouth County, located at 2500 Kozloski

Road, Freehold, N.J.; Borough of Belmar, located at 601 Main Street, Belmar, N.J. (collectively,

the "Municipal Defendants"); Amir Bercovicz, Dewitt Bacon, Daniel Savastano, and William

Whitley, each employed at 1 Municipal Plaza, Asbury Park, N.J. and residing in New Jersey; and John Doe Officers 1–14 (the "John Doe Defendants"), and alleges as follows:

## STATEMENT OF THE CASE

1.   A press badge should not be a bullseye.  Reporters should not be in danger of violence or arrest at the hands of the police seeking to silence their reports on public protests—especially where those reports cover police violence against civilians protesting peacefully against police misconduct.  Yet in recent months, reporters around the country have been targeted, attacked, arrested and locked up for doing their jobs because law enforcement does not want the world to see what these journalists are witnessing.  On June 1, 2020, Gustavo Martínez, a seasoned reporter with more than fifteen years of experience reporting on political protests, became the latest reporter to find himself in the crosshairs of police censorship at the hands of at least three separate law enforcement groups: the Asbury Park Police, Belmar Police, and Monmouth County Sheriff's Office.

2.   That night, at a Black Lives Matter protest in Asbury Park, New Jersey, Mr. Martínez was unlawfully tackled, arrested, detained and jailed by law enforcement while reporting on the police use of force against two teenage protesters whose screams can be heard on the footage Mr. Martínez recorded that night.  Ostensibly, Mr. Martínez was tackled and arrested by the police for being out after the town curfew went into effect, but the Proclamation of State of Emergency, which established the curfew, expressly exempted reporters, including those covering the protest. Mr. Martínez's paper, the Asbury Park Press, had confirmed with police earlier that day that they understood reporters were exempt.  Mr. Martínez wore his brightly colored press badges on a lanyard around his neck all night, so there would be no question that he was one such reporter.

3.   The video Mr. Martínez was recording and broadcasting when he was tackled by law enforcement provides chilling context to his unlawful arrest and detention.  As the arrival of

2

police in riot gear ushered in a wave of police violence against the otherwise peaceful protesters in Asbury Park, Mr. Martínez saw the police spraying protesters with what appeared to be a chemical irritant.  As police aggression left protesters scrambling, Mr. Martínez kept hearing screams from different directions.  And he kept pivoting—trying to document what was happening around him.  In the seconds before he was tackled, Mr. Martínez's camera, which had been broadcasting through his Twitter handle (@newsguz), showed a teenage girl explaining to police that she and her twin brother were trying to leave when her brother was suddenly tackled to the ground by the police and handcuffed, without any apparent provocation.  The girl can then be heard pleading "that's my brother," before a police officer grabs her and slams her to the ground.  Mr. Martínez's footage then shows a number of law enforcement officers advancing toward him as he continued filming.  He begins retreating, walking backwards, while still filming the altercation between police and the teenagers.

4.   Then suddenly, Mr. Martínez heard a police officer scream, apparently in his direction, "Fuck him!  He's the problem!"  An instant later, a large officer tackled him.  As soon as he hit the ground, he heard: "You're under arrest!  Put your fucking hands behind your back!"  No sooner had Mr. Martínez fallen to the ground than he heard an officer yell: "Take down his fucking phone!"  The phone was then slapped out of Mr. Martínez's hand.  On the ground, Mr. Martínez says, "I'm a reporter, bro."  One officer responds: "Shut your mouth."  Yet another adds: "Fuckers!"

5.   By the time New Jersey woke up on June 2, the State's chief law enforcement officer, Attorney General Gurbir Grewal, had publicly apologized for Mr. Martínez's arrest, tweeting: "We will also figure out why this happened and make sure it doesn't happen again.  Because in America, we don't lock up reporters for doing their job."  Attorney General Grewal followed up

his tweet with a personal call to Mr. Martínez, during which he once again apologized to the reporter for his treatment at the hands of law enforcement the prior night.  The charges brought against Mr. Martínez that morning were quickly dropped.  Soon after, United States Senator Cory Booker also issued a statement, calling Mr. Martínez's arrest "unacceptable," and saying, "While charges have been dropped against Mr. [Martínez], incidents like this send a chilling message that runs counter to our values as Americans."

6.     Indeed, they do.  Unfortunately, we will never know what else Mr. Martínez might have recorded on the night of June 1 at the Black Lives Matter Protest in Asbury Park because his ability to report on the protest was cut short by law enforcement who did not want Mr. Martínez recording the events around him.  As Mr. Martínez would later learn, law enforcement was so serious about leaving no trace of what transpired that night that two of the officers involved in silencing him happened to have their body-worn cameras turned off during the entire incident.  Not surprisingly, law enforcement continues to stand behind a shield of silence.

7.     Both Monmouth County and the Monmouth County Prosecutor's Office (the "Monmouth Prosecutor") have refused to release the names of those—or any of the other— officers involved in silencing Mr. Martínez, despite repeated requests that they do so. Monmouth County self-servingly contends that the identities of the individuals from the Monmouth County Sheriff's Office must be irrelevant because its employees involved that night were merely "performing their statutorily mandated duties," even if those duties were discharged in a manner that plainly and openly infringed on the constitutional and civil rights of Mr. Martinez.  And the Monmouth Prosecutor has also refused to release its full investigative file of "evidence" it reviewed in connection with its "investigation" into the misconduct that occurred during that Black Lives Matter protest, claiming those materials are "confidential . . . and exempt

4

from production under the OPRA [New Jersey Open Public Records Act]," even though among the evidence the Monmouth Prosecutor refuses to release is a video of an interview of Mr. Martínez by the Monmouth Prosecutor, which cannot be considered confidential as to Mr. Martínez.

8.   The County's and its Prosecutor's whitewash do not trump the requirements of the United States Constitution and the Constitution of the State of New Jersey, which prohibit the actions taken by law enforcement the night of June 1.  Mr. Martínez now brings this action to prevent law enforcement from continuing to infringe upon the constitutional rights of reporters and others seeking to record and document political protests.  He also seeks to redress the harm unlawfully inflicted on him when law enforcement—from Asbury Park, Belmar, and the Monmouth County Sheriff's Office—acted individually and in concert to tackle, arrest, detain and jail him, preventing him from exercising his First Amendment rights that night.

## JURISDICTION AND VENUE

9.   The Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the Constitution and laws of the United States, as the claims stated in this Complaint raise federal questions under 42 U.S.C. § 1983.

10. The Court also has jurisdiction pursuant to 28 U.S.C. § 1367 over the claims in this Complaint arising under state law because those claims form part of the same case or controversy as the claims brought under 42 U.S.C. § 1983.

11. Venue is proper in the District of New Jersey pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2), because a substantial part of the events giving rise to this claim occurred in this District and all Defendants reside in this District.

## PARTIES

12. Plaintiff Gustavo Martínez is a multimedia journalist for the Asbury Park Press, who at all relevant times was a resident of Brick Township, in Ocean County, New Jersey.  Mr. Martínez was born in El Paso, Texas, and got his first journalism experience at age fourteen when he began covering basketball for a local magazine and radio show in Mexico City.  He was later hired by *El Diario de El Paso* when he was still a college student, and he was employed there until June 2005.  Since then, he has done freelance work or been on the staff at publications such as the *El Paso Times*, *Al Dia* by the *Dallas Morning News*, *Mundo Hispanico*, *El Diario de Nueva York*, and the *Associated Press*.  Mr. Martínez has been a reporter for the Asbury Park Press since August 2019.  Mr. Martínez holds a bachelor's degree in bilingual print media from the University of Texas at El Paso and a master's degree in multimedia journalism from the Craig Newmark Graduate School of Journalism at the City University of New York, where he was elected Student Commencement Speaker of his graduating class.  Mr. Martínez has been a recipient of the National Association of Hispanic Publications José Martí Award in 2009, 2012, and 2013 for his work on immigration and sports journalism.

13. Defendant City of Asbury Park is a municipal corporation and/or public entity organized and existing under the laws of the State of New Jersey.  The City of Asbury Park's principal offices are located at 1 Municipal Plaza, Asbury Park, New Jersey 07712.

14. Defendant Monmouth County is a municipal corporation and/or public entity organized and existing under the laws of the State of New Jersey.  Monmouth County Sheriff's Office's principal offices are located at 2500 Kozloski Road, Freehold, New Jersey 07728.

15. Defendant Borough of Belmar is a municipal corporation and/or public entity organized and existing under the laws of the State of New Jersey.  The Borough of Belmar's principal offices are located at 601 Main Street, Belmar, New Jersey 07719.  As noted, the

6

Borough of Belmar, together with the City of Asbury Park and Monmouth County, are collectively referenced herein as the "Municipal Defendants."

16. Defendant Captain Amir Bercovicz, at all relevant times, is or was the Acting Lieutenant of Patrol Squad C for the Asbury Park Police Department and a resident of New Jersey.

17.  Upon information and belief, Defendant Officer Dewitt Bacon, at all relevant times, is or was a law enforcement officer employed by the Asbury Park Police Department and a resident of New Jersey.

18.  Upon information and belief, Defendant Patrolman William Whitley, at all relevant times, is or was a law enforcement officer employed by the Asbury Park Police Department and a resident of New Jersey.

19. Upon information and belief, Defendant Detective Daniel Savastano, at all relevant times, is or was a law enforcement officer employed by the Asbury Park Police Department and a resident of New Jersey.

20. Mr. Martínez's multiple requests for information regarding the true names of those defendants sued here as John Doe Officers 1–14 (the "John Doe Defendants") has been met with a wall of silence from Defendants thus far.  As a result, Mr. Martínez is unaware of the true names of the John Doe Defendants, and has therefore sued the John Doe Defendants using their fictitious names.  Upon information and belief, the John Doe Defendants are individual law enforcement officers employed by one or more of the Municipal Defendants or other law enforcement agencies who were involved in Mr. Martínez's arrest and detention, including without limitation the Asbury Park Police Department, Belmar Police Department, and

Monmouth County Sheriff's Office, and whose identities can only be ascertained through further discovery. The John Doe Defendants are sued in their individual and official capacities.

## FACTUAL ALLEGATIONS

### *The Morning of June 1:*
### Gustavo Martínez Is Assigned to Cover the Black Lives Matter Protest

21. On May 25, 2020, police officers in Minneapolis killed George Floyd—an unarmed Black man whose death sparked nationwide protests against police brutality and misconduct. The nation's outrage stemmed in no small part from the fact that George Floyd told the police that he could not breathe more than twenty times in the moments leading up to his death.[1] One week later, on June 1, Mr. Martínez received a call from his editor at the Asbury Park Press. Mr. Martínez answered that call.

22. Mr. Martínez was tasked by his editor with documenting the Asbury Park Black Lives Matter protest that day starting around 8:00 p.m. when the City's curfew took effect. A Proclamation of State of Emergency promulgated the same day by Asbury Park Emergency Management Coordinator, Garrett Giberson, Jr., and the Mayor of Asbury Park, John Moor, specifically exempted "credentialed members of the media" from the City's curfew so they could report on events at the protest. (Ex. A, "Emergency Proclamation" at 2.) This press exemption cleared the way for Mr. Martínez's assignment that evening but, out of an abundance of caution, individuals at the Asbury Park Press also contacted local law enforcement to confirm that they understood that the curfew exempted reporters. Upon information and belief, the Asbury Park Press was repeatedly assured that law enforcement understood reporters were exempt from the curfew.

---

[1] *See, e.g.*, M. Singh, *George Floyd Told Officers 'I Can't Breathe' More Than 20 Times, Transcripts Show*, GUARDIAN, July 9, 2020, https://www.theguardian.com/us-news/2020/jul/08/george-floyd-police-killing-transcript-i-cant-breathe.

23.  Around 6:00 p.m., Mr. Martínez packed his gear, including his yellow bandana, reflective armbands, protective eyewear, and helmet, and headed toward the protest to relieve his colleagues who had been covering the protest during the day.  Halfway through his drive, Mr. Martínez realized he had forgotten his press badges.  Mr. Martínez had two press badges: one issued by the State Police through the New Jersey Police Press Credential program and a second from the Asbury Park Press.  Mr. Martínez knew that he needed to carry his press credentials to identify himself as a reporter during the protest and remain safely in the area, so he returned home to retrieve the badges.

### *Around 7:00 p.m.:*
### Gustavo Martínez First Arrives at the Black Lives Matter Protest in Asbury Park

24. Around 7:00 p.m., Mr. Martínez arrived at the protest.  He was wearing his press badges prominently around his neck.  Mr. Martínez first met with the colleagues he was assigned to relieve at the protest before heading toward the Asbury Park Police headquarters, where a gathering of protesters had remained after the curfew.  Even as he approached the gathering of protesters, Mr. Martínez remained close to other nearby journalists as he began reporting on the events of the protest and livestreaming them from his phone.  For some time after he arrived at the protest, Mr. Martínez spoke to several law enforcement officers at the protest without incident.  At one point, he was even introduced to a police spokesperson.

### *Between Approximately 9:00 p.m. and 10:00 p.m.:*
### Law Enforcement's Response to Protesters Takes a Turn for the Worse

25. Around 9:50 p.m., a tall Asbury Park police officer stopped Mr. Martínez on the sidewalk and asked what he was "still doing here."  Mr. Martínez told this officer that he was a journalist with the Asbury Park Press and was in the area to report on the protest.  At this time, Mr. Martínez—who was already wearing his protective gear, including a helmet, goggles, a yellow bandana, and reflective bracelets—showed this officer his press badges.  After this

interaction, Mr. Martínez continued reporting the news, including recording and streaming from his iPhone a scene of police officers "taking a knee" in solidarity with protesters.  (*See* Ex. B, Martínez Video.)  For the first time since curfew began, the police began yelling over bullhorns for protesters to leave the area.  Officers also began to yell at individual protesters to leave, and Mr. Martínez saw more officers enter with riot gear.  Upon information and belief, these officers who began ordering people to leave included members of the Monmouth County Rapid Deployment Force, which is a part of the Monmouth County Sheriff's Office Special Operations Unit.

### Around 10:00 p.m.:
### Law Enforcement Begins Attacking Protesters

26. At around 10:00 p.m., officers, including upon information and belief Monmouth County Rapid Deployment Force officers, started pushing and shoving protesters and reporters out of the area they were occupying.  Though there had been an earlier shift in the atmosphere when the police officers began ordering people to leave, it was not until around 10:00 p.m. when the violence really began.  Mr. Martínez continued to record the scene before him as the police started attacking protesters.

27. Mr. Martínez turned a corner and regrouped with a few other journalists.  They collectively continued to report, capturing video and still images of the scene unfolding before them:  police and protesters racing across the street, people screaming, a helicopter loudly flying above, and officers spraying the crowd with what appeared to be a chemical irritant.  Mr. Martínez heard screams in the distance, and he and other journalists headed in that direction. Mr. Martínez saw police officers spraying an irritant and chasing people, cursing and yelling at them to leave the area.  Mr. Martínez saw an orange haze explode out of its canister and into the air.  Mr. Martínez continued recording without interfering with the police officers.  And as the

10

police officers continued to yell that people should leave, Mr. Martínez immediately turned with the group of retreating protesters.

28. Mr. Martínez suddenly heard a loud scream.  Still recording, he turned to see police officers acting violently toward two teenagers.  Mr. Martínez heard a young woman say that she and a young man were leaving when suddenly the young man was tackled to the ground and handcuffed by several police officers.  The young woman, whom Mr. Martínez later learned was the young man's sister, tried to intervene on her brother's behalf, but a police officer grabbed her and slammed her onto the ground.  Mr. Martínez livestreamed as much of the siblings' encounter with the police as he could.  Mr. Martínez's footage then shows a number of law enforcement officers, advancing toward him to move him away from the incident with the teenagers.  He began retreating, walking backwards, while still trying to film the altercation between police and the teenagers.

### *Around 10:25 p.m.:*
### Police Name Gustavo Martínez the "Problem" and then Tackle, Arrest and Detain Him, Silencing the @Newsguz Broadcast of Police Violence Against Two Teenagers

29.     While Mr. Martínez was backing away but still visibly recording the two teenagers' interactions with the police, Mr. Martínez heard, "Fuck him!  He's the problem."  A law enforcement officer, who upon information and belief was Defendant Whitley, ran toward and tackled him from the side.  As soon as Mr. Martínez hit the ground, he heard: "You're under arrest!  Put your fucking hands behind your back!"  No sooner had Mr. Martínez fallen to the ground than he heard an officer yell: "Take down his fucking phone!"  The phone was then slapped out of Mr. Martínez's hand.  On the ground, Mr. Martínez can be heard in body-worn camera footage from one of the officers saying, "I'm a reporter, bro."  An officer responds twice: "Shut your mouth."  Another exclaims: "Fuckers!"  Upon information and belief, Defendant

Savastano assisted Defendant Whitley in handcuffing Mr. Martínez, and Defendants Bacon and

Bercovicz observed the arrest, but did not intervene.

30.     Plaintiff does not yet know the identities or employers of other officers who may

have been involved in his physical arrest, as he had been pushed to the ground and prevented

from continuing to record the events around him and the police response to those events.  An

unknown number of officers whose employers are also unknown, but are suspected to be Asbury

Park, Belmar, and/or the Monmouth County Sheriff's Office, were passing nearby, but failed to

intervene.  Although Plaintiff does not yet know the identities of these individuals and therefore

cannot be certain of their employers, he observed officers during the course of his arrest that,

upon information and belief, he believed were employed at a minimum by Asbury Park and

Monmouth County.

31.     Upon information and belief, there was no one in charge of all the officers on site.

Upon information and belief, there was instead a command post in Allenhurst, New Jersey,

which included Monmouth County prosecutors and representatives from the Monmouth County

Sheriff's Office.

32.     Two of the officers, whom the Monmouth Prosecutor has refused to identify,

improperly had their body-worn cameras off throughout these events despite regulations

requiring them to activate their body-worn cameras.

33. The arresting officers handed Mr. Martínez to another officer, who took him to a van

that read "Monmouth County Sheriff."  The van was surrounded by a group of officers wearing

jackets emblazoned with the word "Sheriff."  One of those officers noticed Mr. Martínez's press

badges and inquired about them.  Mr. Martínez identified himself as a reporter, now for the

second time following his arrest.  But the Monmouth County officer nevertheless stripped Mr.

12

Martínez of his protective gear and loaded him into the van.  As the officer sat him down in the van and slammed the door shut, Mr. Martínez's press badges still dangled around his neck.

34. Mr. Martínez was driven to the nearby town of Belmar, upon information and belief by Monmouth County officers driving a Monmouth County Sheriff's Office van, along with other individuals arrested at the protest.  He was unloaded at the Belmar police station, upon information and belief, by employees of the Monmouth County Sheriff's Office along with the other arrestees.  Mr. Martínez was handcuffed to a bench, upon information and belief, by Monmouth County Sheriff's Officers to await others being processed in front of him.  When Mr. Martínez was finally called to be processed at Belmar, the local officer taking his belongings noticed the press badges dangling from his neck.  The officer asked Mr. Martínez whether he was a reporter.  Mr. Martínez responded, now for the third time following his arrest, "Yes, I'm a reporter."  That same officer took his press badges and put them with the rest of Mr. Martínez's belongings before escorting him to his cell for the night.

35. While sitting in that cell, yet another law enforcement officer, who did not identify whether he was an Asbury Park Officer, a Belmar Officer, or a Monmouth County Sheriff's Department Officer, asked Mr. Martínez whether he was a reporter.  Again, Mr. Martínez responded, "yes."  This was the fourth time since his arrest that Mr. Martínez had identified himself as a reporter.  After this officer asked Mr. Martínez if he had his press badges with him, Mr. Martínez responded affirmatively and said that they had been placed with the rest of his belongings.  From the cell, Mr. Martínez asked the officers why he had been arrested, but they said only that he was being held for the Asbury Park Police.  He asked when he would be let out, but the officers did not know or did not want to tell him.  They also did not have (or at least, were not willing to share) any information about the charges pending against him.

13

36. Around 12:30 a.m., an Asbury Park Police Officer arrived and took Mr. Martínez into a separate room.  In keeping with the frustrating pattern of the night, the officer asked Mr. Martínez if he was a reporter.  Mr. Martínez confirmed yet again, for the fifth time following his arrest, that he was a reporter covering the protests that night.  The officer notified Mr. Martínez that the police were going to process him and release him soon and stated that he would receive a misdemeanor ticket.  At this point, the officer collected personal identifying information from Mr. Martínez, including his social security number, home address, and full name, before reiterating that Mr. Martínez would be ticketed for disorderly conduct.

### *Around 3:30 a.m. on June 2:*
### Gustavo Martínez Receives Summons, Police Concede No Judicial Probable Cause

37. Around 3:30 a.m., Mr. Martínez was finally released from the Belmar police station, where he was handed a summons and complaint on his way out the door.  Under oath, Defendant Captain Amir Bercovicz, the certifying officer, stated falsely that Mr. Martínez "knowingly, purposely fail[ed] to obey an order to disperse."  (Ex. C, Criminal Summons.)  Importantly, the Complaint-Summons notes that "a judicial probable cause determination is not required prior to the issuance of this Complaint-Summons."  Further, while the complaint states that the alleged failure to obey occurred on June 1, 2020 (and body-worn camera footage makes clear the arrest happened around 10:20 p.m. that night), the certification was not signed by Captain Bercovicz until June 2, 2020, which means that by the time Captain Bercovicz signed the complaint, Mr. Martínez had identified himself as a reporter at least five times to various members of law enforcement over at least two hours.  Mr. Martínez was picked up by his editor about twenty minutes after being released.  Upon returning home, Mr. Martínez found himself unable to sleep. It was not until roughly 9:00 a.m. that Mr. Martínez fell asleep—over twenty-four physically and emotionally painful hours after heading out to work the day prior.

14

***Around Lunchtime on June 2:***
**Attorney General of New Jersey Apologizes to Gustavo Martínez on Call, Twitter**

38. Around 12:30 p.m., Mr. Martínez learned from an Asbury Park Press employee that the charges against him had been dropped. He also discovered that he had a voicemail from New Jersey Attorney General Gurbir Grewal. In that voicemail, the Attorney General apologized for what happened to Mr. Martínez and asked him to return the call. When Mr. Martínez called back around 2:00 p.m., Attorney General Grewal reiterated his apology to Mr. Martínez for the unlawful actions of law enforcement the prior night. The Attorney General also assured Mr. Martínez that there was nothing to worry about and that the charges had been dropped. Mr. Martínez learned from his colleagues that afternoon that Attorney General Grewal had tweeted about his arrest earlier that morning, writing: "We will also figure out why this happened and make sure it doesn't happen again. Because in America, we don't lock up reporters for doing their job." Later, while reading reports on the protests of the prior night, Mr. Martínez learned that United States Senator Cory Booker had also publicly condemned his arrest. By June 3, Mr. Martínez's arrest had been chronicled in at least four media outlets. To date, his Twitter video recording from the night of the arrest has over 58,200 viewers.

***The Morning of June 29:***
**Gustavo Martínez Participates in Congressional Briefing on First Amendment Violations**

39. Despite the outpouring of support, Mr. Martínez's sleeplessness persisted. And so too did the physical and psychological pain. Mr. Martínez's ordeal and unlawful arrest and detention by the Asbury Park Police, Belmar Police, and Monmouth County Sheriff's Office have garnered national attention as a symbol of police abuses and disregard for the First Amendment. On June 29, 2020, at the invitation of the Subcommittee on Civil Rights and Civil Liberties of the United States House of Representatives Committee on Oversight and Reform,

Mr. Martínez participated in a briefing entitled "First Amendment Violations at Black Lives Matter Protests."  During the roughly two-hour briefing, Mr. Martínez spoke to Members of Congress about his experience covering the Asbury Park protest on June 1, 2020.[2]

40. On June 29, 2020, twenty-eight days after his arrest, Mr. Martínez, through counsel, sent letters to the Asbury Park and Belmar Police Departments and the Monmouth County Sheriff's Office notifying them that he intended to assert claims against them relating to their actions the night of June 1 and morning of June 2 in tackling, arresting, detaining and jailing him.  In the letter, Mr. Martínez, through counsel, demanded that the law enforcement offices retain all relevant documents, including copies of all body-worn camera footage.  Mr. Martínez did not receive a response from Asbury Park or the Monmouth County Sheriff's Office.

### The Morning of July 8:
### The Monmouth Prosecutor Issues "Investigative Findings" Replete with Inconsistencies and Contradictions, Cannot Identify Why Two Body-Worn Cameras Never Activated, Refuses to Provide Documents Reviewed in Investigation

41. Roughly a week later, in an attempt to circle the wagons ahead of this lawsuit, the Monmouth Prosecutor issued a press release and a letter to Mr. Martínez purporting to release the results of an investigation into Mr. Martínez's unlawful arrest and detention.  (*See* Ex. D, "Investigative Findings.")  The Investigative Findings, which concede that Mr. Martínez's constitutional rights were violated and conclude only that the violation was not "intentional" or "criminal," also contain a number of errors and inconsistencies in the document.  For example,

---

[2]     The Subcommittee has provided a recording of the Briefing online.  *See* House Comm. on Oversight & Reform, *Subcommittee on Civil Rights and Civil Liberties Briefing on "First Amendment Violations at Black Lives Matter Protests"* (June 29, 2020, 10:00 a.m.), https://oversight.house.gov/legislation/briefings/select-subcommittee-briefing-on-first-amendment-violations-at-black-lives; *see also* Press Release, House Comm. on Oversight & Reform, *Activists, Journalists, and Clergy Brief Subcommittee on First Amendment Violations by Police at Recent Protests* (June 30, 2020), *available at* https://oversight.house.gov/news/press-releases/activists-journalists-and-clergy-brief-subcommittee-on-first-amendment.

the Monmouth Prosecutor says that the "officers who arrested Martínez reasonably believed he was one of the protestors who failed to disperse, ***despite repeated orders to do so***, more than two hours after the expiration of a city-wide curfew," but the Monmouth Prosecutor also states that the officers' "belief was reasonable ***given the brevity*** of their interaction with [Mr. Martínez] (***approximately 1 minute***)," about half of which the Monmouth Prosecutor attributes in its Investigative Findings to the arrest itself.  Footage of the interaction shows that Mr. Martínez is actually backing away, or, in other words, dispersing, which allowed him to both comply with orders and continue his work as a journalist.  The Monmouth Prosecutor says further confusion arose because Mr. Martínez was "wearing a dark hooded sweatshirt and dark jeans," but then they attach a picture of Mr. Martínez to the Investigative Findings, which depicts Mr. Martínez in a gray sweatshirt with a yellow bandana and a light blue facemask.

42. Most important and most troubling, the Monmouth Prosecutor states, "there is no indication that Martínez informed the officers that he was a member of the press," but Mr. Martínez can be heard on the body-worn camera footage that was publicly posted by the Monmouth Prosecutor on YouTube ***identifying himself as a reporter*** to the officer who tackled him.  Although the Monmouth Prosecutor maintains that what Mr. Martínez said was inaudible, Mr. Martínez said "I'm a reporter, bro."  (*See* Ex. E, Arrest Video.)  Law enforcement's code of silence seems to have prevented the Monmouth Prosecutor from addressing law enforcement's response, which appears nowhere in the Investigative Findings but is also audible in the same clip.  After Mr. Martínez identifies himself as a reporter and starts to repeat himself, one officer twice snaps: "Shut your mouth," and another says "Fuckers."

43. The Monmouth Prosecutor also acknowledges that two officers from the Asbury Park Police Department (who have been referred to the Internal Affairs Unit) happened to have their

17

body-worn cameras turned off during the whole incident.  And the limited body-worn camera footage recorded and released from that night actually shows Mr. Martínez's "press credential lanyard" prominently displayed.  While the Monmouth Prosecutor quibbles with the size of Mr. Martínez's press credentials, law enforcement in the State of New Jersey authorized and issued those credentials to Mr. Martínez; Mr. Martínez did not design or have any say so in the size or appearance of the credentials the State authorized.

44. Further, the Monmouth Prosecutor's statement that those credentials were "backwards throughout the night" cannot be squared with the purported "brevity" of law enforcement's interactions with Mr. Martínez (roughly half of which involved tackling him), or the images from that night which were attached to the Investigative Findings and show Mr. Martínez's credentials clearly displayed.  (Of course, the Monmouth Prosecutor does not address whether anyone other than a reporter would typically wear such a lanyard.  Nor does the Monmouth Prosecutor contend that it would be common for a protester to wear a lanyard, presumably because they cannot; body-worn camera footage from that night shows exactly the opposite.)  Finally, the Monmouth Prosecutor says nothing about the training any officers in Monmouth County have received regarding interactions with members of the press, including whether anyone at the Asbury Park or Belmar Police Departments or the Monmouth County Sheriff's Office had received any such training at all.  The Monmouth Prosecutor claims officers interviewed in the investigation "likely would have" asked Mr. Martínez to stand to the side had they known he was a reporter.

45. These various inaccuracies and omissions demonstrate that the conclusions of the Investigative Findings should not be accepted as true.

46. One week later, Mr. Martínez's counsel requested a copy of the "evidence" reviewed by the Monmouth Prosecutor in connection with its Investigative Findings on July 8, 2020, but the Monmouth Prosecutor refused to produce any documents in response to that request and refused to identify any of the officers involved.

47. As a result, on July 15, 2020, Mr. Martínez's counsel submitted a request pursuant to the New Jersey Open Public Records Act ("OPRA"), N.J.S.A. 47:1A-1 *et seq*., for "all documents, materials, and/or information, in whatever form, received, created, and/or reviewed in connection with the Monmouth County Prosecutor's Office's investigation into the June 1, 2020 arrest of Asbury Park Press reporter Gustavo Martínez, including, without limitation, all such documents, materials, and/or information described in, considered for, relied upon, or referred to in the Investigative Findings dated July 8, 2020 on the Monmouth County Prosecutor's Office website . . . ."  Mr. Martínez's counsel also requested the "the names of the 21 people (including 14 members of law enforcement) interviewed as part of the investigation." (Ex. F, OPRA Request.)

48. On July 23, 2020, the Monmouth Prosecutor responded to Mr. Martínez's counsel's request.  The Monmouth Prosecutor failed to provide police narrative reports for certain officers whose body worn camera footage it provided.  The Monmouth Prosecutor also failed to provide body-worn camera footage for each of the officers whose police narrative reports it provided. The Monmouth Prosecutor withheld witness statements regarding the incident, claiming that they are confidential because they were taken as part of an internal affairs investigation and are therefore exempt from production under OPRA.  Among the items withheld include a lengthy video of the interview the Monmouth Prosecutor conducted with Gustavo Martínez, which cannot possibly be confidential as to Mr. Martínez since he participated in the interview with the

Monmouth Prosecutor.  More troubling, the Monmouth Prosecutor did not provide a log of the specific records it relied on, concealing the magnitude of the problem of improperly withheld records.  Mr. Martínez believes records reflecting interviews with Monmouth County Sheriff's officers were relied on by the Monmouth Prosecutor, as the Findings refer to conversations with three officers Mr. Martínez had contact with in the course of his transport; the records would provide a more fulsome view of the Sheriff's officers' involvement.  Mr. Martínez has also sought this information directly from Monmouth County, but the request for this information has been refused.

### The Afternoon of July 8:
### New Jersey Attorney General Forms Working Group to Address Freedom of Press, Free Speech and Safety—Invites Gustavo Martínez to Join

49. Recognizing the numerous deficiencies in the Municipal Defendants' policies and their training and supervision of law enforcement officers, the New Jersey Attorney General announced on July 8, 2020, that he is forming a working group to "develop clear guidelines" for, among other things, "implementing additional training for police officers to handle demonstrations and protesters, including training on identifying and interacting with members of the news media at such events."  The Press Release, which acknowledges that Mr. Martínez's "mistaken arrest" had "prompted" the formation of the working group followed guidance issued from the Attorney General roughly a month earlier (on June 5), when the Attorney General announced that New Jersey would be revising its "statewide Use of Force Policy, which has not been updated in two decades."  The time for the public to submit comments regarding changes to the Use of Force Policy closed on August 21, 2020, and the Attorney General plans to issue a revised statewide policy by the end of 2020.  Upon information and belief, this working group has begun to meet.

20

50. During the June 5 announcement, the Attorney General also instructed all county prosecutors' offices to "remind police departments within your jurisdiction to comply with these rules," including the rule regarding "Media Covering Public Demonstrations," which requires law enforcement officers to "allow credentialed journalists to film, broadcast, and otherwise report on these demonstrations without undue interference," and requires law enforcement "to ensure that they take all reasonable steps to safeguard the First Amendment rights of journalists." Pointedly, the June 5 guidance also explicitly stated that "***police cannot arrest journalists in retaliation for negative coverage* or *to prevent reporting on a public demonstration***."

51. The need for reform of police training and supervision and the policies governing police interactions with journalists is unmistakable.  If the Municipal Defendants' policies regarding training and supervision had prepared officers to deal with journalists during the predictable challenges posed by reporting on protests and similar events, this working group would be unnecessary—and Mr. Martínez would not have been forced to endure the violent arrest and violation of his constitutional rights in early June.

52. Mr. Martínez was attacked by the police while filming police brutality at a protest ***about*** police brutality.  No fewer than five law enforcement officers across at least three different jurisdictions, including Asbury Park, Belmar, and Monmouth County, ignored Mr. Martínez's repeated statements that he was a journalist—and they ignored Mr. Martínez's constitutional rights to record and report the news.

53. The past several years have seen a national swell in the frequency and scale of protests and other forms of civic action against police misconduct and other social wrongs.  This phenomenon has increased even more dramatically following the highly publicized deaths of unarmed individuals at the hands of police, including Breonna Taylor and George Floyd.  This

national phenomenon has been felt in Asbury Park and other towns in Monmouth County, including at the Black Lives Matter protest that ended with Mr. Martínez's violent and unlawful arrest.  And in light of current trends in national politics and society, there is a high likelihood that protests will continue to occur for the foreseeable future.  As a working journalist who has and will continue to cover newsworthy events in Monmouth County and its towns, Mr. Martínez faces the real and immediate, ongoing threat that he will face similar police misconduct in violation of his constitutional rights while covering protests and other events in Monmouth County, given the Municipal Defendants' custom or policy of deliberate indifference to the need to train or improve the training of their officers on the First Amendment rights of journalists and reporters, a policy that the New Jersey Attorney General acknowledges needs to be fixed. Injunctive and declaratory relief from this Court must issue to ensure that the Municipal Defendants make lasting policy changes to adequately train and supervise their officers to avoid violating Mr. Martínez's rights and the rights of other journalists.  Without such relief, the Municipal Defendants' officers will continue to act as they did on June 1, especially considering that the Monmouth Prosecutor turned a blind eye to law enforcement's infringement of reporters' constitutional rights when it "exonerated" those officers whose names the Monmouth Prosecutor will not even release publicly.

54. The United States Constitution and the Constitution of the State of New Jersey demand that journalists be able to do their jobs without fear of reprisal or violence from law enforcement.  Reporters' rights must be as ingrained in policing as Miranda rights.  On the night of June 1, they were not.  The actions taken by law enforcement that night were unconstitutional, and the individuals and departments involved should be held responsible for those trespasses.

## FIRST CAUSE OF ACTION

Against the John Doe Defendants, Daniel Savastano, and William Whitley

Violation of the First and Fourteenth Amendments to the U.S. Constitution
Violation of Art. I, §§ 6 and 18 of the New Jersey Constitution
Free Speech, Free Press, Free Assembly, Right to Record
(Pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2)

55. Mr. Martínez hereby repeats, re-alleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

56. In addition to protecting free speech, free press, and free assembly, the First Amendment and Article I protect the right to record as part of the public's right of access to information.  Recording police activity in public areas is a protected activity that extends beyond the press protection and expressive conduct.

57. On June 1, 2020, Mr. Martínez was lawfully exercising his First Amendment and Article I rights to free speech, free press, and free assembly, and to record police actions in furtherance of the public's right of access to information.  He was reporting on a matter of public concern in a time and at a place where he was authorized to be, including under the express terms of the Emergency Proclamation.  He was wearing his press badges issued by the Asbury Park Press and the New Jersey Press Association on Behalf of the New Jersey State Police and the New Jersey Association of Police Chiefs as he documented what he saw in real time.

58. The John Doe Defendants and Defendants Savastano and Whitley violated Mr. Martínez's First Amendment and Article I rights when they arrested him for engaging in conduct protected by the United States Constitution and the New Jersey Constitution—recording and reporting on a matter of public concern in a time and at a place where he was authorized to be. Mr. Martínez was complying with law enforcement officers' instructions when he was arrested.

23

59. The John Doe Defendants and Defendants Savastano and Whitley's statements and actions demonstrated that they were aware Mr. Martínez was recording or broadcasting the protest.  The John Doe Defendants and Defendants Savastano and Whitley who initially arrested Mr. Martínez, as well as those who loaded him into a van for transportation, were on notice that Mr. Martínez had been exercising his federal and state constitutional rights because his press badges were visibly displayed around his neck on a lanyard and because he identified himself multiple times as a reporter, including in the presence of one officer who twice responded "Shut your mouth" and another who stated simply, "Fuckers."

60. The John Doe Defendants and Defendants Savastano and Whitley consciously or recklessly disregarded Mr. Martínez's rights when they willfully, deliberately, and maliciously arrested him without probable cause.  Moreover, the John Doe Defendants and Defendants Savastano and Whitley's actions in using excessive force to arrest lawfully present members of the media would chill a person of ordinary firmness from continuing to exercise his First Amendment and Article I rights.  Their actions did chill Mr. Martínez from exercising his constitutional rights.

61. The John Doe Defendants and Defendants Savastano and Whitley acted under color of state law when they prevented Mr. Martínez from exercising his First Amendment and Article I rights.

62. Accordingly, Mr. Martínez is entitled to a judgment declaring that the John Doe Defendants and Defendants Savastano and Whitley violated Mr. Martínez's rights under the United States Constitution and the Constitution of the State of New Jersey and an injunction preventing the John Doe Defendants and Defendants Savastano and Whitley from further violating his constitutional rights, applicable to all reporters, including the right to record and

report the news.  The John Doe Defendants and Defendants Savastano and Whitley further

damaged Mr. Martínez by causing him to suffer physical injuries, emotional distress, and mental

anguish.

## <u>SECOND CAUSE OF ACTION</u>

Against the John Doe Defendants, Daniel Savastano, and William Whitley

Violation of the First and Fourteenth Amendments to the U.S. Constitution
Violation of Art. I, §§ 6 and 18 of the New Jersey Constitution
Retaliation
(Pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2)

63. Mr. Martínez hereby repeats, re-alleges, and incorporates the allegations set forth in

the preceding paragraphs as if fully set forth herein.

64. Mr. Martínez was lawfully exercising his First Amendment and Article I rights as he

was documenting matters of public concern in his work as a journalist.

65. The John Doe Defendants and Defendants Savastano and Whitley violated Mr.

Martínez's First Amendment and Article I rights when they arrested Mr. Martínez in retaliation

for recording and reporting their activity—including their violent and seemingly unjustified

arrest of two teenage protesters.  The John Doe Defendants and Defendants Savastano and

Whitley identified Mr. Martínez as a "problem" while he was recording the police.  The John

Doe Defendants and Defendants Savastano and Whitley knew or should have easily recognized

that they were arresting a reporter because Mr. Martínez was wearing a lanyard with his press

badges, was recording police activity, and verbally identified himself as a reporter to law

enforcement who responded: "Shut your mouth" and said, "Fuckers."

66. The John Doe Defendants and Defendants Savastano and Whitley consciously or

recklessly disregarded Mr. Martínez's rights when they willfully, deliberately, and maliciously

arrested him without probable cause in retaliation for his recording an incident of police violence

against teenagers.  The John Doe Defendants and Defendants Savastano and Whitley's actions in using excessive force to arrest lawfully present members of the media would chill a person of ordinary firmness from continuing to exercise his First Amendment and Article I rights.  Their retaliatory actions did chill Mr. Martínez from exercising his constitutional rights.

67. The John Doe Defendants and Defendants Savastano and Whitley acted under color of state law when they retaliated against Mr. Martínez for exercising his First Amendment and Article I rights as a member of the press.

68. Accordingly, Mr. Martínez is entitled to a judgment declaring that the John Doe Defendants and Defendants Savastano and Whitley violated Mr. Martínez's rights under the United States Constitution and the Constitution of the State of New Jersey and an injunction preventing the John Doe Defendants and Defendants Savastano and Whitley from further violating his constitutional rights, applicable to all reporters, including the right to record and report the news free from retaliation.  The John Doe Defendants and Defendants Savastano and Whitley further damaged Mr. Martínez by causing him to suffer physical injuries, emotional distress, and mental anguish.

## **THIRD CAUSE OF ACTION**

Against the John Doe Defendants, Daniel Savastano, and William Whitley

Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution
Violation of Article I, § 7 of the New Jersey Constitution
Unlawful Arrest and False Imprisonment
(Pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2)

69. Mr. Martínez hereby repeats, re-alleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

70. The Fourth Amendment and Article I prohibit "unreasonable searches and seizures," which at a minimum, requires arresting officers to have probable cause that the arrestee has

committed a crime.  Mr. Martínez's arrest was objectively unreasonable as it was effectuated

without a warrant and without probable cause.  Nor could the arresting officers have reasonably

believed they had probable cause.  Because Mr. Martínez's initial arrest was unlawful, Mr.

Martínez's subsequent imprisonment was likewise unlawful.

71. The John Doe Defendants and Defendants Savastano and Whitley unlawfully seized

Mr. Martínez when they tackled, handcuffed, and arrested Mr. Martínez without probable cause.

Mr. Martínez had not committed a crime and did not pose a threat to anyone.  Furthermore, Mr.

Martínez was authorized to be at the protest past curfew under the plain terms of the Emergency

Proclamation and was wearing his press badges on a lanyard around his neck at all relevant

times.  The John Doe Defendants and Defendants Savastano and Whitley consciously or

recklessly disregarded Mr. Martínez's rights when they willfully, deliberately, and maliciously

arrested and imprisoned him without probable cause.

72. The John Doe Defendants and Defendants Savastano and Whitley acted under color

of state law when they unlawfully arrested and imprisoned Mr. Martínez without probable cause.

73. Accordingly, Mr. Martínez is entitled to a judgment declaring that the John Doe

Defendants and Defendants Savastano and Whitley violated Mr. Martínez's rights under the

United States Constitution and the Constitution of the State of New Jersey and an injunction

preventing the John Doe Defendants and Defendants Savastano and Whitley from further

violating his constitutional rights, applicable to all reporters, including the right to be free from

arrest and imprisonment without probable cause.  The John Doe Defendants and Defendants

Savastano and Whitley further damaged Mr. Martínez by causing him to suffer physical injuries,

emotional distress, and mental anguish.

## FOURTH CAUSE OF ACTION

Against the John Doe Defendants, Daniel Savastano, and William Whitley

Violation of the Fourth and Fourteenth Amendments to the U.S. Constitution
Violation of Article I, § 7 of the New Jersey Constitution
Excessive Force
(Pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2)

74. Mr. Martínez hereby repeats, re-alleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

75. The Fourth Amendment and Article I prohibit "unreasonable searches and seizures." Mr. Martínez's arrest constituted an unreasonable seizure because the police deliberately used excessive force under the circumstances when they tackled Mr. Martínez to the ground as Mr. Martínez was complying with orders, if any, and not resisting.

76. Defendant Whitley approached Mr. Martínez from out of his line of direct sight and tackled him to the ground.  The John Doe Defendants and Defendants Savastano and Whitley held Mr. Martínez down on the ground and subsequently handcuffed him, despite Mr. Martínez's conduct not inviting any sort of physical force.  The John Doe Defendants and Defendants Savastano and Whitley consciously or recklessly disregarded Mr. Martínez's rights when they willfully, deliberately, and maliciously tackled and held him to the ground to arrest him without justification.

77. The John Doe Defendants and Defendants Savastano and Whitley acted under color of state law when they used excessive force against Mr. Martínez.

78. Accordingly, Mr. Martínez is entitled to a judgment declaring that the John Doe Defendants and Defendants Savastano and Whitley violated Mr. Martínez's rights under the United States Constitution and the Constitution of the State of New Jersey and an injunction preventing the John Doe Defendants and Defendants Savastano and Whitley from further

violating his constitutional rights, applicable to all reporters, including the right to not be

subjected to arrest and injury through the intentional use of unreasonable levels of force while

complying with police orders, not resisting, and posing no danger to the police.  The John Doe

Defendants and Defendants Savastano and Whitley further damaged Mr. Martínez by causing

him to suffer physical injuries, emotional distress, and mental anguish.

## FIFTH CAUSE OF ACTION

Against the John Doe Defendants and Defendants Bercovicz and Bacon

Failure to Intervene
(Pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2)

79. Mr. Martínez hereby repeats, re-alleges, and incorporates the allegations set forth in

the preceding paragraphs as if fully set forth herein.

80. The John Doe Defendants who arrested and detained Mr. Martínez violated his rights

under the United States and New Jersey Constitutions.  Defendants Bercovicz and Bacon, and

other John Doe Defendants, as police officers, had a duty to intervene to prevent those violations

of those rights by the officers who unlawfully arrested and detained Mr. Martínez.  Despite

having both a duty to intervene and more than sufficient opportunity to do so, neither of

Defendants Bercovicz or Bacon nor a single John Doe Defendant attempted to prevent or curtail

the deprivation of Mr. Martínez's rights.  Defendants Bercovicz and Bacon and the John Doe

Defendants consciously or recklessly disregarded Mr. Martínez's rights when they willfully,

deliberately, and maliciously failed to intervene to stop other Defendants Savastano and Whitley

from violating his constitutional rights.

81. Defendants Bercovicz and Bacon and the John Doe Defendants were acting under

color of state law when they failed to intervene to prevent Mr. Martínez's unlawful treatment.

82. Accordingly, Mr. Martínez is entitled to a judgment declaring that Defendants Bercovicz and Bacon and the John Doe Defendants were responsible for the violation of Mr. Martínez's rights under the United States Constitution and the Constitution of the State of New Jersey and an injunction preventing Defendants Bercovicz and Bacon and the John Doe Defendants from further violating their duties to intervene to prevent other officers from violating his constitutional rights, applicable to all reporters.  Defendants Bercovicz and Bacon and the John Doe Defendants further damaged Mr. Martínez by causing him to suffer physical injuries, emotional distress, and mental anguish.

### SIXTH CAUSE OF ACTION

Against the Municipal Defendants (City of Asbury Park,
Borough of Belmar, and Monmouth County)

Municipal Liability – Failure to Train and Failure to Supervise
(Pursuant to 42 U.S.C. § 1983 and N.J.S.A. 10:6-2)

83. Mr. Martínez hereby repeats, re-alleges, and incorporates the allegations set forth in the preceding paragraphs as if fully set forth herein.

84. As set forth above, Mr. Martínez was deprived of his federal and state constitutional rights by virtue of the John Doe Defendants' actions.

85. The John Doe Defendants are each police officers or other employees of Municipal Defendants Asbury Park, Monmouth County, and the Borough of Belmar.

86. The Municipal Defendants' training policies were inadequate to train their officers and employees to carry out their duties at protests where credentialed journalists were expected to be in attendance or at the police stations where arrestees would be held.

87. The Municipal Defendants failed to supervise their officers and employees in carrying out their duties at protests where credentialed journalists were expected to be in attendance or at the police stations where arrestees would be held.

30

88. The Municipal Defendants knew or should have known that their officers and employees would confront journalists at these protests, especially considering, among other things, that Asbury Park issued the Emergency Proclamation that specifically exempted credentialed journalists from the restrictions of the curfew, and which was specifically imposed in connection with the July 1 protest.

89. Defendants employed by Asbury Park demonstrated a lack of training and supervision when they arrested Mr. Martínez for reporting on the actions while he was simultaneously complying with law enforcement commands to leave.

90. Defendants employed by Monmouth County demonstrated a lack of training and supervision by, at the very least, transporting Mr. Martínez despite having cause to question whether he had been arrested for exercising his First Amendment rights as a journalist.  Their actions reflect either a lack of training or a policy of ignoring relevant information related to an arrest.

91. Defendants employed by the Borough of Belmar demonstrated a lack of training and supervision by jailing Mr. Martínez despite having cause to question whether he had been arrested for exercising his First Amendment rights as a journalist.

92. Additional John Doe Defendants, believed to be employed by Asbury Park or Monmouth County based on their known presence at the protest, demonstrated a lack of training and supervision by either directly participating in or observing and failing to intervene in the arrest of someone who was visibly (and audibly) exercising his First Amendment rights as a journalist.

93. There can be little question that reporters will cover events of consequence, including protests.  The existence of the New Jersey Police Press Credential program ensures that law

enforcement in New Jersey can identify journalists and tailor their interactions with them.  As such, the Municipal Defendants knew that their officers would come into contact with reporters doing their jobs at protests.  Here, law enforcement required journalists like Mr. Martínez to apply to them for a press badge, which is designed to help police identify reporters, but then ignored that press badge precisely when it mattered most.

94. It was readily foreseeable, indeed patently obvious, that the Municipal Defendants' officers or employees would violate the above-referenced constitutional rights of journalists like Mr. Martínez if they arrested them at protests, including one like the June 1 Black Lives Matter protest, where journalists were specifically privileged to be present past curfew under the Emergency Proclamation.  It was also readily foreseeable that their officers or employees would face difficult choices about how to interact with journalists at protests.

95. Further, there is no doubt that the arrest of a reporter who was not violating any law at a protest will frequently deprive that reporter of his or her rights under the United States Constitution and the Constitution of the State of New Jersey.  It is obvious that officers would need to know how to address journalists covering major events like protests.  The failure to train and supervise officers and employees on how to treat reporters in light of the obvious need to do so is reflective of Municipal Defendants' unconstitutional custom and policy of deliberate indifference to Mr. Martínez's and journalists' safety, well-being, and constitutional rights.  It is highly likely that Defendants will continue to violate journalists' constitutional rights without adequate training and supervision.

96. Accordingly, Mr. Martínez is entitled to a judgment declaring that the Municipal Defendants proximately caused the violation of Mr. Martínez's rights under the United States Constitution and Constitution of the State of New Jersey based on their failure to adequately

train and/or supervise their law enforcement officers and an injunction preventing the Municipal

Defendants from further violating his rights, applicable to all reporters.  The Municipal

Defendants further damaged Mr. Martínez by proximately causing him to suffer physical

injuries, emotional distress, and mental anguish.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Martínez respectfully requests that this Court enter judgment in his

favor and, in addition:

A.     Declare that the prohibition on Mr. Martínez's protected free speech and free press

rights in a public forum on June 1, 2020, while Mr. Martínez was acting as a journalist for the

news media, violated the First and Fourteenth Amendments to the United States Constitution and

Article I, Sections 6 and 18 of the New Jersey Constitution;

B.     Declare that Mr. Martínez's arrest and detention were unreasonable and unlawful

and violated Mr. Martínez's rights under the Fourth and Fourteenth Amendments to the United

States Constitution and Article I, Section 7 of the New Jersey Constitution;

C.     Declare that the arrest and detention that violated Mr. Martínez's rights under the

United States and New Jersey Constitutions were proximately caused by the failure of the City of

Asbury Park, Monmouth County, and the Borough of Belmar to adequately train or supervise their

officers;

D.     Declare that there must be a reform in policing policy to prevent further

unwarranted arrest, harassment, or violence against journalists reporting on police activity;

E.     Enjoin Defendants and their employees, agents, and assigns, from restricting or

prohibiting Mr. Martínez or any other persons from engaging in protected free speech or free press

activity, including but not limited to recording police activity in public spaces in Asbury Park,

except when such activities are prohibited by valid law or local ordinance;

33

F.      Award Mr. Martínez appropriate compensatory damages, punitive damages, and prejudgment interest in an amount to be proven at trial;

G.      Award Mr. Martínez reasonable attorney's fees and costs under 42 U.S.C. § 1988 and N.J.S.A. 10:6-2; and

H.      Grant any other relief the Court deems just and proper.

Mr. Martínez demands a trial by jury.

Dated:  September 8, 2020
        New York, New York

By:  *s/ Stephanie L. Silvano*

| | |
|---|---|
| Goutam U. Jois (N.J. Bar No. 037412007) | Shireen A. Barday (admitted *pro hac vice*) |
| SIEGEL TEITELBAUM & EVANS, LLP | Stephanie L. Silvano (N.J. Bar No. 168182016) |
| 260 Madison Avenue, 17th Floor | GIBSON, DUNN & CRUTCHER LLP |
| New York, NY 10016 | 200 Park Avenue |
| (212) 455-0300 | New York, NY 10166 |
| gjois@stellp.com | (212) 351-2621 |
| | sbarday@gibsondunn.com |
| | ssilvano@gibsondunn.com |

*Attorneys for Plaintiff*

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 11.2</u>

Pursuant to Local Civil Rule 11.2, undersigned counsel for Plaintiff hereby certifies under penalty of perjury under the laws of the United States of America that the matter in controversy here is not the subject of any action pending in any other court, arbitration, or administrative proceeding.

## <u>CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1</u>

Pursuant to Local Civil Rule 201.1, undersigned counsel for Plaintiff hereby certifies that this action is excluded from compulsory arbitration because it is based on an alleged violation of a right secured by the Constitution of the United States.

<div align="right">

*s/ Stephanie L. Silvano*
Shireen A. Barday (admitted *pro hac vice*)
Stephanie L. Silvano (N.J. Bar No. 168182016)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2621
sbarday@gibsondunn.com
ssilvano@gibsondunn.com

</div>