**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**
**TRENTON VICINAGE**

| | |
|---|---|
| GUSTAVO MARTINEZ,<br><br>                 Plaintiff,<br><br>       v.<br><br>CITY OF ASBURY PARK, et al.,<br><br>             Defendants. | Hon. Anne E. Thompson, U.S.D.J.<br><br>Civil Action No.:20-8710 (AET-DCA)<br><br><u>CIVIL ACTION</u> |

---

**ASBURY PARK DEFENDANTS' BRIEF IN SUPPORT OF
THEIR MOTION TO PARTIALLY DISMISS THE FIRST
AMENDED COMPLAINT FOR LACK OF STANDING AND
FAILURE TO STATE A CLAIM PURSUANT TO
<u>FED. R. CIV. P. 12(b)(1) AND (6)</u>**

---

ROSHAN D. SHAH, ESQ.
**ANDERSON & SHAH, LLC**
**ATTORNEYS AT LAW**
1040 Broad Street, Suite 304
Shrewsbury, NJ 07002
Tel.: 732-398-6545
Fax: 732-576-0027
*Defendants City of Asbury Park,*
*Dewitt Bacon, Daniel Savastano, William*
*Whitley, and Amir Bercovicz*

Of Counsel and On the Brief:
Roshan D. Shah, Esq.

## PRELIMINARY STATEMENT

Plaintiff Gustavo Martinez, a journalist, alleges he was unlawfully arrested on June 1, 2020, while covering a Black Lives Matter protest in Asbury Park, New Jersey. On that date, the City of Asbury Park had implemented an 8:00 p.m. curfew pursuant to an emergency proclamation. The proclamation exempted certain groups, including members of the press, from the curfew. Martinez alleges he was wrongly arrested and tackled to the ground close to 10:30 p.m. while filming officers arresting two siblings. Martinez was handcuffed while on the ground, placed in a Monmouth County Sheriff's Office van, and then transported to the Belmar Police Station. He was ultimately released with a Summons and Complaint for failing to obey an order to disperse. The Summons and Complaint were later dismissed.

Martinez now files suit against the Borough of Belmar, the County of Monmouth, the City of Asbury Park, and four Asbury Park police officers--Dewitt Bacon, Daniel Savastano, William Whitley, and Captain Amir Bercovicz. Martinez alleges a plethora of constitutional claims: 1) violation of his First Amendment rights of free speech, free press, free assembly, and right to record (against Whitley and Savastano only); 2) retaliation under the First Amendment (against Whitley and Savastano only); 3) false arrest in violation of the Fourth Amendment (against Whitley and Savastano only); 4) excessive force in violation of the Fourth Amendment (against Whitley and Savastano only); 5) failure to intervene in violation of the Fourth Amendment (against Bacon and Bercovicz only); and a 6) *Monell* claim for failure to train (against Asbury Park, Belmar, and the County of Monmouth).[1] Martinez seeks both damages and injunctive relief.

---

[1] As explained below, all of Martinez's federal constitutional claims are accompanied by a parallel claim under the New Jersey State Constitution.

Asbury Park, Bacon, Whitley, Savastano, and Bercovicz (collectively, the "Asbury Park Defendants") move to partially dismiss the Amended Complaint for lack of standing and failure to state a claim pursuant to FED. R. CIV. P. 12(b)(1) and (6).

*First*, Martinez lacks standing to pursue any injunctive relief claims. He has failed to allege any real and immediate threat of a future injury. Rather, what Martinez alleges is past exposure to allegedly unlawful conduct. That's insufficient to confer upon him standing to pursue the injunctive relief he seeks.

*Second*, Martinez's *Monell* claim against Asbury Park fails. Martinez has not adequately pled that any unconstitutional Asbury Park policy or custom caused his injuries. Martinez's claim is predicated on a single incident--namely, his June 1st arrest. This is insufficient under *Monell*.

*Third*, Martinez's failure-to-intervene claim against Bercovicz and Bacon is inadequately pled. The claim is predicated on nothing more than the fact that Bercovicz and Bacon "observed" Martinez's arrest. This falls woefully short of plausibly pleading that they had a realistic and reasonable opportunity to intervene.

*Fourth*, Savastano is entitled to qualified immunity on Martinez's excessive force claim. The only allegation against him is that he assisted Whitley in handcuffing Martinez. This does not assert a viable excessive force claim--and this is true even if this Court assumes, for purposes of this motion, that the arrest was unlawful.

*Finally*, Martinez's state constitutional claims under the New Jersey Civil Rights Act (NJCRA), N.J.S.A. § 10:6-2, are barred for the same reasons his federal constitutional claims are barred.

For these reasons, and as more fully explained below, the Court should grant the Asbury Park Defendants' motion to partially dismiss the Amended Complaint.

## PROCEDURAL AND FACTUAL BACKGROUND

A.    The City Of Asbury Park's Emergency Proclamation

On May 25, 2020, George Floyd died during a police encounter in Minneapolis, Minnesota. *Id*. at ¶ 21. Mr. Floyd's death sparked outrage across the country and across all demographic groups.

On June 1, 2020, protests over Mr. Floyd's death were scheduled to take place in Asbury Park. *Id*. at ¶ 22. Because a small number of protests in other states, including in Minneapolis and New York City, had turned violent, as a public safety measure, the City of Asbury Park issued a state of emergency proclamation (the "Emergency Proclamation"). *See Emergency Proclamation*, dated June 1, 2020, attached as Exhibit A to Am. Comp.

The Emergency Proclamation condemned, in the strongest terms, "the actions of the officers involved in the murder of George Floyd and any acts of police misconduct[.]" *Id*. In addition, the Emergency Proclamation recognized that "peaceful assemblies are the lifeblood of our democracy based on the Constitutional rights guaranteed to all citizens of the United States of America . . . [and that] in the past week, individuals have engaged in legal and peaceful protests throughout the nation[.]" *Id*. And it made clear where the City's leadership stood: "the City of Asbury Park, its Mayor and Council, and the Asbury Park Police Department stand in full solidarity with the Asbury Park community in promotion of a peaceful demonstration." *Id*.

The Emergency Proclamation also, however, recognized an uncomfortable truth: "during the same timeframe, certain individuals have engaged in behavior that has endangered the health and safety of residents of their respective cities[.]" *Id*. Accordingly, to balance these competing values--upholding the right to protest and protecting the

3

health, safety and property of its residents--the City of Asbury Park implemented a curfew. *Id.* at *2.

The curfew ran from 8:00 p.m. on June 1, 2020, to 5:00 a.m. on June 2, 2020. *Id.* The curfew prohibited "all persons . . . from using, standing, sitting, travelling or being present on any public street or in any public place, including for the purpose of travel" with certain exemptions. *Id.* "[L]aw enforcement, firefighters, paramedics or other medical personnel, as well as any other emergency response personnel authorized by the State of New Jersey, and credentialed members of the media" were not subject to the curfew. *Id.* Asbury Park police officers Bacon, Whitley, Savastano and Bercovicz were part of a law enforcement group that was deployed to keep the peace.

B.    Martinez's Arrest

Martinez is a journalist for the Asbury Park Press. *Am. Comp.*, ¶ 12. On June 1, 2020, Martinez was assigned to cover the protests in Asbury Park. *Id.* at ¶ 22. Martinez was specifically assigned to begin his coverage at 8:00 p.m.--the same time the curfew took effect. *Id.*   The Asbury Park Press was repeatedly assured that law enforcement understood reporters were exempt from the curfew. *Id.*

The Amended Complaint alleges Martinez arrived at 7:00 p.m. and was wearing his press badges around his neck. *Id.* at ¶ 24. He claims he spoke with several law enforcement officers without incident. *Id.*

Despite the curfew, protestors remained in the area well beyond 8:00 p.m. *Id.* at ¶ 25. At 10 p.m., two hours after curfew, protestors still occupied the streets in Asbury Park. *Id.* at ¶ 26. Martinez claims he and other journalists were documenting the unfolding scene of police officers attempting to clear the streets. *Id.* at ¶ 26-27. Martinez claims he witnessed a chemical irritant being released into the air, heard people

screaming, saw a helicopter loudly flying above. *Id.* at ¶ 27. It appears officers from Asbury Park, Belmar, and Monmouth County Sheriff's Department officers were present.

At around 10:25 p.m., Martinez alleges he was livestreaming the arrest of two sibling teenagers. *Id.* at ¶¶ 28-29. He claims a "number of law enforcement officers" began to move him away from the arrest scene. *Id.* Martinez began backing away, though still purportedly livestreaming the arrest, when he heard, "Fuck him! He's the problem." *Id.* at ¶ 29. He claims Whitley tackled him. *Id.* Once he hit the ground, Martinez was instructed to put his hands behind his back and that he was under arrest. *Id.* Martinez alleges Savastano assisted Whitley in handcuffing him. *Id.* In addition, he claims "Bacon and Bercovicz "observed the arrest, but did not intervene." *Id.*

After handcuffing and bringing Martinez to his feet, the arresting officers handed Martinez off to other unidentified officers. *Id.* at ¶ 33. He was then placed in a van marked "Monmouth County Sheriff" and taken to the Belmar police station and placed in a cell. *Id.* Martinez claims he identified himself as a reporter before being placed in the van, upon arriving at the Belmar police station, while being placed in a cell, and while being processed. *Id.* at ¶¶ 33-35.

The Amended Complaint makes much of these repeated identifications, wholly ignoring the fact that, while the curfew did not apply to reporters, all other criminal and municipal laws did. Nothing in the Emergency Proclamation wholly exempted reporters from New Jersey's criminal code or Asbury Park's municipal code.

Martinez received a criminal summons for failing to obey an order to disperse. *See Criminal Summons*, attached as Exhibit C to Comp. The summons was signed by Bercovicz. *Am. Comp.*, ¶ 30. Martinez was released at around 3:30 a.m. on June 2, 2020.

Later that day, Martinez learned from a colleague that the charges had been dropped. *Id.* at ¶ 37. Evidently, New Jersey Attorney General Gurbir Grewal also called him and apologized to him. *Id.* at ¶ 38. He also received words of encouragement from Senator Cory Booker and testified before Congress. *Id.* at ¶ 38-39.

C.    Martinez's Claims.

Martinez now files the instant suit asserting constitutional violations. He seeks not only compensatory and punitive damages, but also injunctive relief premised upon his single arrest. The Complaint asserts the following claims:

- Count I Against Savastano and Whitley: violation of his rights to free speech, free press, free assembly and right to record under the First Amendment of the United States Constitution, and Article I, §§ 6 and 18 of the New Jersey Constitution;

- Count II Against Savastano and Whitley: retaliation for recording police in violation of the First Amendment of the United States Constitution, and Article I, §§ 6 and 18 of the New Jersey Constitution;

- Count III Against Savastano and Whitley: false arrest in violation of the Fourth Amendment of the United States Constitution, and Article I, § 7 of the New Jersey Constitution;

- Count IV Against Savastano and Whitley: excessive force in violation of the Fourth Amendment of the United States Constitution, and Article I, § 7 of the New Jersey Constitution;

- Count V Against Bercovicz and Bacon: failure to intervene under the United States and New Jersey constitutions;

- Count VI against the City of Asbury Park, Borough of Belmar and Monmouth County: *Monell* claim alleging a failure to train and supervise.

*Am. Comp.*, Counts I thru VI. Martinez seeks both compensatory and punitive damages, as well as injunctive relief, against the Asbury Park Defendants. The Asbury Park Defendants now move to partially dismiss the Amended Complaint pursuant to FED. R. CIV. P. 12(b)(1) and (6).

## ARGUMENT

### POINT I

### MARTINEZ LACKS STANDING TO PURSUE INJUNCTIVE RELIEF.

"It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Art. III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101 (1983). "Plaintiffs must demonstrate a 'personal stake in the outcome' in order to 'assure that concrete adverseness which sharpens the presentation of issues' necessary for the proper resolution of constitutional questions." *Id.* (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)). "Abstract injury is not enough." *Id.* "The plaintiff must show that he 'has sustained or is immediately in danger of sustaining some direct injury' as the result of the challenged official conduct and the injury or threat of injury must be both 'real and immediate,' not 'conjectural' or 'hypothetical.'" *Id.* at 101-02 (citing *Golden v. Zwickler*, 394 U.S. 103, 109-110 (1969)).

"[P]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." *Id.* at 102 (citing *O'Shea v. Littleton*, 414 U.S. 488, 495-96 (1974)). In determining whether there are continuing, present adverse effects, a "plaintiff's subjective apprehensions" are irrelevant. Id. at 107 n.8 ("It is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions"). "The emotional consequences of a prior act simply are not a sufficient basis for an injunction absent a real and immediate threat of future injury by the defendant." *Id.*

*Lyons* is instructive. In that case, plaintiff Adolph Lyons alleged he was stopped by officers from the Los Angeles Police Department (LAPD) and, without justification, placed in a chokehold. *Id.* at 98. Lyons brought claims under the First, Fourth, Eighth and Fourteenth Amendments, and sought, among other relief, an injunction prohibiting such chokeholds absent situations where the suspect "reasonably appears to be threatening the immediate use of deadly force." *Id.*

On Lyons's application for a preliminary injunction, the district court found the following: "Lyons had been stopped for a traffic infringement and that without provocation or legal justification the officers involved had applied a 'Department authorized chokehold which resulted in injuries to the plaintiff'"; "the department authorizes the use of the holds in situations where no one is threatened by death or grievous bodily harm"; "officers are insufficiently trained"; "the use of the holds involves a high risk of injury or death as then employed"; and "their continued use in situations where neither death nor serious bodily injury is threatened 'is unconscionable in a civilized society.'" *Id.* at 99. Lyons moved for a preliminary injunction, submitting "affidavits, depositions, and government records," including 15 other incidents where the chokehold was applied. *Id.*

The court then entered a preliminary injunction "enjoining 'the use of both the carotid artery and bar arm holds under circumstances which do not threaten death or serious bodily injury,'" as well as an improved training program and regular reporting and recordkeeping'. . . ." *Id.* at 100. After the Ninth Circuit Court of Appeals affirmed, the United States Supreme Court reversed, holding that Lyons lacked standing. *Id.*

The Court reasoned that, while "Lyons may have been illegally choked by the police on October 6, 1976," that only "afford[ed] Lyons standing to claim damages against the

individual officers and perhaps against the City[.]" *Id*. at 105. That fact "does nothing to establish a real and immediate threat that he would again be stopped for a traffic violation, or for any other offense, by an officer or officers who would illegally choke him into unconsciousness without any provocation or resistance on his part." *Id*.

Nor did it matter that Lyons claimed that LAPD "routinely apply chokeholds in situations where they are not threatened by the use of deadly force[.]" *Id*. The Court held that such a showing "falls far short of the allegations that would be necessary to establish a case or controversy between these parties." *Id*. (emphasis added). The Court was unmoved by Lyons's claim that he "feared he would be choked in any future encounter with the police." *Id*. at 107 n.8. The Court held that such "subjective apprehensions" were meaningless to the standing inquiry. *Id*.

Here, Martinez seeks an injunction against the Asbury Park Defendants enjoining them from "restricting or prohibiting Mr. Martinez or any other persons from engaging in protected free speech or free press activity . . . ." *Am. Comp.*, Prayer for Relief. But the Amended Complaint fails to adequately establish the threat of a real and immediate future injury justifying equitable relief.

At the outset, there are no allegations that Whitley and Savastano have a practice of arresting reporters on sight, or that Bercovicz and Bacon regularly fail to intervene to stop allegedly unconstitutional arrests.

The Amended Complaint also fails to allege that Asbury Park has an official policy or unofficial custom of arresting reporters covering events. There are no well-pled facts anywhere in the Amended Complaint to show Asbury Park's governing body officially adopted any unlawful policy that would subject Martinez to arrest for merely acting as a journalist. Nor are there any well-pled facts--*i.e.*, a sufficient quantum of prior incidents-

-to show Asbury Park Defendants has an unofficial custom of arresting reporters for merely doing their jobs. Thus, unlike the plaintiff in *Lyons* who had provided evidence sufficient to convince the district court that the LAPD "authorizes the use of the holds in situations where no one is threatened by death or grievous bodily harm," 461 U.S. at 100, Martinez cannot even show there is a policy, custom or practice to enjoin. Indeed, the very premise of Martinez's claim is that the Emergency Proclamation exempted reporters from the curfew in effect on June 1st. That demonstrates the absence of an unconstitutional policy or custom.

Rather, it appears Martinez's claim for injunctive relief rests upon his subjective fear of a future arrest. Respectfully, this is legally insufficient. *Id.* at 107 n.8 ("It is the reality of the threat of repeated injury that is relevant to the standing inquiry, not the plaintiff's subjective apprehensions").

For these reasons then, the Court should dismiss Martinez's injunctive relief claims.

POINT II

MARTINEZ'S *MONELL* CLAIM FAILS
BECAUSE HE CANNOT POINT TO ANY
ASBURY PARK POLICY OR CUSTOM THAT IS
UNCONSTITUTIONAL.

"[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). "Plaintiffs who seek to impose liability on local governments under § 1983 must prove that action pursuant to official municipal policy caused their injury." *Connick v. Thompson*, 563 U.S. 51, 131 S.Ct. 1350, 1359 (2011)(citations and internal quotations omitted). Where a plaintiff contends that a policy or custom caused a civil rights violation, "rigorous standards of culpability and causation must be applied." *Bd. of the County Comm'rs v. Brown*, 520 U.S. 397, 405 (1997).

"Not all state action rises to the level of a custom or policy." *Natale v. Camden County Corr. Facility*, 318 F.3d 575, 584 (3d Cir. 2003). A policy is made "when a decision maker possessing final authority to establish [] policy with respect to the action issues a final proclamation, policy or edict." *Kneipp v. Tedder*, 95 F.3d 1199, 1212 (3d Cir. 1996). "A custom is an act 'that has not been formally approved by an appropriate decision maker,' but that is 'so widespread as to have the force of law.'" *Natale*, 318 F.3d at 584 (citing *Brown*, 520 U.S. at 404). "Proof of a single incident of unconstitutional activity is not sufficient to impose liability under *Monell*, unless proof of the incident includes proof that it was caused by an existing, unconstitutional municipal policy, which policy can be attributed to a municipal policymaker." *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985).

Here, Martinez alleges, in conclusory fashion, that:

- "The Municipal Defendants' training policies were inadequate to train their officers and employees to carry out their duties at protests where credentialed journalists were expected to be in attendance or at the police stations where arrestees would be held";

- "The Municipal Defendants failed to supervise their officers and employees in carrying out their duties at protests where credentialed journalists were expected to be in attendance or at the police stations where arrestees would be held";

- "The Municipal Defendants knew or should have known that their officers and employees would confront journalists at these protests, especially considering, among other things, that Asbury Park issued the Emergency Proclamation that specifically exempted credentialed journalists from the restrictions of the curfew, and which was specifically imposed in connection with the July 1 protest'"

- "Defendants employed by Asbury Park demonstrated a lack of training and supervision when they arrested Mr. Martínez for reporting on the actions while he was simultaneously complying with law enforcement commands to leave";

*Id.* at ¶¶ 86-89.

At the outset, it should be noted that Martinez is not alleging that Asbury Park adopted any unconstitutional policy. Even the Emergency Proclamation isn't at issue, as the Amended Complaint admits that it exempted reporters from the curfew. *Am. Comp.*, ¶ 2.

Nor does the Amended Complaint allege Asbury Park has a widespread practice of falsely arresting reporters. The Amended Complaint is predicated on a single incident-- Martinez's arrest on June 1, 2020. The Amended Complaint fails to allege another instance where Asbury Park police officers wrongly arrested anyone. A single incident is not sufficient to state a viable *Monell* claim under a custom theory. *Tuttle*, 471 U.S. at 823-24.

Seemingly aware of this, Martinez tries to couch his claim as a "'single-incident'" failure-to-train theory "that th[e] Court hypothesized [about] in *Canton*,"[2] *Connick*, 563 U.S. at 63. "In *Canton*, the Court left open the possibility that, 'in a narrow range of circumstances,' a pattern of similar violations might not be necessary to show deliberate indifference." *Id.* (citing *Brown*, 520 U.S. at 409). The *Canton* Court "posed the hypothetical example of a city that arms its police force with firearms and deploys the armed officers into the public to capture fleeing felons without training the officers in the constitutional limitation on the use of deadly force." *Id.* (citing *Canton*, 489 U.S. at 390, n. 10). Because of the "known frequency with which police attempt to arrest fleeing felons and the 'predictability that an officer lacking specific tools to handle that situation will violate citizens' rights,'" the *Canton* Court "theorized that a city's decision not to train the officers about constitutional limits on the use of deadly force could reflect the city's deliberate indifference to the 'highly predictable consequence,' namely, violations of constitutional rights." *Id.* at 63-64 (citing *Bryan Cty.*, 520 U.S. at 409).

*Canton* did not, however, dispense with the requirement that plaintiff allege facts showing that municipal policymakers had actual or constructive knowledge of the deficiency. As the *Connick* Court explained, it is "when city policymakers are on ***actual or constructive notice*** that a particular omission in their training program causes city employees to violate citizens' constitutional rights, [that] the city may be deemed deliberately indifferent if the policymakers choose to retain that program." *Connick*, 563 U.S. at 61 (citing *Bryan Cty.*, 520 U.S. at 409) (emphasis added). In such instances, it is fairly said that the city has adopted a "'policy of inaction' ***in light of notice*** that its

---

[2] *City of Canton v. Harris*, 489 U.S. 378 (1989).

program will cause constitutional violations," and, thus, has made the "functional equivalent of a decision . . . to violate the Constitution." *Id.* at 61-62 (citing *Canton*, 489 U.S., at 395 (O'Connor, J., concurring in part and dissenting in part)) (emphasis added).

Here, there are no well-pled facts to show that Asbury Park has an obvious and known deficiency in its police training program. The Amended Complaint is completely devoid of any facts to show that Asbury Park policymakers had knowledge--either actual or constructive--of any training deficiencies with respect to journalists or constitutional rights.

Indeed, where the Amended Complaint offers well-pled facts, it acknowledges just the opposite is true. For example, the Amended Complaint states that the Asbury Park Press contacted local law enforcement officials in Asbury Park and received assurances that law enforcement officers were aware that reporters were exempt from the 8:00 p.m. curfew. *Am. Comp.*, ¶ 22. In fact, Martinez admits he met with Asbury Park police officers "without incident" well beyond the curfew. *See Id.* ¶ 25. When he was stopped by an Asbury Park officer at 9:50 p.m.--almost two hours after the curfew went into effect--he simply identified himself as a reporter and continued to work. *Id.* If Martinez is correct, and Asbury Park has an obvious defect in its training program that leads to journalists being unlawfully arrested, then he should have no problem citing to other similar incidents involving his colleagues. The fact that his amended pleading offers no such examples is telling.

Thus, not only does Martinez fail to adequately allege facts to show an obvious deficiency in Asbury Park's police training program, when he does plead factual content, those allegations cut the other way. For these reasons, Martinez's claims against the City of Asbury Park should be dismissed.

<u>POINT III</u>

MARTINEZ HAS FAILED TO ALLEGE A
VIABLE FAILURE-TO-INTERVENE THEORY
<u>AGAINST BERCOVICZ AND BACON.</u>

The Amended Complaint does not allege that Bercovicz and Bacon participated in Martinez's arrest. Rather, in Count V, Martinez seeks to hook these two officers on the grounds that they failed to intervene. Once again, though, Martinez has failed to adequately plead his claim.

A "police officer has a duty to take reasonable steps to protect a victim from another officer's use of excessive force . . . ." *Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002). "If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983." *Id.* "However, an officer is only liable if there is a realistic and reasonable opportunity to intervene." *Id.* at 651.

"When considering whether a plaintiff has provided sufficient factual averments to state a claim for failure to intervene, courts must consider the officers' physical location relative to the alleged constitutional violation, the temporal sequence of events before and during the alleged violation, and whether the officers were otherwise engaged during the alleged violation." *Brown v. Ridley Twp.*, 2015 U.S. Dist. LEXIS 16428, at *31 (E.D. Pa. Feb. 10, 2015); *Buchanan v. W. Whiteland Twp.*, 2009 U.S. Dist. LEXIS 6653, at *9 (E.D. Pa. Jan. 7, 2009) (same).

Here, Martinez merely alleges that "Defendants Bacon and Bercovicz observed the arrest, but did not intervene." *Am. Comp.*, ¶ 12. He offers no well-pled facts to show their physical location at the time he was arrested; if they knew who initiated Martinez's arrest; why the arrest was initiated; and whether they were engaged with other policing activities

at the time. The only allegation is that they were present somewhere in the vicinity. *See Id*. That allegation is insufficient to show a "realistic and reasonable opportunity" to intervene. The Court should reject Martinez's attempt to skyrocket the cost of litigation by dragging into this Court police officers who merely "observed [an] arrest."

Thus, the Court should dismiss the claims against Bercovicz and Bacon.

<u>POINT IV</u>

SAVASTANO IS ENTITLED TO QUALIFIED
IMMUNITY ON MARTINEZ'S EXCESSIVE
<u>FORCE CLAIM.</u>

Qualified immunity "'protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231 (2009). Two questions must be answered in the affirmative before this protection is pierced: 1) taken in the light most favorable to the non-moving party, do the facts alleged show the officer's conduct violated a constitutional right; and 2) was the right alleged to have been violated so clearly established that it would have been clear to a reasonable officer that his actions violated the law. *Scott v. Harris*, 550 U.S. 372, 377 (2007). These questions may be analyzed in either order. *Pearson*, 555 U.S. at 242. Where the underlying facts are undisputed, the doctrine's applicability is a question of law. *Curley v. Klem*, 499 F.3d 199, 210 (3d Cir. 2007). The United States Supreme Court has "emphasized that qualified immunity questions should be resolved at the earliest possible stage of a litigation." *Anderson v. Creighton*, 483 U.S. 635, 646 n.6 (1987).

A.   <u>Martinez Has Failed To Allege Savastano Used Excessive Force.</u>

"*[A]ll* claims that law enforcement officers have used excessive force — deadly or not — in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard . . . ." *Graham v. Connor*, 490 U.S. 386, 395 (1989). "A claim for excessive force under the Fourth Amendment requires a plaintiff to show that a seizure occurred and that it was unreasonable." *Curley v. Klem*, 298 F.3d at 279.

"The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments - in circumstances that are tense, uncertain, and rapidly evolving - about the amount of force that is necessary in a particular situation." *Id.* at 396-97.

The inquiry into the reasonableness of the force used is an objective one: "the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.

Factors guiding this inquiry include: (1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether he is actively resisting arrest or attempting to evade arrest by flight. *Id.* at 396. In addition, the Third Circuit has set forth an additional non-exhaustive list of factors, including: (4) the duration of the officer's action; (5) whether the action takes place in the context of effecting an arrest; (6) the possibility that the suspect may be armed; and (7) the number of others persons at the scene with whom the officers may have to contend. *Kopec v. Tate*, 361 F.3d 772, 776-77 (3d Cir. 2004).

Here, Martinez fails to adequately plead an excessive force claim against Savastano. His claim is only that "Savastano assisted Defendant Whitley in handcuffing [him]." *Am. Comp.*, ¶ 29. Merely helping one officer handcuff a suspect is not excessive force. That's a common occurrence that takes place whenever an arrest is made.

It's not lost on us that Martinez's claim may be predicated on the idea that, because his arrest was allegedly unjustified, even handcuffing him constituted excessive force. If

so, he's on the wrong side of United States Supreme Court precedent. *Cnty. of L.A. v. Mendez*, ___ U.S. ___, 137 S. Ct. 1539, 1547 (2017)( "*The* framework for analyzing excessive force claims is set out in *Graham*. If there is no excessive force claim under *Graham,* there is no excessive force claim at all. To the extent that a plaintiff has other Fourth Amendment claims, they should be analyzed separately"); *see also Bodine v. Warwick*, 72 F.3d 393 (3d Cir. 1995). The Court should dismiss Martinez's excessive force claim against Savastano.

      B.    <u>Savastano Did Not Violate Any Clearly Established Law.</u>

The second prong of the qualified immunity analysis examines whether the defendant violated clearly established law. *Scott*, 550 U.S. at 377. The United States Supreme Court has emphasized the high bar that must be cleared before a right is deemed "clearly established."  A clearly established right is one that is so "'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'" *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quoting *Reichle v. Howards*, 566 U.S. 30 (2012)). "'We do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Id.* (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "We have repeatedly told courts . . . not to define clearly established law at a high level of generality." *Id.* (quoting *al-Kidd*, 563 U.S. at 742). "The dispositive question is 'whether the violative nature of particular conduct is clearly established.'" *Id.* (quoting *al-Kidd*, 563 U.S. at 742). This "inquiry 'must be undertaken in light of the specific context of the case, not as a broad general proposition.'" *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (quoting *Saucier v. Katz*, 533 U.S. 194, 206 (2001)).

In determining whether "existing precedent [] ha[s] placed the statutory or constitutional question beyond debate," *Mullenix*, 577 U.S. at 12, "[w]e look first for

applicable Supreme Court precedent." *Mammaro v. N.J. Div. of Child Prot. & Permanency,* 814 F.3d 164, 169 (3d Cir. 2016). "Even if none exists, it may be possible that a 'robust consensus of cases of persuasive authority' in the Court of Appeals could clearly establish a right for purposes of qualified immunity." *Id.* (citing *Taylor v. Barkes*, 575 U.S. 822, 824 (2015)).

Here, there is no clearly established law that says an officer merely handcuffing a suspect constitutes excessive force under the Fourth Amendment. Martinez cannot point to any precedent that supports this proposition. And, as pointed out above, existing precedent cuts the other way. *Mendez*, ___U.S. ___, 137 S. Ct. at 1547.Thus, Savastano is entitled to qualified immunity on Martinez's excessive force claim.

<u>POINT V</u>

<u>MARTINEZ'S NJCRA CLAIMS ARE BARRED
FOR THE SAME REASONS HIS SECTION 1983
CLAIMS ARE BARRED.</u>

The NJCRA "was modeled after 42 U.S.C. § 1983, and creates a private cause of action for violations of civil rights secured under the New Jersey Constitution[.]" *Trafton v. City of Woodbury*, 799 F. Supp. 2d 417, 443 (D.N.J. 2011). "This district has repeatedly interpreted NJCRA analogously to § 1983." *Id.*; *see also Cluver v. Borough of Sayreville*, 2013 U.S. Dist. LEXIS 12210, at *29 (D.N.J. Jan. 28, 2013), aff'd, 557 F. App'x 180 (3d Cir. 2014).

Each of Martinez's federal constitutional claims are accompanied by a parallel claim under the New Jersey Constitution. Those parallel claims are brought under the NJCRA. Because the NJCRA is interpreted analogously to § 1983, the Court should dismiss Martinez's state constitutional claims for the same reasons it should dismiss his federal constitutional claims.

## **<u>CONCLUSION</u>**

For these reasons, the Court should grant the Asbury Park Defendants' motion to partially dismiss the Amended Complaint for lack of standing and failure to state a claim pursuant to FED. R. CIV. P. 12(b)(1) and (b)(6).

Respectfully submitted,

**ANDERSON & SHAH, LLC**
**ATTORNEYS AT LAW**
*Attorneys for Defendants City of Asbury Park, Dewitt Bacon, Daniel Savastano, William Whitley, and Amir Bercovicz*

Dated: October 19, 2020                    By: */s/Roshan D. Shah*
                                                          ROSHAN D. SHAH, ESQ.

21