Shireen A. Barday (admitted *pro hac vice*)
Stephanie L. Silvano (N.J. Bar No. 168182016)
Patrick J. Hayden (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
200 Park Avenue
New York, NY 10166
(212) 351-2621
SBarday@gibsondunn.com
SSilvano@gibsondunn.com
PHayden@gibsondunn.com

Goutam U. Jois (N.J. Bar No. 037412007)
SIEGEL TEITELBAUM & EVANS, LLP
260 Madison Avenue, 22nd Floor
New York, NY 10016
(212) 455-0300
gjois@stellp.com

*Attorneys for Plaintiff Gustavo Martínez*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| GUSTAVO MARTÍNEZ<br><br>Plaintiff,<br>v.<br><br>CITY OF ASBURY PARK, MONMOUTH COUNTY, BOROUGH OF BELMAR, AMIR BERCOVICZ, DEWITT BACON, DANIEL SAVASTANO, WILLIAM WHITLEY, and JOHN DOE OFFICERS 1–14,<br><br>Defendants. | Civil Action No. 3:20-8710-AET-DEA |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

## TABLE OF CONTENTS

Page(s)

INTRODUCTION ................................................................................................... 1

FACTUAL BACKGROUND .................................................................................. 3

PROCEDURAL HISTORY ..................................................................................... 6

LEGAL STANDARDS ............................................................................................ 7

ARGUMENT ............................................................................................................ 8

      I.     Mr. Martínez Has Stated a Claim Against All Municipal Defendants. ................. 8

           A.     Asbury Park ...................................................................................... 9

           B.     Monmouth County .......................................................................... 13

           C.     Borough of Belmar ......................................................................... 20

      II.    Savastano Is Not Entitled To Qualified Immunity. ................................. 22

           A.     Savastano Violated Mr. Martínez's Fourth Amendment Rights. ............. 23

           B.     Mr. Martínez's Rights Were Clearly Established. .................................... 25

      III.   Mr. Martínez Has Stated A Failure-To-Intervene Claim. .................................... 26

      IV.   Asbury Park's Challenge To Mr. Martínez's Request For Injunctive Relief Is Premature and Meritless. ..................................................................................... 28

CONCLUSION ....................................................................................................... 30

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abraham v. Raso*,
183 F.3d 279 (3d Cir. 1999)....................................................................................23

*Adams v. City of Atl. City*,
294 F. Supp. 3d 283 (D.N.J. 2018) .........................................................................23

*Anderson v. Branen*,
17 F.3d 552 (2d Cir. 1994)......................................................................................26

*Bauer v. Norris*,
713 F.2d 408 (8th Cir. 1983) ..................................................................................24

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007)..........................................................................................7, 13

*Benhur v. Madavaram*,
2015 WL 6739109 (D.N.J. Nov. 2, 2015) ..............................................................29

*Berg v. County of Allegheny*,
219 F.3d 261 (3d Cir. 2000) .............................................................................11, 17

*Bodine v. Warwick*,
72 F.3d 393 (3d Cir. 1995)......................................................................................25

*Breton v. City of New York*,
404 F. Supp. 3d 799 (S.D.N.Y. 2019) ....................................................................15

*Bruni v. City of Pittsburgh*,
941 F.3d 73 (3d Cir. 2019)......................................................................................18

*Carter v. City of Philadelphia*,
181 F.3d 339 (3d Cir. 1999)....................................................................................12

*City of Canton v. Harris*,
489 U.S. 378 (1989).................................................................................................10

*City of Los Angeles v. Lyons*,
461 U.S. 95 (1983).............................................................................................28, 30

*Connick v. Thompson*,
563 U.S. 51 (2011)...................................................................................................10

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*County of Los Angeles v. Mendez*,
   137 S. Ct. 1539 (2017) ....................................................................................25

*Cozzi v. City of Birmingham*,
   892 F.3d 1288 (11th Cir. 2018) ......................................................................15

*Davis v. Borough*,
   669 F. Supp. 2d 532 (E.D. Pa. 2009) .............................................................16

*Decker v. Borough of Hughestown*,
   2009 WL 4406142 (M.D. Pa. Nov. 25, 2009) ...........................................12, 13

*Doe v. Univ. of Sciences.*,
   961 F.3d 203 (3d Cir. 2020)..............................................................................8

*Duncan v. City of Jersey City*,
   2015 WL 7069656 (D.N.J. Nov. 12, 2015) ....................................................15

*Edelglass v. New Jersey*,
   2015 WL 225810 (D.N.J. Jan. 16, 2015) .......................................................30

*Ekukpe v. Santiago*,
   823 F. App'x 25 (2d Cir. 2020) ......................................................................28

*El v. City of Pittsburgh*,
   975 F.3d 327 (3d Cir. 2020)................................................................23, 25, 26

*Fields v. City of Philadelphia*,
   862 F.3d 353 (3d Cir. 2017)............................................................................12

*Figueroa v. Mazza*,
   825 F.3d 89 (2d Cir. 2016)..............................................................................28

*Forrest v. Parry*,
   930 F.3d 98 (3d Cir. 2019)..........................................................8, 9, 10, 11, 20

*Gibson v. Inacio*,
   2010 WL 3943684 (D.N.J. Oct. 5, 2010)........................................................17

*Gonzalez v. Cape May Cty.*,
   2015 WL 1471814 (D.N.J. Mar. 31, 2015)................................................16, 17

*Graham v. Connor*,
   490 U.S. 386 (1989)........................................................................................24

*Greenway Dev. Co. v. Borough of Paramus*,
   163 N.J. 546 (2000) ........................................................................................18

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Hernandez v. United States*,
    939 F.3d 191 (2d Cir. 2019)...................................................................15

*A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*,
    372 F3d .572 (3d Cir. 2004)..................................................................11

*Jones v. County of York*,
    2020 WL 3892878 (M.D. Pa. July 10, 2020)....................................11, 12

*In re K–Dur Antitrust Litig.*,
    338 F. Supp. 2d 517 (D.N.J. 2004) ........................................................29

*Lawn v. Enhanced Serv. Billing, Inc.*,
    2010 WL 2773377 (E.D. Pa. July 13, 2010)..........................................29

*Lora-Pena v. Denney*,
    760 F. Supp. 2d 458 (D. Del. 2011)........................................................27

*Martin v. County of Atlantic*,
    2019 WL 6318309 (D.N.J. Nov. 26, 2019) ..............................................9

*May v. Sanna*,
    2012 WL 1067686 (D.N.J. Mar. 29, 2012)........................................24, 25

*McBride v. Cahoone*,
    820 F. Supp. 2d 623 (E.D. Pa. 2011) .....................................................29

*Pagan v. Rivera*,
    2020 WL 2060274 (D.N.J. Apr. 29, 2020) ..............................................30

*Pinkston v. City of Jersey City*,
    2020 WL 4251485 (D.N.J. July 24, 2020)..........................................26, 27

*Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*,
    413 U.S. 376 (1973)...............................................................................19

*Robinson v. Fair Acres Geriatric Ctr.*,
    722 F. App'x 194, 200 (3d Cir. 2018) ....................................................18

*Estate of Roman v. City of Newark*,
    914 F.3d 789 (3d Cir. 2019).....................................................................9

*Saheed v. City of New York*,
    2020 WL 1644006 (S.D.N.Y. Apr. 2, 2020)...........................................28

*Serrata v. Givens*,
    2019 WL 1597297 (E.D.N.Y. Apr. 15, 2019) .........................................14

**TABLE OF AUTHORITIES** *(continued)*

Page(s)

*Sharrar v. Felsing*,
128 F.3d 810 (3d Cir. 1997)..................................................................24

*Skinner v. Switzer*,
562 U.S. 521 (2011)..............................................................................8

*Smith v. Mensinger*,
293 F.3d 641 (3d Cir. 2002)..................................................................26

*Snatchko v. Peters Twp.*,
2012 WL 6761369 (W.D. Pa. Dec. 28, 2012)..........................................9

*Starnes v. Butler Cty. Court of Common Pleas*,
971 F.3d 416 (3d Cir. 2020)....................................................7, 14, 21, 24

*State v. Kelly*,
84 N.J.L. 1 (Sup. Ct. 1913)..................................................................17

*Terebesi v. Torreso*,
764 F.3d 217 (2d Cir. 2014)..................................................................27

*Thomas v. Cumberland Cty.*,
749 F.3d 217 (3d Cir. 2014)........................................9, 10, 11, 18, 19

*Tice v. Cramer*,
133 N.J. 347 (1993) ............................................................................18

*Torres v. Allentown Police Dep't*,
2016 WL 5404476 (E.D. Pa. Sept. 27, 2016) ..................................27, 28

*United States v. Nobel Learning Cmtys.*,
2018 WL 2134034 (D.N.J. May 9, 2018) ..............................................29

*United States v. Ortiz–Hernandez*,
427 F.3d 567 (9th Cir. 2005) ..............................................................15

*Williams v. Fields*,
535 F. App'x 205 (3d Cir. 2013) ..........................................................27

*Wilson v. Dewees*,
977 F. Supp. 2d 449 (E.D. Pa. 2013) ..................................................17

*Wolfington v. Recons. Ortho. Assocs. II PC*,
935 F.3d 187 (3d Cir. 2019)............................................................8, 21

## TABLE OF AUTHORITIES *(continued)*

<u>Page(s)</u>

### Statutes

N.J.S.A. § 30:8-1 ................................................................................................................17

### Rules

Fed. R. Civ. P. 8 ................................................................................................................13

Fed. R. Civ. P. 12(d) .....................................................................................................8, 21

Fed. R. Civ. P. 56(d) ..........................................................................................................21

## INTRODUCTION

Journalist Gustavo Martínez wanted to report the news, not become the news. But on June 1, 2020, while covering a Black Lives Matter protest in the wake of George Floyd's death, Mr. Martínez's civil rights were violated when he was tackled, arrested, and detained by numerous police officers and departments for simply doing his job.

Repeatedly throughout the night, Mr. Martínez told police officers that he was a reporter; his interactions with law enforcement were amicable and uneventful. But when he started reporting on the arrest of two young protesters and recording it on his phone, officers decided they'd had enough. They pointed out Mr. Martínez, yelled, "F--- him, he's the problem!" and rushed at him. Officers tackled Mr. Martínez to the ground and slapped away his phone. Mr. Martínez pleaded, "I'm a reporter, bro." An officer responded, "Shut your mouth!" Mr. Martínez's only offense was reporting on police use of force during a protest, and for that he was attacked and arrested. Mr. Martínez had broken no law—as a reporter, he was exempt from that night's curfew—and no Defendant claims that he was arrested for anything other than his post-curfew presence. But Mr. Martínez's repeated pleas went unheeded.

Mr. Martínez brings six claims against three municipal defendants and over a dozen named and unnamed individuals. Of those claims, three remain unchallenged by any Defendant and will proceed to discovery: Count 1 (First Amendment free speech), Count 2 (First Amendment retaliation), and Count 3 (Fourth Amendment false arrest). The pending Rule 12 motions only challenge portions of the remaining claims.

Asbury Park, Monmouth County, and Belmar (collectively, the "Municipal Defendants") seek dismissal of Mr. Martínez's municipal liability claim that they failed to adequately train and supervise their officers in interacting with members of the press, including at public protests

1

(Count 6). But the Municipal Defendants do not address the factors the Third Circuit has set forth for analyzing such a claim, much less dispute that Mr. Martínez satisfied them. Where Defendants do not even engage with the relevant legal standard, their motions should be denied.

Monmouth County and Belmar seek dismissal based on an additional, flawed premise: they claim they were only tangentially involved with Mr. Martínez on the night of June 1. But that argument requires disregarding Mr. Martínez's well-pleaded allegations and crediting the Defendants' version of events—precisely the opposite of what Rule 12 requires. Mr. Martínez has plausibly alleged that officers of Monmouth County and Belmar were involved in his initial arrest, and even if they were not, this Court has recently held that those who subsequently transport or detain an arrestee may face liability—even if they were not involved in the initial arrest. Belmar's motion is further defective: it argues against claims Mr. Martínez did not make (such as respondeat superior liability and personal liability), and it includes a certification by its chief of police. The certification should not be considered on a Rule 12 motion; if it were considered, Belmar's motion must be converted to one for summary judgment, and discovery must be permitted. But even without such conversion or discovery, Belmar's certification—replete with claims that contradict Mr. Martínez's well-pleaded allegations and even statements of the other Defendants—only confirms the existence of factual disputes that defeat Belmar's motion.

The Individual Defendants—Officers Dewitt Bacon, Amir Bercovicz, and Daniel Savastano—fare no better in their motions to dismiss, in whole or in part, Mr. Martínez's claims for false arrest and failure to intervene (Counts 4 and 5). Alongside Officer Whitley, who does not dispute using excessive force at this stage, Savastano pinned Mr. Martínez to the ground even though he posed no threat and was complying with officers' demands. Doing so constitutes excessive force under clearly established law, and Savastano's motion to dismiss based on

2

qualified immunity fails. Similarly, the Third Circuit has held that officers may not stand by while a colleague uses excessive force; therefore, Bacon and Bercovicz, whom Mr. Martínez has alleged stood mere feet away during the tackle and arrest, may not be dismissed.

Finally, Asbury Park seeks to "dismiss" Mr. Martínez's request for injunctive relief. Asbury Park has not moved to dismiss the First and Fourth Amendment claims in Counts 1–3, thus acknowledging that they are adequately pled, yet it seeks to dismiss a claim for relief arising out of those well-pleaded claims. But it is black letter law that Mr. Martínez's request for relief is not properly the subject of a Rule 12 motion. Even if this argument could be considered, it fails: Mr. Martínez alleges a systematic failure to train or supervise—all but certain to result in further constitutional violations—that warrants injunctive relief.

For these reasons and as set forth more fully below, Defendants' motions should be denied.

## FACTUAL BACKGROUND

On May 25, 2020, police officers in Minneapolis killed George Floyd, an unarmed Black man. The unjustified killing of Mr. Floyd sparked nationwide protests against police brutality and misconduct. *See* First Am. Compl. ¶ 21 (Dkt. 16).[1] One week later, on June 1, 2020, one such protest—organized by Black Lives Matter—was scheduled in Asbury Park. *See* ¶ 22. Mr. Martínez, a journalist for the Asbury Park Press, was assigned to cover the protest. *Id.* At that time, the Emergency Proclamation imposed a curfew of 8:00 p.m., but specifically exempted "credentialed members of the media" from the curfew. *See id.*; *see also* Ex. A at 2. The Asbury Park Press was assured that the police were aware of this exemption. ¶ 22.

Mr. Martínez arrived at the protest around 7:00 p.m., ¶ 24, bearing gear that would make

---

[1] Citations in the form "¶ __" and "Ex. __" refer to paragraphs in and exhibits to the First Amended Complaint, respectively. Unless otherwise noted, all emphasis has been added, and all quotation marks, citations, and alterations have been omitted.

his credentials as a journalist clear, including a yellow bandana, reflective armbands, protective eyewear, a helmet, and his two press badges, ¶ 23. One press badge was issued by the State Police through the New Jersey Police Press Credential Program, which is designed to help officers identify reporters. *E.g.*, ¶¶ 22, 93. The second credential came from the Asbury Park Press. ¶ 23. Mr. Martínez wore his press badges on a lanyard around his neck all night. *E.g.*, ¶¶ 2, 23–25, 33.

Police officers from at least three departments—Asbury Park, Monmouth County, and Borough of Belmar—were present at the protest. ¶ 30; *see also* Asbury Park Br. at 5 ("It appears officers from Asbury Park, Belmar, and Monmouth County Sheriff's Department . . . were present."); Monmouth County Br. at 16 ("Many police departments were present at the protest and the post-curfew unlawful gathering that ensued."). Around 10:00 p.m., officers began to yell at protestors to leave. ¶ 26.

Without interfering with police officers' work, Mr. Martínez live-streamed these chaotic scenes, capturing screams and officers' use of chemical irritants. ¶ 27. Shortly after 10:00 p.m., Mr. Martínez heard a loud scream and turned—still broadcasting—to see officers tackle a young man to the ground and handcuff him, while his sister told officers that she and her brother were attempting to leave. ¶ 28. Officers then grabbed the young woman and threw her to the ground as she screamed. *Id.* Mr. Martínez recorded these events. *Id.* While capturing the arrest of the young siblings, Mr. Martínez suddenly heard someone yell, "F--- him! He's the problem." ¶ 29. Defendant William Whitley ran toward him and tackled him to the ground. ¶ 29; *see also* Exs. B (Dkt. 16-2) (Mr. Martínez's recording of events), E (Dkt. 16-5) (body-worn camera footage from one arresting officer); Silvano Decl. Ex. A (transcript). While Mr. Martínez was on the ground, he clearly stated "I'm a reporter, bro." *Id.* In response, an officer told him to "shut [his] mouth" two separate times. *Id.* Another officer responded, "F---ers." *Id.* After Mr. Martínez was on the ground,

Savastano assisted Whitley in holding him to the ground and handcuffing him, while Bacon and Bercovicz passively observed without intervening. *See* ¶ 29. Police body-camera footage also captures officers nearby who may have observed, but failed to intervene. ¶ 30; Ex. E.

Mr. Martínez was then passed to another officer, who took Mr. Martínez to a van labeled "Monmouth County Sheriff" and surrounded by officers wearing jackets that said "Sheriff." ¶ 33. One of those officers noticed Mr. Martínez's press badges and asked about them. *Id.* Mr. Martínez again identified himself as a reporter, but this officer nevertheless loaded Mr. Martínez into the van and took him to the Belmar police station. *See* ¶ 34. At Belmar, the officer processing his intake noticed Mr. Martínez's press badges and asked if he was a reporter. *Id.* Mr. Martínez again said yes, but the officer merely confiscated the press badge before taking him to a cell. *Id.*

Another unidentified officer asked Mr. Martínez if he was a reporter, which he again confirmed. ¶ 35. The officer asked if Mr. Martínez had his press credentials, and Mr. Martínez said he did, but that they had been stored with his other belongings. ¶ 36. Mr. Martínez asked the officers present why he had been arrested, but received no answer—he was told only that he was being held for the Asbury Park Police Department. *Id.* Eventually, Mr. Martínez was told that he would be ticketed for disorderly conduct, given a summons and complaint, and released around 3:30 a.m. The Complaint-Summons, which was signed by Bercovicz, stated that Mr. Martínez "knowingly, purposely fail[ed] to obey an order to disperse." ¶ 37; Ex. C.

At around 12:30 p.m. the next day, Mr. Martínez learned that the charges against him had been dropped. ¶ 38. New Jersey Attorney General Gurbir Grewal had left him a voicemail message apologizing for what happened and asked Mr. Martínez to call him back. *Id.* Attorney General Grewal also tweeted about the arrest, writing: "We will also figure out why this happened and make sure it doesn't happen again. Because in America, we don't lock up reporters for doing their

job." *Id.* Following the arrest, recognizing the deficiency in the police curriculum, Attorney General Grewal drew attention to the training officers receive, announcing that he would be establishing a working group to "develop clear guidelines" and "implement[] additional training for police officers to handle demonstrations and protesters, including training on identifying and interacting with members of the news media at such events." ¶ 49.

Although others recognized that something wrong had occurred, local leadership was reluctant to do so. The Monmouth County Prosecutor's Office ("MCPO") conducted a so-called "investigation" into Mr. Martínez's unlawful treatment, but the investigation was hollow. ¶ 41; Ex. D. In a cover letter to Mr. Martínez regarding the investigation, the MCPO stated that "what occurred [the night of June 1] was not an *intentional* infringement upon the First Amendment, but a reasonable and justifiable arrest when viewed under the totality of the circumstances." Ex. D at 2.[2]  The Investigative Findings confirm that officers from each of the Municipal Defendants were involved on June 1. *Id.* at 7 (identifying "14 police officers who were involved in or in the vicinity of the arrest," including Monmouth County and Belmar officers)*.* The Investigative Findings did not, however, disclose the identities of officers involved in Mr. Martínez's arrest, transport, or detention. *See* Ex. D.  Mr. Martínez has diligently sought to learn these officers' identities through public records requests, which Monmouth County has thus far rejected. *See* ¶¶ 46–48; Ex. F.

## PROCEDURAL HISTORY

Mr. Martínez initiated this action on July 13, 2020, Dkt. 1, and amended his complaint on September 8, 2020, Dkt. 16. The Amended Complaint names the City of Asbury Park, the Borough of Belmar, Monmouth County, Bercovicz, Bacon, Savastano, and Whitley, as well as the 14 unnamed John Doe Officers referenced in the Investigative Findings, as defendants. ¶¶ 13–20. The

---

[2]  Unless otherwise noted, all citations to Exhibit D use ECF pagination.

Amended Complaint asserts six causes of action, including First Amendment claims against Savastano and Whitley, ¶¶ 55–68 (Counts 1 and 2), a Fourth Amendment false arrest and false imprisonment claim against Savastano and Whitley, ¶¶ 69–73 (Count 3), a Fourth Amendment excessive force claim against Savastano and Whitley, ¶¶ 74–78 (Count 4), a failure-to-intervene claim against Bacon and Bercovicz, ¶¶ 79–82 (Count 5), and a municipal liability claim for failure to train and supervise against the Municipal Defendants, ¶¶ 83–96 (Count 6).

No Defendant has moved to dismiss any of Mr. Martínez's first three claims. The Asbury Park Defendants move to dismiss Count 4 as to Savastano (but not as to Whitley), Count 5, and Count 6, and further claim that Mr. Martínez is not entitled to injunctive relief. *See* Asbury Park Br. (Dkt. 35-1).[3] Monmouth County moves to dismiss Count 6. *See* Monmouth Br. (Dkt. 33-1). Belmar filed an Answer to the Amended Complaint, *see* Ans. (Dkt. 20), then filed a Rule 12(c) motion for judgment on the pleadings as to Count 6, *see* Belmar Br. (Dkt. 27-1), to which Belmar attached a certification from its chief of police, *see* Dkt. 27-4.[4] Mr. Martínez files this omnibus brief in opposition to all three motions.

## LEGAL STANDARDS

In deciding a motion to dismiss, the Court "must accept [the] well-pleaded allegations as true, construe them in the light most favorable to [the nonmoving party], and draw all reasonable inferences in [his] favor." *Starnes v. Butler Cty. Court of Common Pleas*, 971 F.3d 416, 422 (3d Cir. 2020). A Rule 12(b)(6) motion must be denied if the complaint pleads "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

---

[3] Whitley has neither moved to dismiss nor served an answer. Whitley has belatedly sought to extend his time to answer, Dkt. 41; Mr. Martínez opposes this request in a separately filed letter.

[4] Belmar has since amended its answer to withdraw its counterclaim and several affirmative defenses against Mr. Martínez. *See* Dkt. 40. The parties have agreed that this amendment does not affect the briefing schedule on Belmar's Rule 12(c) motion.

The plausibility question is "not whether [the plaintiff] will ultimately prevail," but "whether his complaint [is] sufficient to cross the federal court's threshold." *Skinner v. Switzer*, 562 U.S. 521, 529–30 (2011). "A motion for judgment on the pleadings under Rule 12(c) is analyzed under the same standards that apply to a Rule 12(b)(6) motion." *Wolfington v. Recons. Ortho. Assocs. II PC*, 935 F.3d 187, 195 (3d Cir. 2019).

Under either Rule 12(b)(6) or Rule 12(c), "courts generally consider only the allegations contained in the complaint, exhibits attached to the complaint, and matters of public record." *Doe v. Univ. of Scis.*, 961 F.3d 203, 208 (3d Cir. 2020) (Rule 12(b)(6)); *Wolfington*, 935 F.3d at 195 (Rule 12(c)). "If, on a motion under Rule 12(b)(6) or Rule 12(c), matters outside pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56," and the respondent "must be given a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *Wolfington*, 935 F.3d at 195.

## ARGUMENT

### I.     Mr. Martínez Has Stated a Claim Against All Municipal Defendants.

Mr. Martínez has alleged that Asbury Park, Monmouth County, and Belmar are liable under Section 1983 for constitutional violations. Such claims "against a municipality may proceed in two ways": either by alleging an "unconstitutional policy or custom"—which Mr. Martínez has *not* done—or, as here, by alleging that a plaintiff's constitutional injuries "were caused by a failure or inadequacy by the municipality that reflects a deliberate or conscious choice." *Forrest v. Parry*, 930 F.3d 98, 105 (3d Cir. 2019), *cert. denied*, 140 S. Ct. 902 (2020). The latter theory applies to failure-to-train and failure-to-supervise claims, *id.*, which are at issue here, *see* ¶¶ 83–96. All Defendants incorrectly focus on the "policy or custom" theory of liability, which is irrelevant here.

A plaintiff states a failure-to-train or failure-to-supervise claim by alleging: "(1) municipal policymakers know that employees will confront a particular situation, (2) the situation involves a

difficult choice or a history of employees mishandling, and (3) the wrong choice by an employee will frequently cause deprivation of constitutional rights." *Forrest*, 930 F.3d at 106. Additionally, the failure "must have a causal nexus with [the plaintiff's] injury." *Thomas v. Cumberland Cty.*, 749 F.3d 217, 226 (3d Cir. 2014).[5] *None* of the Defendants moving to dismiss the municipal liability claims makes any reference to these factors, which are grounded in over twenty years of Third Circuit law. Nevertheless, the Amended Complaint satisfies these requirements.[6]

### A.    Asbury Park

Asbury Park officers tackled Mr. Martínez to the ground for attempting to report on their response to the protest he attended, and at this stage those allegations must be taken as true. Asbury Park's arguments against municipal liability are unpersuasive for at least three reasons.

***First***, Asbury Park asserts that its policymakers simply had no "knowledge" of "any training deficiencies with respect to journalists or constitutional rights." Asbury Park Br. at 13–14. But that is the wrong legal standard: in a failure-to-train case, the first question is *not* whether policymakers knew of "training deficiencies," *id.*, but whether they knew "that employees will confront a particular situation," *Forrest*, 930 F.3d at 106. Asbury Park does not dispute knowing that its officers would confront a situation like the one here—a protest at which credentialed journalists would be in attendance; indeed, the Emergency Proclamation demonstrates as much. ¶ 93. And that situation was all the more likely on June 1—one week after the death of George

---

[5]  Mr. Martínez's federal and state municipal liability claims may "be analyzed together because the NJCRA is generally interpreted nearly identically to § 1983 and claims under the NJCRA are generally contemporaneous with and subject to the same defenses and immunities as those brought under § 1983." *Martin v. County of Atlantic*, 2019 WL 6318309, at *5 n.5 (D.N.J. Nov. 26, 2019).

[6]  Failure to train and failure to supervise may be "consider[ed] . . . together because they fall under the same species of municipal liability." *Estate of Roman v. City of Newark*, 914 F.3d 789, 799 n.7 (3d Cir. 2019); *Snatchko v. Peters Twp.*, 2012 WL 6761369, at *13 (W.D. Pa. Dec. 28, 2012) (pleading requirements for "failure to train and failure to supervise" are "essentially the same").

Floyd and following days of global protests regarding police brutality and widespread criticism over law enforcement's treatment of reporters. ¶ 1. Monmouth County's own investigation made this point:  "Given the large number of people participating in the Asbury Park protest, as well as the international attention on protests following the deaths of George Floyd, *it is not surprising* that the event was heavily covered by members of the press from numerous media outlets." Ex. D at 5; *see also* ¶ 88 ("The Municipal Defendants knew or should have known that their officers and employees would confront journalists at these protests[.]").

Other New Jersey officials' actions confirm that policymakers saw this situation coming. As Asbury Park explains, the Emergency Proclamation established a curfew "[b]ecause a small number of protests in other states, including in Minneapolis and New York City, had turned violent," Asbury Park Br. at 3, and it specifically exempted reporters because policymakers knew they would be present at such "protests," *id.*; *see also* ¶¶ 2, 22, 88; Ex. A § 2(a)(i). The New Jersey Police Press Credential Program further confirms this knowledge:  it enables officers to identify reporters and tailor their interactions with them—including, as here, at public protests—precisely because officers were so likely to confront journalists at such events. *See* ¶ 93; *see also* ¶ 22 (noting that Mr. Martínez wore a press badge issued through the program). If policymakers were truly ignorant of the possibility that their officers would encounter reporters at protests, they would not have taken any of these measures; by implication, officials knew (or should have known) that their officers would "confront [the] particular situation presented" here. *Forrest*, 930 F.3d at 106.[7]

**Second**, Asbury Park repeatedly asserts that Mr. Martínez was required to allege "similar

---

[7]  The Supreme Court cases cited by Asbury Park are not to the contrary. *See* Asbury Park Br. at 12–14 (citing *City of Canton v. Harris*, 489 U.S. 378 (1989) and *Connick v. Thompson*, 563 U.S. 51 (2011)). Indeed, the Third Circuit's failure-to-train framework, as articulated in its lead cases cited above, expressly rely on both of these decisions. *See, e.g.*, *Forrest*, 930 F.3d at 109 (citing *Canton*); *Thomas*, 749 F.3d at 223–26 (discussing *Connick*).

incidents" to support his claim. *See, e.g.*, Asbury Park Br. at 12, 14. That argument is also incorrect: in a failure-to-train case, a "single-incident" violation is sufficient, "even without a pattern of constitutional violations." *Thomas*, 749 F.3d at 223. Accordingly, the Third Circuit has repeatedly held that "a single-incident constitutional violation" may establish a "failure-to-train claim against a municipality," where the injury is a "highly predictable consequence" of inadequate training. *Id.* at 224–25. And that is the case here: the Monmouth County Prosecutor's Office itself admits that officers' interaction with journalists was "not surprising," Ex. D at 5, and the New Jersey Attorney General responded by announcing the need for "additional training" on the situation officers faced, ¶ 49. "Single-incident" municipal liability is not only available, but critical in a case like this one— a situation officers are sure to face again, where further constitutional deprivations are a "highly predictable consequence" of the training they lack. *Thomas*, 749 F.3d at 224; *see also A.M. ex rel. J.M.K. v. Luzerne Cty. Juvenile Detention Ctr.*, 372 F.3d 572 (3d Cir. 2004) (recognizing single-incident liability on failure-to-train claim); *Berg v. County of Allegheny*, 219 F.3d 261 (3d Cir. 2000) (per curiam) (same).

*Finally*, Asbury Park—like the other Municipal Defendants—fails to even address the remaining elements of Mr. Martínez's failure-to-train claim, which are sufficiently alleged here. Mr. Martínez has adequately alleged the second element, namely that this situation—interacting with journalists in the context of public protests—"involves a difficult choice" for officers. *Forrest*, 930 F.3d at 106. "A difficult choice could be a situation where more than the application of common sense is required or where the employee has powerful incentives to make the wrong choice." *Jones v. Cty. of York*, 2020 WL 3892878, at *5 (M.D. Pa. July 10, 2020). As Mr. Martínez explained, the Municipal Defendants placed their officers in a position—overseeing a widely publicized protest and its aftermath—where officers would have to balance their duty to maintain

order against their obligation to identify and cooperate with journalists, in recognition of their First Amendment rights. ¶ 94. Those choices are not easy: indeed, that explains the Emergency Proclamation's reporter exemption and the New Jersey Press Credential Program, neither of which would be necessary if officers needed nothing more than their own common sense. ¶¶ 2, 22, 88, 93. And—especially in the context of a protest regarding police brutality, ¶ 52—officers have "powerful incentives" to make the "wrong choice," *Jones*, 2020 WL 3892878, at *5, including by silencing journalists through arrests or physical force. In fact, officers pointed out Mr. Martínez as "the problem" and attacked him only *after* Mr. Martínez began reporting on police use of force. ¶ 29. The situation officers confront at public protests attended by credentialed journalists involves choices that any officer would find difficult. *See, e.g.*, *Decker v. Borough of Hughestown*, 2009 WL 4406142, at *4 (M.D. Pa. Nov. 25, 2009) (finding "difficult choice" in determining "whether the obscene language which violates the disorderly conduct statute is protected by the First Amendment"). That is why the Attorney General has convened a task force on this topic: so that, going forward, officers will have better training to make the *right* choice.

Mr. Martínez has likewise alleged the third element of his claim, that the "wrong choice" would "frequently cause deprivation[s] of constitutional rights," including under the First Amendment. *Carter v. City of Philadelphia*, 181 F.3d 339, 357 (3d Cir. 1999). By covering and recording public protests without violating any law, reporters are—almost by definition—engaging in constitutionally protected activity. *See Fields v. City of Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017) ("[T]he First Amendment . . . [encompasses a] right to record—photograph, film, or audio record—police officers conducting official police activity in public areas," where they are not interfering with police activity). Accordingly, there can be little "doubt that the arrest of a reporter who [i]s not violating any law at a protest will frequently deprive that reporter of his

or her rights under the United States Constitution and the Constitution of the State of New Jersey." ¶ 95; *see also Decker*, 2009 WL 4406142, at *4 ("[T]he wrongful issuance of a citation could frequently cause the deprivation of First Amendment rights."). The New Jersey Attorney General confirmed as much through his "Guidance Regarding Police Use of Force," which reminds law enforcement to "allow credentialed journalists to . . . report on these demonstrations without undue interference," and "to ensure that they take all reasonable steps to safeguard the First Amendment rights of journalists." ¶ 50; *see also id.* ("[P]olice cannot arrest journalists in retaliation for negative coverage or to prevent reporting on a public demonstration."). As the Attorney General recognized, it is highly likely that the "wrong choice"—"undue interference" with the activities of "credentialed journalists" at protests, *id.*—would result in constitutional deprivations.

### B.    Monmouth County

Monmouth County has filed an extensive brief in support of its motion to dismiss. Nearly all of that brief is arguments divorced from the governing legal framework and pleading standards. None of Monmouth County's arguments provides a basis for dismissing Mr. Martínez's claims.

***First***, Monmouth County repeatedly asserts that Mr. Martínez has inappropriately "lumped" Defendants together—which it goes so far as to label a violation of Rule 8. *See* Fed. R. Civ. P. 8. But Mr. Martínez has plainly satisfied Rule 8's requirement to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). As Monmouth County itself notes, "[m]any police departments were present at the protest and the post-curfew unlawful gathering that ensued." Monmouth Br. at 16; *see also* Asbury Park Br. at 5. Mr. Martínez has specifically alleged that some of those Monmouth County officers violated his rights. He has identified Monmouth County officers where possible, ¶¶ 26, 33–34, and noted where Monmouth County appears to have employed other officers involved, ¶¶ 30–31, 35. On top of that, Mr. Martínez incorporated into his

13

Amended Complaint a video of some of the events at issue, *see* Ex. E, and the investigative report prepared by Monmouth County itself, which specifies Monmouth County's "deploy[ment]" to "disperse the crowd" at the protest, Ex. D at 5. Mr. Martínez's allegations are more than sufficient to put Monmouth County on notice of the claims it faces. *See Serrata v. Givens*, 2019 WL 1597297, at *6 (E.D.N.Y. Apr. 15, 2019) (finding allegations sufficient despite claim that complaint "lumped all three named defendants with John Doe 1-10 . . . without pleading specific facts demonstrating what each named defendant purportedly did").

**Second**, Monmouth County claims its officers played no role in Mr. Martínez's arrest—they did no more, purportedly, than transport Mr. Martínez from the protest to Belmar. *See, e.g.*, Monmouth Br. at 4–6, 21. But that is *Monmouth County's* version of the facts. At this stage, the Court must accept all well-pleaded allegations as true and draw inferences in Mr. Martínez's favor. *See Starnes*, 971 F.3d at 422. Monmouth County cannot simply ignore the allegations, exhibits, and even Defendants' own arguments plausibly linking Monmouth County officers to Mr. Martínez's initial arrest, and then argue that Mr. Martínez's claims should be dismissed.

In fact, Monmouth County's own investigation explains that, at the protest, "the Monmouth County Rapid Deployment Force (RDF) and the NJSP Mobile Field Force were jointly deployed to disperse the crowd." Ex. D at 5; *see also* Monmouth Br. at 16.[8]  The remaining Defendants agree: "It appears officers from Asbury Park, Belmar, and Monmouth County Sheriff's Department officers [sic] were present." Asbury Park Br. at 5. And beyond simply alleging Monmouth County's "mere presence," Monmouth Br. 16, Mr. Martínez specifically explains that, only moments before he was thrown to the ground, "Monmouth County Rapid Deployment Force

---

[8]  Notably, even though the Investigative Findings purport to absolve officers of wrongdoing, they did *not* conclude that Monmouth County officers were simply uninvolved in the arrest.

officers[] *started pushing and shoving protesters and reporters* out of the area they were occupying." ¶ 26. When officers threw Mr. Martínez to the ground shortly thereafter, he observed officers "employed at a minimum by Asbury Park *and Monmouth County*," including some who failed to intervene. ¶ 30. These allegations are more than sufficient to infer the involvement of Monmouth County officers in Mr. Martínez's arrest.

At this stage, and particularly in light of Monmouth County's refusal to provide identifying information, Mr. Martínez's inability to "identify the particular officers who performed the allegedly wrongful acts is not unreasonable." *Duncan v. City of Jersey City*, 2015 WL 7069656, at \*3 (D.N.J. Nov. 12, 2015). Instead, as is customary in Section 1983 cases like this one, "[d]iscovery . . . should uncover" the identities of the officers—as well as their employers. *Id.* at \*3. For now, Mr. Martínez alleged specific facts that plausibly link Monmouth County's officers to his arrest—which, as set forth above, states a claim for municipal liability. *See supra* Part I.A.

***Third***, even if Monmouth County's role were as limited as it now claims—solely relating to the transport of Mr. Martínez—it could not escape liability under Section 1983. "[A] police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest." *Breton v. City of New York*, 404 F. Supp. 3d 799, 811 (S.D.N.Y. 2019); *see also, e.g.*, *Hernandez v. United States*, 939 F.3d 191, 201 (2d Cir. 2019) ("[O]fficers may not disregard facts tending to dissipate probable cause."); *Cozzi v. City of Birmingham*, 892 F.3d 1288, 1294 (11th Cir. 2018) ("[A]n officer may not unreasonably disregard certain pieces of evidence by choosing to ignore information that has been offered to him or her or electing not to obtain easily discoverable facts that might tend to exculpate a suspect."); *United States v. Ortiz–Hernandez*, 427 F.3d 567, 574 (9th Cir. 2005) ("A person may not be arrested, or must be released from arrest, if previously established probable cause has dissipated.").   While officers may rely on other officers'

determinations in some circumstances, they are not at liberty to ignore indicia undermining the basis for that arrest—even when merely "transferr[ing] custody and control" of the arrestee to others. *Gonzalez v. Cape May Cty.*, 2015 WL 1471814, at *1, *10 (D.N.J. Mar. 31, 2015); *see also Davis v. Borough*, 669 F. Supp. 2d 532, 536 & n.4 (E.D. Pa. 2009) (official who "only transported the Plaintiff from a police station to a correctional facility" may be liable under Section 1983, where official "failed to make even the briefest of inquiries" into basis of initial arrest).

This Court's decision in *Gonzales* is instructive. There, officers allegedly arrested the wrong person pursuant to a warrant, despite inconsistencies in the warrant regarding its subject. *See* 2015 WL 1471814, at *9. The arresting officers then passed the arrestee to another officer who—like Monmouth's officers—transported the arrestee to a detention facility. *See id.* at *9–10. Although not involved in the initial arrest, this transporting officer nonetheless remained subject to liability under Section 1983, where he "never questioned [the arrestee] nor attempted to confirm that [the arrestee] was indeed the target of the warrant, or even the correct transportee," and "did not attempt to positively identify Plaintiff as the person listed on the warrant," instead relying on the arresting officers' "assurance that Plaintiff was the 'guy.'" *Id.* at *10. Just as questions of fact remained regarding the reasonableness of the initial arrest, questions of fact remained regarding "whether [the transporting officer] acted reasonably and whether he had good faith belief that [he was] justified in transporting and detaining" the plaintiff. *Id.*; *see Davis*, 669 F. Supp. 2d at 536.

So, too, here. As in *Gonzales*, Mr. Martínez alleged that his initial arrest was unlawful, and those well-pleaded allegations must be credited. *See* ¶¶ 55–73 (Counts I–III). No Defendant has attempted to defend this arrest or justify it as reasonable in any other respect. *See Gonzales*, 2015 WL 1471814 at *9. After this unlawful initial arrest, Monmouth County officers accepted Mr. Martínez for transport, as in *Gonzales*, and quickly ascertained the problematic nature of this

16

arrest—noticing Mr. Martínez's press credentials and verbally confirming that he was a "reporter." *See* ¶¶ 33–34. Despite these red flags, the officers did not even attempt to confer with Asbury Park officers (who were admittedly present) or otherwise inquire into the arrest—instead, they stripped Mr. Martínez of his press credentials, loaded him into a van, and drove him to a police station. ¶¶ 33–34. The Constitution does not permit this. *See Gonzalez*, 2015 WL 1471814, at *10; *Berg*, 219 F.3d at 272–74 (ruling against official, where the availability of information undermining basis for arrest presented "valid questions concerning the reasonableness of [the official's] conduct"); *Wilson v. Dewees*, 977 F. Supp. 2d 449, 456–57 (E.D. Pa. 2013) (ruling against officer claiming reliance on arresting officer's probable cause determination, where there was neither an "independent probable cause determination" nor any "indication that [the arresting officer] made any statement to [the defendant officer] about why Plaintiff was being detained").[9]

**Fourth**, Monmouth County incorrectly suggests New Jersey law authorizes such unconstitutional conduct. Monmouth Br. at 17, 20, 22–28, 34. As Monmouth County's own cases explain, the statute it cites—N.J.S.A. § 30:8-1—applies only when an initial arrest was "*legally* made." *State v. Kelly*, 84 N.J.L. 1, 5 (Sup. Ct. 1913), *aff'd*, 86 N.J.L. 704 (1914). Here, Mr. Martínez alleges that his arrest was unlawful. Defendants cannot assume Mr. Martínez's allegations to be false and then, on that basis, invoke a statutory protection. The statute is thus inapplicable, as are Monmouth County's cases. *See, e.g.*, *Gibson v. Inacio*, 2010 WL 3943684, at *8 (D.N.J. Oct. 5, 2010) (considering officials who "acted pursuant to a valid warrant").

And even if the statute applied here (it does not), it cannot authorize violations of the

---

[9]   Monmouth County's claim that its officers lacked "any knowledge of the crime for which Plaintiff was arrested" must be rejected at the Rule 12 stage. Monmouth Br. at 18. As noted, Mr. Martínez has plausibly alleged that Monmouth officers were involved in Mr. Martínez's initial arrest themselves, and surely Monmouth does not mean to suggest its officers did not know why they were arresting someone.

federal constitution—a state statute cannot "abrogate constitutional rights." *Greenway Dev. Co. v. Borough of Paramus*, 163 N.J. 546, 558 (2000). To prevent its invalidation on Supremacy Clause grounds, this New Jersey statute must be read narrowly to avoid such a result—and thus cannot, so construed, authorize Monmouth County's violation of Mr. Martínez's constitutional rights. *See, e.g.*, *Bruni v. City of Pittsburgh*, 941 F.3d 73, 85 (3d Cir. 2019) ("[U]nder the doctrine of constitutional avoidance, '[i]t has long been a tenet of First Amendment law that in determining a facial challenge to a statute, if it be readily susceptible to a narrowing construction that would make it constitutional, it will be upheld.").[10]

*Fifth*, Monmouth County argues that Martínez fails to allege a "causal nexus" between the failure to train or supervise and Mr. Martínez's injury. *See* Monmouth Br. at 19–20. Although Monmouth County does not cite any relevant Third Circuit authority, its argument seems to allude to the causation inquiry the Third Circuit has articulated, which asks only whether "the injury could have been avoided had the employee been trained under a program that was not deficient in the identified respect." *Thomas*, 749 F.3d at 226. "[B]ecause [Mr. Martínez's] injuries involved" unlawful arrest and detention in retaliation for exercising his First Amendment rights, "the identified deficiency in . . . training program[s]"—here, their failure to adequately train officers to identify and interact with reporters at protests and their aftermath—is "closely related to the ultimate injury." *Robinson v. Fair Acres Geriatric Ctr.*, 722 F. App'x 194, 200 (3d Cir. 2018). The Attorney General confirms this causal link:  in response to Mr. Martínez's arrest, he formed a working group to "develop clear guidelines" and "implement[] additional training for police officers to handle demonstrations and protesters, including training on identifying and interacting

---

[10] *See also Tice v. Cramer*, 133 N.J. 347, 375 (1993) ("[W]hatever the immunity conferred by the [New Jersey Tort Claims] Act, public entities and law enforcement personnel should understand that federal liability under section 1983 may exist, even if inconsistent with the Act.").

with members of the news media at such events." ¶ 49. Unless the Municipal Defendants now believe the Attorney General's response is futile, there can be no question that Mr. Martínez's injury—his violent arrest and inability to record and report on the Asbury Park protest—"could have been avoided" if officers had the training New Jersey's Attorney General believes they need. *Thomas*, 749 F.3d at 226.[11]

**Finally**, Monmouth County's assertion that Mr. Martínez seeks "journalistic immunity" is disingenuous and a red herring. Monmouth Br. at 26–28. To be sure, the "Founding Fathers gave the free press the protection it must have to fulfill its essential role in our democracy" through "the First Amendment." *Pittsburgh Press Co. v. Pittsburgh Comm'n on Human Relations*, 413 U.S. 376, 381–82 (1973). But Mr. Martínez is not asking for special treatment—only that these constitutionally enshrined protections be respected. There has never been a contention at any stage that Mr. Martínez was tackled, arrested, or detained for any legitimate reason—as evidenced by the overnight dismissal of charges and apology from the Attorney General. Monmouth County claims that "members of the press were *not immune* from arrest for disorderly conduct, inciting a riot, assault, or any of the other numerous criminal violations in the State Code." Monmouth Br. at 17. So what? Mr. Martínez has never claimed any such "immunity." Nor has any Defendant even hinted that there was probable cause to arrest and detain Mr. Martínez for "any of the other numerous criminal violations in the State Code." *Id.* Indeed, Mr. Martínez has been accused of no other violation, and there is no challenge to his claim that he was arrested without probable cause, ¶¶ 69–73, in retaliation for exercising his First Amendment rights, ¶¶ 63–68. Like anyone else,

---

[11] Monmouth County's claim that Mr. Martínez was "already under arrest" at the time its officers interacted with him, Monmouth Br. at 20, is belied by the factual allegations, exhibits, and briefing, which, as noted above, support a reasonable inference that Monmouth County officers participated in Mr. Martínez's initial arrest.

Mr. Martínez's constitutional rights must be protected.

### C.    Borough of Belmar

As a threshold matter, Belmar's brief conflates various theories of liability under Section 1983 and never addresses the theory actually advanced by Mr. Martínez. Belmar focuses almost exclusively in its brief on *Monell* claims for deprivation of constitutional rights based on a municipality's policy, custom, or practice. *See* Belmar Br. at 8–13. But Mr. Martínez does not assert a municipal liability claim premised on Belmar's customs and practices; the claim is premised instead on Belmar's (and the other Municipal Defendants') failure to train and supervise their employees. *See* ¶¶ 83–96. Those two theories of municipal liability are "distinct," *Forrest*, 930 F.3d at 106, and Belmar never squarely addresses the latter.

Additionally, Belmar appears to perceive Mr. Martínez's *failure to supervise* claim against the *municipality* as a *supervisory liability* claim against the *police chief* individually. *See, e.g.*, Belmar Br. at 8 (discussing whether "a police chief may be personally liable"); *id.* at 10 (discussing Chief Scott's personal knowledge); *id.* at 11 (concluding that "there can be no supervisory liability . . . on Chief Scott's part"). Again, Belmar is wrong. The claim is against the municipality, not the police chief. At no point in the brief does Belmar actually discuss the relevant factors of a failure-to-train or -supervise claim, set out in decades of case law reiterated just last year in *Forrest*.

Belmar's motion is further defective, and should be denied, because it attempts to shoehorn Belmar's view of the facts into a Rule 12 motion. For example, Belmar makes repeated assertions about what discovery will or will not show. *See, e.g.*, Belmar Br. at 9 (describing what "discovery . . . will not reveal"), *id.* (describing other facts "discovery will establish"), *id.* (again describing what "discovery will not disclose"), *id.* at 10 ("discovery will not reveal the existence of a policy"), *id.* at 11 ("discovery will reveal no evidence [of] deliberate[] indifferen[ce]"). But at this stage, the Court cannot grant a Rule 12 motion based on the defendant's assertions about what

discovery will or will not show; the Court "must accept the well-pleaded allegations as true, construe them in the light most favorable to the nonmoving party, and draw all reasonable inferences in his favor." *Starnes*, 971 F.3d at 422.

Most egregiously, Belmar attempts to have the Court consider one-sided extrinsic evidence. Belmar filed an answer, *see* Dkt. 20, and a motion for judgment on the pleadings, *see* Dkt. 27, to which it attached a certification from its chief of police, *see* Dkt. 27-4. That certification makes a host of factual assertions about the events on June 1–2, 2020, including about the actions of other Defendants, and even contradicts some assertions and denials made by other Defendants.

When material outside the pleadings, such as Belmar's certification, is presented and considered on a Rule 12(c) motion, the Court must "treat [the motion] as one for summary judgment under Rule 56" in considering that material, in which case "the procedures of Rule 56 govern." *Wolfington*, 935 F.3d at 195; *see* Fed. R. Civ. P. 12(d). Those procedures include "the opportunity to submit evidence of record to support or oppose summary judgment." *Wolfington*, 935 F.3d at 195–96; *see* Fed. R. Civ. P. 56(d).

Belmar's certification should be disregarded, because it only highlights the factual disputes in this case and underscores why all Defendants' motions should be denied. For example, the certification states that "[n]o member of the Belmar Police Department . . . was even remotely present at th[e] time," Scott Cert. ¶ 6, and that "[n]o member of the Belmar Police Department participated in th[e] arrest" of Mr. Martínez, *id.* ¶ 7. But Asbury Park—whose brief Belmar incorporates by reference—says the opposite: "It appears that officers from Asbury Park, *Belmar*, and Monmouth County Sheriff's Department officers [sic] were present," Asbury Park Br. at 5. Likewise, Mr. Martínez has plausibly alleged Belmar's involvement throughout the evening, including at the time of his initial arrest—when officers whose employers are "suspected to be

Asbury Park, *Belmar*, and/or the Monmouth County Sheriff's Office[] were passing nearby, but failed to intervene." ¶ 30. With such allegations that Belmar officers were involved in Mr. Martínez's arrest, Mr. Martínez's claim against Belmar must proceed. Chief Scott's Certification simply emphasizes that there is a factual dispute as to the involvement of Belmar's officers at the time of Mr. Martínez's arrest—a dispute that cannot be resolved at this stage.

If the certification is considered, then Belmar's motion should be converted to one for summary judgment, and the Court should order discovery. In particular, Mr. Martínez would require discovery into the following topics, at a minimum, to respond to Belmar's motion:

- The roles and responsibilities of the Belmar Police Department at the protest;
- The identities of any Belmar Police Department officers who were involved in or witnessed Mr. Martínez's arrest, transportation, or detention;
- Any Belmar Police Department policies, practices, or training materials related to the detention of individuals arrested by other police departments, such as Asbury Park;
- Any Belmar Police Department policies, practices, or training materials related to the arrest or detention of journalists, including with respect to public protests.

To that end, proposed interrogatories and requests for the production of documents are attached.

Belmar's only other argument, beyond those asserted by other Defendants, is that Mr. Martínez's claim should be dismissed pursuant to the New Jersey Tort Claims Act, because that statute precludes vicarious liability. Belmar Br. at 7–8. But Mr. Martínez's claims are not premised on a theory of vicarious liability, so Belmar's arguments are irrelevant to its motion.

*     *     *

Mr. Martínez has adequately stated a municipal liability claim against each of the three Municipal Defendants, and their motions to dismiss Count 6 should be denied.

## II.     Savastano Is Not Entitled To Qualified Immunity.

Mr. Martínez claims that two named Asbury Park police officers used excessive force in

his arrest. One of them, Daniel Savastano, has moved to dismiss on the basis of qualified immunity.

"In the familiar qualified immunity analysis, the court asks (1) whether the officer violated a constitutional right, and (2) whether the right was clearly established, such that it would have been clear to a reasonable officer that his conduct was unlawful." *El v. City of Pittsburgh*, 975 F.3d 327, 334 (3d Cir. 2020). "The court may address the steps in either order." *Id.* "To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable." *Adams v. City of Atl. City*, 294 F. Supp. 3d 283, 294 (D.N.J. 2018). "[R]easonableness under the Fourth Amendment should frequently remain a question for the jury." *Abraham v. Raso*, 183 F.3d 279, 290 (3d Cir. 1999). Importantly, an officer is not entitled to qualified immunity for applying "physical force" where, as here, "the danger to the police and the community was virtually nil." *El*, 975 F.3d at 341–42.

### A.    Savastano Violated Mr. Martínez's Fourth Amendment Rights.

Under the circumstances alleged, Savastano's use of force was unreasonable as a matter of law. After officers had tackled Mr. Martínez, Savastano pinned him to the ground and forcibly held him there, handcuffing him while ignoring Mr. Martínez's self-identification as a reporter. *See* ¶¶ 3–4, 29, 76. "[T]here was no serious crime, no immediate safety threat, and no resistance or flight." *El*, 975 F.3d at 341. Just the opposite: Mr. Martínez was "retreating" and "walking backwards" in the direction officers were directing the crowd when officers tackled him and Savastano restrained and handcuffed him. ¶¶ 3, 28. Nothing indicated that Mr. Martínez was "violent or dangerous" or "may be armed," and as the video footage reveals, Mr. Martínez was the sole individual "with whom [Savastano was required to] contend at one time." *El*, 975 F.3d at 336–37. (Indeed, the video shows there were at least five officers there to assist Savastano in his arrest of Mr. Martínez.)  "[I]n light of the facts and circumstances confronting" him—a journalist reporting the news without any possible or actual wrongdoing—Savastano acted in a matter that

was not "objectively reasonable." *Graham v. Connor*, 490 U.S. 386, 397 (1989); *see, e.g.*, *May v. Sanna*, 2012 WL 1067686, at *6 (D.N.J. Mar. 29, 2012) (finding issue of material fact as to excessive use of force where officers "chest-bumped" and "pushed backwards" a plaintiff who was "standing still" and "posed no threat" as he turned to leave lawfully); *Bauer v. Norris*, 713 F.2d 408, 412 (8th Cir. 1983) (holding that "*any* use of force" was unreasonable given "scant, if any, evidence to suggest . . . that [the officer] suspected the [plaintiffs] of committing any crime" and "no evidence" that plaintiff was "engaged in any wrongful conduct").[12]

To avoid this conclusion, Asbury Park ignores the rule to "construe [the facts] in the light most favorable to [Mr. Martínez], and draw all reasonable inferences in [his] favor" at this stage. *Starnes*, 971 F.3d at 422. For example, Asbury Park asserts in conclusory terms that Savastano was "[m]erely helping one officer handcuff Mr. Martínez." Asbury Park Br. at 18. But Mr. Martínez alleges more:  as Mr. Martínez explains, Savastano handcuffed him when he was *already* on the ground, after telling reporters "I'm a reporter" and after officers had already tackled him, slapped away his phone, and exclaimed "Shut your mouth" and "F---ers!" ¶ 29. And contrary to Asbury Park's assertions, Mr. Martínez was not "a suspect," Asbury Park Br. at 18—he was simply a credentialed journalist doing his job, which he confirmed to officers the moment before Savastano handcuffed him on the ground, ¶¶ 28–29. Indeed, Asbury Park nowhere claims that Savastano "suspect[ed]" Mr. Martínez of any crime at all. *See* Asbury Park Br. at 17–20.[13]

---

[12]  Asbury Park's suggestion that the absence of any serious injury defeats Mr. Martínez's excessive force claim is incorrect as a matter of well-settled law. *See, e.g.*, *Sharrar v. Felsing*, 128 F.3d 810, 822 (3d Cir. 1997) ("We do not agree that the absence of physical injury necessarily signifies that the force has not been excessive[.]").

[13]  A number of actions attributed to John Doe officers on the scene—such as slapping away Mr. Martínez's phone and attempting to silence him when told "I'm a reporter"—may ultimately be attributed to Savastano. ¶¶ 29, 76; Ex. E. At this preliminary stage, dismissing Savastano—without determining whether he was responsible for any of these actions—is premature.

24

Finally, Asbury Park's reliance upon two cases for the proposition that an officer may apply force even when an "arrest was allegedly unjustified" is misplaced. *See* Asbury Park Br. at 18–19 (citing *County of Los Angeles v. Mendez*, 137 S. Ct. 1539 (2017) and *Bodine v. Warwick*, 72 F.3d 393 (3d Cir. 1995)). The *Mendez* court considered officers' use of force against a plaintiff whom they believed "was holding a firearm rifle threatening their lives," 137 S. Ct. 1545—a far cry from the retreating, unarmed Mr. Martínez, ¶ 3. And whereas the initial seizure at issue in *Mendez* was "reasonable," *see* 137 S. Ct. at 1544–46, Mr. Martínez claims his arrest was unreasonable and in violation of the Fourth Amendment, ¶¶ 69–78. Further, *Bodine* is distinguishable on its facts:  it involved a plaintiff who was believed to be "violent" and resisted communicating with police, *see* 72 F.3d at 394–96, again unlike Mr. Martínez, who was walking backwards and peacefully conveyed to officers that he was "a reporter," ¶¶ 28–29. Mr. Martínez has plausibly alleged that Savastano's conduct constitutes more force than was reasonable in the face of an unarmed, cooperative man walking backwards, who was not suspected of any crime.

### B.    Mr. Martínez's Rights Were Clearly Established.

At the time of Mr. Martínez's arrest, the law was clear that "an unarmed individual who is not suspected of a serious crime . . . has the right not to be subjected to physical force such as being grabbed, dragged, or taken down." *El*, 975 F.3d at 340. Indeed, more than a decade *before* Mr. Martínez's arrest, "the law was clear that an officer may not assault an individual without provocation." *May*, 2012 WL 1067686, at *8 (D.N.J. Mar. 29, 2012) (addressing clearly established law as of July 2007). But here, Savastano pinned and handcuffed Mr. Martínez on the ground "without any apparent provocation," ¶ 3—"subject[ing] [Mr. Martínez] to physical force," even though he was "unarmed" and "not suspected of any serious crime," *El*, 975 F.3d at 340 (denying qualified immunity even where suspect was believed to be "uncooperative," and to possess "synthetic marijuana," neither of which is true here). The Third Circuit has held that clearly

established law does not permit officers to apply such "physical force" even when an individual "is verbally uncooperative or passively rest[ing] the police," *id.*—and here, Mr. Martínez did not resist at all, ¶ 3. "Viewing the facts in the light most favorable to [Mr. Martínez]," Savastano's use of force violated Mr. Martínez's clearly established Fourth Amendment right, as "the danger [Mr. Martínez posed] to the police and the community was virtually nil." *El*, 975 F.3d at 342.

## III.   Mr. Martínez Has Stated A Failure-To-Intervene Claim.

Defendants Bercovicz and Bacon move to dismiss the failure-to-intervene claim against them on the basis that Mr. Martínez's claim is based on their *inaction* rather than affirmative actions. *See* ¶¶ 79–82.[14] However, "[i]t is widely recognized that all law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence," and inaction in the face of this duty is actionable as a matter of law. *Anderson v. Branen*, 17 F.3d 552, 557 (2d Cir. 1994); *accord Smith v. Mensinger*, 293 F.3d 641, 650 (3d Cir. 2002) (holding that a police officer who "fails or refuses to intervene when a constitutional violation . . . takes place in his presence . . . is directly liable"). "To state a claim for failure to intervene, a plaintiff must demonstrate that defendants: (1) observed or had knowledge that a constitutional violation was taking place, yet failed to intervene; and (2) had a reasonable and realistic opportunity to intervene." *Pinkston v. City of Jersey City*, 2020 WL 4251485, at *8 (D.N.J. July 24, 2020). Mr. Martínez has done so.

***First***, both Bercovicz and Bacon observed the First and Fourth Amendment violations that other Defendants, including Whitley, undisputedly inflicted in Mr. Martínez's arrest. In particular, Mr. Martínez alleges that Bercovicz and Bacon were present, observed, and did not intervene when Defendant Whitley "tackled [Mr. Martínez] from the side" while Mr. Martínez was recording two

---

[14]  Neither Bacon nor Bercovicz asserts qualified immunity. *See* Asbury Park Br. at 15–16.

teenagers' interactions with the police. ¶ 29. Moreover, as captured in body-worn camera footage, Mr. Martínez announced to officers "I'm a reporter"—all while officers attempted to silence him for recording and reporting on their actions. ¶ 29; *see* Ex. E. Despite observing these constitutional deprivations, neither officer even attempted to intervene. And it was Bercovicz himself who ultimately signed Mr. Martínez's Complaint-Summons, certifying that Mr. Martínez "knowingly, purposely fail[ed] to obey an order to disperse." ¶ 37, Ex. C.[15]  Having signed a certification as to the alleged basis for Mr. Martínez's arrest, Bercovicz may not now claim that he "merely 'observed an arrest.'" Asbury Park Br. at 16; *see, e.g.*, *Williams v. Fields*, 535 F. App'x 205, 210 (3d Cir. 2013) (reversing judgment in favor of officer where jury could reasonably infer corrections officer "must have seen" incident); *Pinkston*, 2020 WL 4251485, at *8 (finding sufficient allegations that the "[o]bserving [o]fficers were present when the violation[s] took place and—despite the reasonable opportunity—did not intervene").

**Second**, Mr. Martínez has alleged that Bercovicz and Bacon had a realistic opportunity to intervene, and "[w]hether the officer had a 'realistic opportunity' to intervene is normally a question for the jury." *Terebesi v. Torreso*, 764 F.3d 217, 244 (2d Cir. 2014). So it should be here. As body-worn camera footage reveals, Bacon and Bercovicz stood in close proximity—no more than five feet away—as Whitley, Savastano, and other as-yet unnamed officers tackled Mr. Martínez to the ground. Ex. E at 0:00–0:24; *see Torres v. Allentown Police Dep't*, 2016 WL 5404476, at *6 (E.D. Pa. Sept. 27, 2016) (reasonable jury could find officer liable for failure to intervene, where officer stood "approximately 15 to 20 feet from where plaintiff was handcuffed").

---

[15]  Courts in the Third Circuit have observed that "although legally distinct, the fate of [a] plaintiff's failure to intervene claim is closely linked to that of the excessive force claim since, by definition, if there was no excessive force then there can be no failure to intervene." *Lora-Pena v. Denney*, 760 F. Supp. 2d 458, 468 (D. Del. 2011). With no dispute that Mr. Martínez's excessive force claim will proceed, his "closely linked" claim for failure to intervene should proceed as well.

At this close proximity, "[n]othing in the record suggests that they would have for any reason found it difficult to reach" Mr. Martínez, or "communicate with the officer who committed the assault" —yet "both officers sat passively through the entire event." *Figueroa v. Mazza*, 825 F.3d 89, 108 (2d Cir. 2016). Neither Bacon nor Bercovicz identifies any "obstacles that might have hindered his ability to intercede," and the video recording reveals none. *Id.*; *see* Ex. E at 0:15–0:27. Moreover, Mr. Martínez made his plea—"I'm a reporter"—to all officers in the vicinity, and there is no claim that Bacon or Bercovicz failed to hear him. *See, e.g.*, *Saheed v. City of New York*, 2020 WL 1644006, at *16 (S.D.N.Y. Apr. 2, 2020) (finding issues of fact as to officers' failure to intervene, where plaintiff "made his requests . . . known" to officers, but "neither of them responded to his request"). And "[a]lthough the altercation was brief, there is no 'hard-and-fast temporal cutoff' for what constitutes adequate time to intervene." *Ekukpe v. Santiago*, 823 F. App'x 25, 32 (2d Cir. 2020) (jury could find officer had reasonable opportunity to intervene where "incident lasted less than fifty seconds"); *see also, e.g.*, *Figueroa*, 825 F.3d at 107–08 (incident "lasted less than twenty seconds"); *Torres*, 2016 WL 5404476, at *6 (same where incident lasted "somewhere between thirty seconds and approximately five minutes"). Under these circumstances, Bacon and Bercovicz had more than enough opportunity to intervene, and their failure to do so precludes dismissal of Mr. Martínez's claim.

## IV.   Asbury Park's Challenge To Mr. Martínez's Request For Injunctive Relief Is Premature and Meritless.

Asbury Park devotes a considerable portion of its brief to arguing that Mr. Martínez may not seek injunctive relief, relying almost exclusively upon *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). *See* Asbury Park Br. at 7–10. As a threshold matter, it is surprising that Asbury Park would oppose a request for an injunction requiring its officers to respect Mr. Martínez's constitutional rights—surely, in that respect, one would think the parties' interests aligned. But

this argument is also wrong on the law:  it is premature at the motion-to-dismiss stage and may be rejected on that basis alone, but it fails on the merits in any event.

At the Rule 12 stage, it is well settled that a "district court should not dismiss a claim for injunctive relief at this early stage of the proceedings." *United States v. Nobel Learning Cmtys.*, 2018 WL 2134034, at *7 (D.N.J. May 9, 2018). That is because "[t]he test of the complaint upon a motion to dismiss lies in the claim not in the demand," and "[t]he only issue is whether the claim stated would give the plaintiff a right to *any* relief, not to the particular relief he demands." *Benhur v. Madavaram*, 2015 WL 6739109, at *6 (D.N.J. Nov. 2, 2015) (Thompson, J.). For that reason, courts in the Third Circuit have rejected the argument—advanced here—that *Lyons* permits courts to conclude "at this nascent stage of the proceedings that [a plaintiff] lacks standing to assert his claims for prospective relief." *McBride v. Cahoone*, 820 F. Supp. 2d 623, 633 (E.D. Pa. 2011). With no finding of liability, Asbury Park's claim that Mr. Martínez may not seek injunctive relief is not cognizable. *See, e.g.*, *Nobel Learning Cmtys.*, 2018 WL 2134034, at *7; *Benhur*, 2015 WL 6739109, at *6; *Lawn v. Enhanced Serv. Billing, Inc.*, 2010 WL 2773377, at *6 (E.D. Pa. July 13, 2010) (denying request to "dismiss Plaintiff's claim for injunctive relief," as the "Court will address the issue of remedies, including the possibility of injunctive relief, if there is a finding of liability"); *In re K–Dur Antitrust Litig.*, 338 F. Supp. 2d 517, 550 (D.N.J. 2004) ("[W]hile this Court may ultimately agree with Defendants that claims for injunctive relief are inappropriate, dismissal at this stage of the proceedings would be premature.").

Even if considered on the merits, Asbury Park's argument is unpersuasive. Asbury Park misconstrues the teaching of *Lyons*, in which the Court reasoned that a plaintiff did not have standing to seek an injunction preventing police officers from using chokeholds—yet made clear that a plaintiff could seek such relief if he alleged "that the City ordered or authorized police

officers to act in such [a] manner." 461 U.S. at 105–106. Here, unlike in *Lyons*, Mr. Martínez alleges the Municipal Defendants "authorized police officers" to act as they did—through their failure to train or supervise officers on interacting with journalists at public protests. *See supra* Part I. Mr. Martínez's unconstitutional arrest and detention were thus the product of policymakers' failure to prepare their officers for the predictable situation they encountered on June 1. Absent injunctive relief, the glaring gaps in training that this incident exposed—and which the New Jersey Attorney General has since acknowledged, ¶ 49—are all but certain to result in further constitutional deprivations.

Finally, the "*Lyons* standing rule" does not bar injunctive relief where plaintiffs can show "they are likely to have another encounter with the [defendants]." *Edelglass v. New Jersey*, 2015 WL 225810, at *12 (D.N.J. Jan. 16, 2015). That is the case here:  Mr. Martínez remains a journalist for the Asbury Park Press, where he will almost certainly encounter members of the Municipal Defendants' police. To do his job free of harassment and with his constitutional rights intact, Mr. Martínez requires injunctive relief, and *Lyons* does not counsel otherwise.[16]

## CONCLUSION

For the foregoing reasons, Defendants' Rule 12 motions should all be denied.

---

[16]  For the same reasons that its motion to dismiss Mr. Martínez's federal constitutional claims fail, Asbury Park's challenge to his New Jersey constitutional claims fail as well. Asbury Park Br. at 21; *see, e.g.*, *Pagan v. Rivera*, 2020 WL 2060274, at *8 (D.N.J. Apr. 29, 2020) ("[T]he NJCRA is construed nearly identically to Section 1983.").

Dated: November 16, 2020
      New York, New York

                     By:  *s/ Stephanie L. Silvano*

<table>
<tr><td>

Goutam U. Jois (N.J. Bar No. 037412007)<br>
SIEGEL TEITELBAUM & EVANS, LLP<br>
260 Madison Avenue, 22nd Floor<br>
New York, NY 10016<br>
(212) 455-0300<br>
gjois@stellp.com

</td><td>

Shireen A. Barday (admitted *pro hac vice*)<br>
Stephanie L. Silvano (N.J. Bar No. 168182016)<br>
Patrick J. Hayden (admitted *pro hac vice*)<br>
GIBSON, DUNN & CRUTCHER LLP<br>
200 Park Avenue<br>
New York, NY 10166<br>
(212) 351-2621<br>
SBarday@gibsondunn.com<br>
SSilvano@gibsondunn.com<br>
PHayden@gibsondunn.com

</td></tr>
</table>

*Attorneys for Plaintiff Gustavo Martínez*

31